**United States District Court**
**Southern District Of New York**

Arthur Angermeir, Nitesh Bhagwanani, Becky D.
Glynn, Louis Marrou, and Shiva Nancy Shabnam,

}
}
}
}

**12 CIV 0055**

No.

Plaintiffs

}
}
}

v.

}
}

Jay Cohen, Leonard Mezei, Sara Krieger, Louis
Cucinotta, Lease Finance Group, LLC, MBF Leasing
LLC, and Northern Leasing Systems, Inc.,

}
}
}
}
}

**COMPLAINT**

**JURY TRIAL DEMANDED**

Defendants

}
}
}

## Nature of the Action

1.  This action arises out of defendants' racketeering scheme to intimidate out-of-state individuals into paying unwarranted sums of money by commencing fraudulent lawsuits in New York City Civil Court for relatively small sums of money, typically under $10,000. Defendants were aware well before bringing such actions that the documents underlying Defendants' claims against Plaintiffs were forged and/or that Defendants never had a claim. Nevertheless, Defendants persisted in these small claims proceedings - and even obtained fraudulent default judgments - in order to harass, intimidate, and thereby extort money from Plaintiffs through threats of expensive long-distance litigation, of damage to credit rating, and/or entry of default judgments. On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, and New York's Anti-Deceptive Trade Practices Act, N.Y.G.B.L., §349, and seek

**United States District Court**
**Southern District Of New York**

Arthur Angermeir, Nitesh Bhagwanani, Becky D. Glynn, Louis Marrou, and Shiva Nancy Shabnam,

}
}
}
}

**12 CIV 0055**  No.

Plaintiffs

}
}
}

v.

}
}

Jay Cohen, Leonard Mezei, Sara Krieger, Louis Cucinotta, Lease Finance Group, LLC, MBF Leasing LLC, and Northern Leasing Systems, Inc.,

}
}
}
}
}

**COMPLAINT**

**JURY TRIAL DEMANDED**

Defendants

}
}
}

## Nature of the Action

1. This action arises out of defendants' racketeering scheme to intimidate out-of-state individuals into paying unwarranted sums of money by commencing fraudulent lawsuits in New York City Civil Court for relatively small sums of money, typically under $10,000. Defendants were aware well before bringing such actions that the documents underlying Defendants' claims against Plaintiffs were forged and/or that Defendants never had a claim. Nevertheless, Defendants persisted in these small claims proceedings - and even obtained fraudulent default judgments - in order to harass, intimidate, and thereby extort money from Plaintiffs through threats of expensive long-distance litigation, of damage to credit rating, and/or entry of default judgments. On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, and New York's Anti-Deceptive Trade Practices Act, N.Y.G.B.L., §349, and seek

compensatory, treble and/or punitive damages, together with attorneys' fees and expenses.

## Jurisdiction

2.   Jurisdiction is proper under the federal racketeering statute, 18 U.S.C. §1964(c), and the principles of supplementary jurisdiction, 28 U.S.C. §1367. Defendants conducted a racketeering scheme in interstate commerce, through the use of interstate communication facilities.

## Parties

3.   Mr. Arthur Angermeir is a resident of Newport Beach, California.

4.   Mr. Nitesh Bhagwanani is a resident of San Mateo, California.

5.   Dr. Shiva Nancy Shabnam is a resident of Canoga Park, California.

6.   Mr. Louis Marrou is a resident of Miami, Florida.

7.   Ms. Becky D. Glynn is a resident of San Antonio, TX.

8.   Defendant Jay Cohen is one of the masterminds of the enterprise which is the subject of this action. He is also a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, President and Chief Executive Officer of NLS, an officer of LFG and some of the shell entities through which the enterprise is conducted.

9.   Defendant Leonard Mezei is one of the masterminds of the enterprise which is the subject of this action. He is also a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Chairman of the

Board of NLS and is also an officer of LFG and some of the shell entities through which the enterprise is conducted.

10.     Defendant Sara Krieger is one of its masterminds of the enterprise which is the subject of this action.  She is also a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Vice President for Operations of NLS and an officer of some of the shell entities through which the enterprise is conducted.

11.     Louis Cucinotta is one of its masterminds of the enterprise which is the subject of this action.  He is also a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the enterprise is conducted.

12.     Defendant Northern Leasing Systems, Inc. ("NLS") is a New York corporation with its principal place of business at 132 West 31st Street, New York, New York.

13.     Defendant MBF Leasing LLC ("MBF") is a New York corporation, and a "pass through" entity for NLS.

14.     Defendant Lease Finance Group, LLC ("LFG") is a Delaware company and a "pass through" entity for NLS.

15.     Defendants Cohen, Mezei, Krieger, and Cucinotta ("Individual Defendants") direct and control NLS, LFG, MBF and various shell entities as more fully described below.  Through the corporate defendants and other shell entities, the Individual Defendants are ostensibly engaged in the business of equipment

finance leasing. The Individual Defendants worked in concert to cause the racketeering enterprise at issue to engage in the misconduct described in this complaint. In particular, the Individual Defendants each directed NLS, LFG, LSI, MBF, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the NLS, LFG, LSI, MBF, shell entities, and certain other members of the scheme as more fully described below, to consummate the unlawful transactions described herein, and to attempt to enforce non-existent leases against Plaintiffs through a misuse of New York's judicial system. The Individual Defendants have all profited personally from those activities.

### Factual Allegations

16. This case involves the systematic and repeated manner in which Defendants attempted to and did intimidate individuals located around the country in essentially a "shakedown" effort, in common parlance, to bully them into paying Defendants monies to which Defendants never were entitled. Based on forged documents, <u>which Defendants knew were forged</u>, Defendants sought to intimidate Plaintiffs with dunning letters and phone calls, telling them that it would be more expensive for them to dispute Defendants's claims in New York City Civil Court than it would be to pay off Defendants.

17. Obviously, once Defendants commenced these legal proceedings, Plaintiffs faced significant hurdles to having their day in court, including excessive expenses of long-distance litigation, and multiple trips to New York. The relatively small

amounts at issue would have, as Defendants were well aware, prevented these Plaintiffs from obtaining counsel or from otherwise developing their defense. Further, Plaintiffs' potential witnesses were all in their respective local areas, quite far from the New York City Civil Court. Defendants' entire scheme was designed to ensure that Plaintiffs had no real opportunity to raise defenses to Defendants' bogus lawsuits, so that the entry of a default judgment was all but certain.

18.     As this Court is well aware, once a judgment is entered in the New York City Civil Court, it would be almost impossible for Plaintiffs to challenge Defendants in the subsequent judgment enforcement actions without incurring costs far in excess of the judgment itself. Had Defendants filed the suits in Plaintiffs' home location to enforce their claims, Plaintiffs might have been able to present evidence of what really transpired, either through an attorney or by themselves.

19.     Further, the very entry of judgment in New York City Civil Court is automatically reported as an adverse entry in Plaintiffs' respective personal credit reports. This has significant impact on credit availability to Plaintiffs, including without limitation, denial of credit opportunities, increase in interest rates, and diverse other consequences.

20.     As shown below through the facts of each Plaintiff, the repeated nature of the manner in which Defendants acted and their wrongful behavior set the pattern and practice of a scheme unlawful under both federal and state law.

## Mr. Arthur Angermeir

21. On or about October 7, 2008, Defendants' representative called Mr. Angermeir's business and offered to lease a credit card processing equipment, which he sent to Mr. Angermeir's business. The equipment was returned, unused, to Defendants. Defendants accepted the returned equipment without any objections.

22. Meanwhile, Defendants helped themselves, through electronic deductions from Mr. Angermeir's bank account, for alleged "lease payments."

23. Upon coming to know of this self-help by Defendants, Mr. Angermeir contacted Defendants, who informed him that he had signed two leases with Defendant MBF, and had to pay MBF over $7,600 thereunder.

24. Mr. Angermeir requested copies of the two leases he allegedly signed from MBF.

25. Upon receipt of copies of the two alleged leases from MBF, Mr. Angermeir confirmed that he had never seen those leases before. Mr. Angermeir neither signed nor initialed either of those leases or any of the pages thereon. Mr. Angermeir's signatures and initials were forged on both of these alleged leases.

26. Mr. Angermeir promptly informed Defendants that the leases were forged. Defendants promised to conduct an "investigation."

27. Defendants never bothered conducting any "investigation." Nevertheless, Defendants insisted that the signatures on each of the leases as well as the guarantees were genuine, not forgeries. Defendants then filed their usual lawsuit in the New York City Civil Court, and obtained a default judgment for $4,246.98 against Mr. Angermeir on April 21, 2010.

28. Mr. Angermeir was unaware of the lawsuit as well as the default judgment thereon. He eventually discovered the default judgment while checking his credit report. Thereupon, Mr. Angermeir had to retain attorneys in New York, and incur attorneys' fees and litigation expenses. Eventually, Defendants stipulated to vacate the default judgment and dismiss the complaint.[1]

29. Meanwhile, Defendants had made derogatory entries in Mr. Angermeir's personal credit report. As a result, he suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York.[2] In addition, Mr. Angermeir had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

Mr. Nitesh Bhagwanani

30. On or about October 31, 2008, Defendants' representative approached Mr. Bhagwanani's business to sell credit card processing and check cashing services. Defendants' representative told Mr. Bhagwanani categorically that the equipment for credit card processing would be provided for 90 days on a trial basis, and that Mr. Bhagwanani could cancel the arrangement at any time without penalties.

---

[1]The stipulation is "without prejudice" so that Defendants could commence this bogus lawsuit once again.

[2]Such damages include, for example, increased interest rates on existing debts, loss of promotional opportunities, curtailment and even possible refusal of credit. P. McGeehan, *The Plastic Trap: Soaring Interest Compounds Credit Card Pain for Millions*, N.Y. Times, Nov. 21, 2004, at A1.

Based on these representations, Mr. Bhagwanani signed a one-page document, an alleged equipment finance lease, amongst other documents.

31. Consistent with these representations to Mr. Bhagwanani, the term of the lease and the schedule of payments was left blank, to be filled in after Mr. Bhagwanani's trial period and Mr. Bhagwanani agreed to the transaction.

32. Nevertheless, the very next month, Mr. Bhagwanani noticed that Defendants had debited his account. Mr. Bhagwanani immediately contacted Defendants' representative to inquire about the charges. Defendants' representative stated that the charges were made by mistake and promised to look into it. After several telephone calls from Mr. Bhagwanani, Defendants' representative stopped answering his calls and disappeared without a trace.

33. In order to stop the unauthorized deductions, Mr. Bhagwanani closed the bank account.

34. Mr. Bhagwani informed Defendants that the leases were forged. Defendants promised to conduct an "investigation."

35. Defendants never bothered conducting any "investigation." Nevertheless, Defendants insisted that the signatures on the lease as well as the guarantees were genuine, not forgeries.

36. On or about September 11, 2009, Defendants commenced their usual lawsuit in New York City Civil Court and on March 15, 2010, obtained a default judgment for $6,739.87 against Mr. Bhagwanani.

37.	Mr. Bhagwanani was unaware of the lawsuit and the default judgment until his bank account was frozen.  Thereupon, Mr.  Bhagwanani had to retain attorneys in New York, and incur attorneys' fees and litigation expenses.  On June 20, 2011, the New York City Civil Court vacated the judgment entered against Mr. Bhagwanani and dismissed Defendants' lawsuit.

38.	Meanwhile, Defendants had made derogatory entries in Mr. Bhagwanani's personal credit report.  As a result, he suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York.[3]  In addition, Mr. Bhagwanani had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

Ms. Becky D. Glynn

39.	On or about February 17, 2009, Ms. Glynn received an invoice from Defendants, under the name of MBF, for an alleged lease of a credit card processing machine.  Ms. Glynn had never had any dealings, and indeed, had not even heard about MBF.

40.	Thereupon, Ms. Glynn contacted Defendants through the toll free number on the invoice.  During the telephone conversation, Defendants' representative asserted that Ms. Glynn had signed a lease with MBF.  Ms. Glynn requested a copy of the alleged lease.

---

[3]Such damages include, for example, increased interest rates on existing debts, loss of promotional opportunities, curtailment and even possible refusal of credit.  P. McGeehan, *The Plastic Trap: Soaring Interest Compounds Credit Card Pain for Millions*, N.Y. Times, Nov. 21, 2004, at A1.

41. On February 24, 2009, Defendants faxed a copy of the alleged lease to Ms. Glynn. According to the lease, allegedly signed in 2006, Ms. Glynn was an owner of the Laundromat in Washington, D.C.

42. The alleged lease was a fraudulent document with forged signatures. Ms. Glynn contacted Defendants immediately and advised its representative that she had been a resident of Texas since 1993, and neither owned any business in Washington, D.C., nor signed any equipment leases.

43. Defendants' thereupon demanded that Ms. Glynn send them an affidavit of forgery in Defendants' form, whereupon they would "investigate" the situation.

44. On March 3, 2009, Ms. Glynn filed an ID theft complaint with the San Antonio Police Department, completed the affidavit of forgery requested by Defendants, and mailed it along with a copy of her driver's license to Defendants.

45. Subsequently, Defendants requested additional documents from Ms. Glynn. Defendants demanded that Ms. Glynn send a copy of identification documents to verify her signature and identity. Ms. Glynn promptly sent a copy of her driver's license and other identification documents.

46. For about a year, Ms. Glynn repeatedly contacted Defendants attempting to resolve the fraud and ID theft issue and sending them documents, relying on their promises of a "reasonable investigation." However, Defendants never bothered to conduct any investigation. Ms. Glynn never received any meaningful response – except demands for more documents – from Defendants.

47.    In November 2009, Ms. Glynn began to receive dunning letters from Defendants demanding payments on the forged lease.

48.    On April 21, 2010, Ms. Glynn received a copy of a Summons and Verified Complaint filed by Defendant MBF in the N.Y. City Civil Court demanding $4,620 from her personally.

49.    Promptly, on April 22, 2010, Ms. Glynn contacted Defendants regarding the lawsuit. Defendants' representative informed her that he would expedite her paperwork to accounting in order to determine whether enough evidence was presented to support Ms. Glynn's claim of fraud and ID theft. Defendants' representative also stated that Ms. Glynn should be prepared to either settle, retain a lawyer, or appear herself in New York to answer and defend the lawsuit filed in New York City Civil Court.

50.    Ms. Glynn never heard back from Defendants in response to her complaints about fraud and forgery.

51.    Ms. Glynn had to retain a lawyer and incur legal expenses in New York to avoid the default judgment. That lawsuit has now been stayed upon consent of counsel.

52.    Meanwhile, Defendants had made derogatory entries in Ms. Glynn's personal credit report. As a result, she suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York. In addition, Ms. Glynn had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## Mr. Louis Marrou

53. Mr. Marrou never had any dealings with, and indeed, had never heard about any of the Defendants.

54. In September of 2010, Mr. Marrou started receiving phone calls from Defendants demanding payments for some equipment. Defendants claimed that Mr. Marrou had signed a lease and personal guarantee on behalf of S. Jordan Event Planners, a Decatur, GA, based company.

55. Mr. Marrou had never lived in Georgia, and had not even heard about the alleged company "S. Jordan Event Planners." Assuming this was a genuine mistake on Defendants' part, Mr. Marrou attempted to explain to Defendants' representative that he had neither seen nor signed any lease with NLS, and had never lived in Georgia. NLS's representative then agreed to, and did send, Mr. Marrou a copy of the alleged lease.

56. Upon examining the alleged lease, it was clear that Mr. Marrou's signature was forged. Indeed, the alleged lease reflected "Luis Marron," not Mr. Marrou, as a personal guarantor. Mr. Marrou informed Defendants of these facts by telephone and by mail on several occasions.

57. Nevertheless, Defendants continued to demand the payments for the alleged lease and threatened to commence a lawsuit against Mr. Marrou in New York.

58.     Eventually, on September 26, 2011, NLS commenced a lawsuit in the N.Y. City Civil Court against Mr. Marrou personally. Mr. Marrou had to retain a lawyer and incur litigation expenses and fees therefor.[4]

59.     Meanwhile, Defendants had made derogatory entries in Mr. Marrou's <u>personal</u> credit report. As a result, he suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York. In addition, Mr. Marrou had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

<u>Dr. Shiva Shabnam</u>

60.     Dr. Shabnam had never had any dealings with, and, indeed, had never even heard about Defendants.

61.     In May 2009, Defendants commenced an action against Dr. Shabnam in the New York City Civil Court, County of New York based upon an alleged lease that Dr. Shabnam allegedly signed with LFG. Dr. Shabnam was never served with process and was not aware of the lawsuit. On November 20, 2009, Defendants obtained a default judgment in the amount of $7,365.07 against Dr. Shabnam in the City Civil Court.

62.     Dr. Shabnam was unaware of the lawsuit and the default judgment.

---

[4]By agreement between counsel, that lawsuit has been stayed.

63. Sometime in October of 2010, Dr. Shabnam discovered about the judgment from her credit report. Thereupon, Dr. Shabnam filed an identity theft report with the Los Angeles Police Department on October 29, 2010.

64. Dr. Shabnam contacted Defendants and informed them of the forgery, whereupon Defendants demanded that she submit an affidavit of forgery, and they would then conduct an "investigation."

65. Dr. Shabnam submitted the affidavit of forgery as requested by Defendants. But Defendants never conducted any "investigation". Instead, they flatly told her, "We have an entered judgment and just want to be paid regardless if you owe the debt or not."

66. Left with no choice, on January 24, 2011, Dr. Shabnam moved the N.Y. City Civil Court to vacate that judgment. She had to retain an attorney and incur attorneys' fees and expenses. Defendants simply defaulted on the return date of that motion, and the N.Y. City Civil Court vacated the default judgment and dismissed Defendants' complaint with prejudice.

67. Meanwhile, Defendants had made derogatory entries in Ms. Shabnam's personal credit report. As a result, she suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York. In addition, Dr. Shabnam had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## COUNT I

## (RICO, 18 U.S.C. §1962(c))

68.    The contents of the above paragraphs are incorporated herein by reference as if
       fully set forth herein.

69.    The association of Defendants, certain attorneys retained by Defendants,
       salesmen and others whose identities are known only to Defendants at this time
       (cumulatively, the "Conspirators"), constituted an enterprise within the meaning
       of 18 U.S.C. §1961(c), which enterprise was engaged in, and whose activities
       affected, interstate and foreign commerce.  This enterprise was continuous in that
       it lasted for more than two years, had an ascertainable structure, and was distinct
       from the predicate offenses alleged here.

70.    Each Defendant is a person within the meaning of 18 U.S.C. §1961(3) and
       separate from the enterprise.

71.    Defendant Cohen, the President of the Defendant Northern Leasing and officer of
       some of the other related corporate enterprises, was in charge of all its
       operations.  As such, he was one of the masterminds of the enterprise who set up,
       orchestrated, and supervised the entire racketeering scheme at issue.

72.    Defendant Mezei is the Chairman of the Board of Defendant Northern Leasing,
       and an officer of some of the other related corporate enterprises.  As such, he was
       one of the masterminds of the enterprise who set up, orchestrated, and
       supervised the entire racketeering scheme at issue.

73. Defendant Krieger, the Vice President for Operations of the Defendant Northern Leasing, and an officer of some of the other related corporate enterprises, was responsible for several aspects of its day-to-day operations and sales. In addition, until recently, she routinely verified most of the fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

74. Defendant Cucinotta, the Legal Collections Manager for the corporate Defendants, and an officer of some of the other related corporate enterprises, was responsible for collection aspects of the enterprise. He routinely verified many fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

75. Defendants' *scienter* is clearly established from their pattern and practices at issue. Moreover, Defendants continued repeating these false statements nonchalantly.

76. Defendants participated, and conspired with others (including their attorneys and others whose identities are known only to Defendants at this time) to participate, in the affairs of the aforementioned enterprise through a pattern of racketeering activity, as more fully set forth below, an all in violation of 18 U.S.C. §§ 1962(c)).

Mail Fraud, Violations of 18 U.S.C. §1341

77. Defendants and the other members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises,

for the purpose of executing such scheme or artifice or attempting so to do, placed in post office(s) or authorized depository for mail matter, several letters and/or packages to be sent or delivered by the Postal Service, and/or took or received therefrom, letters and/or packages, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it was directed to be delivered by the addressee such letters and/or packages. Specifically,

a.     On or about February 17, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Glynn in Texas;

b.     On or about February 24, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Glynn in Texas;

c.     On or about May 6, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Glynn in Texas;

d.     On or about November 4, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Glynn in Texas;

e.     On or about November 9, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Glynn in Texas;

f.     On or about November 11, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Glynn in Texas;

g.     On or about November 10, 2010, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Marrou in Florida;

h.   On or about April 5, 2011, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Marrou in Florida, requiring him to appear in New York in connection with Defendants' bogus lawsuit;

i.   On or about June 27, 2011, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Marrou in Florida;

j.   On or about October 18, 2011, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Marrou in Florida;

k.   On or about November 4, 2011, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Marrou in Florida, requiring him to appear in New York in connection with Defendants' bogus lawsuit;

l.   On or about April 9, 2009, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Bhagwanani in California;

m.   On or about December 9, 2010, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Bhagwanani in California;

n.   On or about June 15, 2009, Defendants in New York, through the use of interstate mail, mailed the summons and complaint ostensibly to Dr. Shabnam in California;

o.   On or about July 24, 2009, Defendants in New York, through the use of interstate mail, mailed another copy of the summons and complaint ostensibly to Dr. Shabnam in California;

p.   On or about April 1, 2010, Defendants in New York, through the use of interstate mail, mailed an "Advice of Judgment" to Dr. Shabnam in California;

q.   On or about November 29, 2010, Dr. Shabnam in California mailed a letter to the New York City Civil Court in New York;

r.   On or about November 29, 2010, Dr. Shabnam in California mailed a letter to Defendants in New York;

s.   On or about February 22, 2011, Dr. Shabnam in California mailed the signed order to show cause with supporting papers to Defendants in New York;

t.   On or about November 10, 2009, Defendants in New York caused the mailing of a summons and complaint to Mr. Angemeir in California;

u.   On or about November 17, 2009, Defendants in New York caused the mailing of another copy of the summons and complaint to Mr. Angemeir in California;

v.   On or about December 15, 2009, Defendants in New York caused the mailing of another copy of the summons and complaint to Mr. Angemeir in California;

w.   On or about January 28, 2011, Defendants in New York caused the mailing of an order to show cause by Mr. Angermeir in California to Defendants in New York.

78. Each participant knew, expected, reasonably foresaw, and intended that the facilities of interstate mail would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

79. The Conspirators, wilfully and with intent to mislead, concealed the material facts from the New York City Civil Court and from Plaintiffs as referred to above.

80. The material misrepresentations were made by Conspirators to the New York City Civil Court concerning Plaintiffs, and to Plaintiffs, Dr. Shabnam in California, Mr. Angermeir in California, Mr. Bhagwanani in California, Mr. Marrou in Florida, and Ms. Glynn in Texas.

81. The New York City Civil Court, and Plaintiffs, relied upon Defendants' misrepresentations, and such reliance was reasonable.

82. Defendants' perjurious misconduct was a fraud on the court and on Plaintiffs.

Wire Fraud, Violations of 18 U.S.C. §1343

83. Defendants and the other Members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, transmitted by means of interstate wire directives to various Automated Clearing Houses to deduct monies from accounts of lessees that Defendants knew they were not entitled to. In all, numerous of separate occurrences of wire fraud took place. For example,

a.     On or about November 13, 2008, Defendants in New York, through the use of interstate wires, made a telephone call to Mr. Bhagwanani;

b.     On or about November 21, 2008, Defendants in New York, through the use of interstate wires, made a telephone call to Mr. Bhagwanani;

c.     On or about January 1, 2009, Defendants in New York, through the use of interstate wires, made a telephone call to Mr. Bhagwanani;

d.     On or about September 7, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Marrou from Experian, a credit reporting agency, outside New York State;

e.     On or about October 14, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Marrou from Experian, a credit reporting agency, outside New York State;

f.     On or about March 21, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Marrou from Experian, a credit reporting agency, outside New York State;

g.     On or about May 22, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

h.  On or about June 14, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

i.  On or about July 14, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

j.  On or about August 20, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

k.  On or about September 20, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

l.  On or about October 20, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

m.  On or about December 1, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit

report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

n.　On or about February 3, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

o.　On or about February 5, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State

p.　On or about October 2, 2008, Defendants, through the use of interstate wires, faxed a copy of the alleged Form Lease to Mr. Angermeir in California;

q.　On or about November 20, 2008, Defendants, through the use of interstate wires, faxed a copy of the alleged Form Lease to Mr. Angermeir in California;

84.　Defendants, in the same manner through the use of interstate wires, made dunning telephone calls to abuse, intimidate, and threaten Plaintiffs on numerous other occasions. The details of each of these phone calls is readily available from Defendants' records and recordings.

85.　Each participant knew, expected, reasonably foresaw, and intended that the facilities of the interstate wires affecting interstate commerce would be used in

furtherance of the racketeering scheme, and that such use was an essential *part of* the scheme.

86. The Conspirators wilfully and with intent to mislead concealed material facts, and made affirmative misrepresentations of material facts to Plaintiffs.

87. Plaintiffs relied upon Defendants' misrepresentations, and such reliance was reasonable.

Extortion Under The Hobbs Act, 18 U.S.C. §1951

88. Defendants had and implemented a practice and pattern of starting bogus legal proceedings based on false representations, and solely for the purpose of injuring Plaintiffs and recovering unwarranted sums through extortion.

89. For this purpose, Defendants affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

a. Ms. Glynn "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF;

b. Ms. Glynn "entered into an Equipment Finance Lease" with MBF and "personally guaranteed" payments under the lease;

c. Ms. Glynn "consent[ed]" to litigation in New York;

d. There was "presently due and owing" from Ms. Glynn to MBF the sum of $3,850.00 with interest thereon from August 1, 2009;

e. There "is due and owing" from Ms. Glynn to MBF attorneys' fees in the sum of $770.00;

90.  Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

a.  Mr. Angermeir "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF;

b.  Mr. Angermeir "entered into an Equipment Finance Lease" with MBF and "personally guaranteed" payments under the lease;

c.  Mr. Angermeir "consent[ed]" to litigation in New York;

d.  There was "presently due and owing" from Mr. Angermeir to MBF the sum of $3,680.00 with interest thereon from February 1, 2009;

e.  There "is due and owing" from Mr. Angermeir to MBF attorneys' fees in the sum of $736.00.

91.  Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

a.  Dr. Shabnam "unconditionally guaranteed all of the Lessee's obligations to" Defendant LFG;

b.  Dr. Shabnam "entered into an Equipment Finance Lease" with LFG and "personally guaranteed" payments under the lease;

c.  Dr. Shabnam "consent[ed]" to litigation in New York;

d.  There was "presently due and owing" from Dr. Shabnam to LFG the sum of $6,348.00 with interest thereon from June 16, 2008;

e.  There "is due and owing" from Dr. Shabnam to LFG attorneys' fees in the sum of $1,269.60.

92. Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

   a. Mr. Marrou "unconditionally guaranteed all of the Lessee's obligations to" Defendant NLS;

   b. Mr. Marrou "entered into an Equipment Finance Lease" with NLS and "personally guaranteed" payments under the lease;

   c. Mr. Marrou "consent[ed]" to litigation in New York;

   d. There was "presently due and owing" from Mr. Marrou to NLS the sum of $7,003.00 with interest thereon from October 1, 2010;

   e. There "is due and owing" from Mr. Marrou to NLS' attorneys' fees in the sum of $1,400.60.

93. Defendants similarly affirmatively misrepresented in filings with the City Civil Court in New York, under penalties of perjury, that

   a. Mr. Bhagwanani "unconditionally guaranteed all of the Lessee's obligations to" Defendant NLS;

   b. Mr. Bhagwanani "entered into an Equipment Finance Lease" with NLS and "personally guaranteed" payments under the lease;

   c. Mr. Bhagwanani "consent[ed]" to litigation in New York;

   d. There was "presently due and owing" from Mr. Bhagwanani to NLS the sum of $5,934.00 with interest thereon from January 1, 2009;

   e. There "is due and owing" from Mr. Bhagwanani to NLS' attorneys' fees in the sum of $1,860.80.

94. Defendants knew, and should have known, that the above representations were false when made. Defendants' knowing fraud upon, and/or their intentional misrepresentations to, the Court deprived the litigation of its legitimacy.

95. Nevertheless, Defendants commenced actions in The New York City Civil Court with the aforesaid false statements. Based upon such actions, they attempted to extort undeserved sums of money from Plaintiffs.

96. Thereby, Defendants used wrongful means for a wrongful objective, with an intent to obtain that which in justice and equity Defendants were not entitled to, and knew that they were not entitled to, receive.

97. Defendants affected interstate commerce by extortion and/or attempted or conspired so to do.

98. Defendants attempted to extort property from each Plaintiff, with each Plaintiff's consent, induced by wrongful use of actual or threatened fear of economic loss and/or injury. Such loss or injury included, without limitation, legal expenses in long-distance litigation, damage to credit rating, and/or entry of default judgments which could remain valid and enforceable for upto 20 years.

Extortion Under New York Law

99. Plaintiffs incorporate the aforesaid allegations herein by reference.

100. Defendants intended to deprive Plaintiffs of property or to appropriate the same to themselves. They wrongfully took or obtained, or attempted to take or obtain, such property from each Plaintiff.

101. Defendants wrongfully attempted to take such property by compelling or inducing Plaintiffs and other persons to deliver such property to Defendants. They did so by attempting to induce a fear that, if the property is not so delivered, Defendants would cause damage to Plaintiffs' property, or engage in other conduct constituting a crime, or testify or provide false information with respect to Defendants' legal claim.

102. Thereby, Defendants committed the offense of extortion under New York's Extortion Act, N.Y. Penal Law, §155.05.

103. Defendants' extortions are chargeable under New York law and punishable by imprisonment for more than one year. As such, they constitute predicate racketeering acts under 18 U.S.C. §1961.

Pattern of Racketeering Activity

104. The aforesaid acts had the same or similar purposes, results, participants, victims, and/or methods of commission, and were otherwise interrelated by distinguishing characteristics and were not isolated events. The pattern of racketeering activity engaged in by Defendants consisted of a scheme executed by the aforementioned conspirators from January 1998, and continuing to date, to extort and collect unwarranted sums through litigation based on perjurious averments or threats thereof. That pattern included multiple predicate acts of extortion.

105. The racketeering acts identified hereinabove were related to one another and formed a pattern of racketeering activity in that they: (a) were in furtherance of a

common goal, including the goal of profiting illegally by improperly commencing or threatening fraudulent litigation; (b) used similar methods and standard form letters to intimidate; (c) had similar participants; and (d) had similar victims.

106. The acts of racketeering activity extended over a substantial period of time from January 1998, and continue to this day. They were sufficiently continuous to form a pattern of racketeering activity.

107. Defendants participated in the scheme through themselves, and, in the case of the corporate Defendants, their representatives, salesmen, employees and officers, and others whose identities are known only to Defendants at this time. Defendants benefitted enormously by the profits they made from the scheme, and the various amounts collected unlawfully. The Conspirators knew, enabled, and actively participated in the racketeering scheme.

108. Defendants engaged in a pattern of racketeering activity consisting of extortion. The predicate acts occurred over a period of well over 6 years. Defendants received income from these patterns in the form of unwarranted payments. Defendants disbursed these funds amongst themselves in a manner known only to them.

109. Each Defendant's participation was critical to the racketeering scheme. Each Defendant enabled, conducted, maintained, aided, and abetted the racketeering scheme by:

   a.    Drafting and preparing letters, "Important Notices," Verified Complaints, false affidavits, and other documents;

b.  Supervising, conducting, and monitoring the conduct of the fraudulent scheme;

c.  Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

d.  encouraging third parties to participate in the racketeering scheme;

e.  wilfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering, and the misuse of the judicial system;

f.  Wilfully violating or being recklessly indifferent to their legal obligations to verify the legality of the alleged lease agreements to ensure that they were not fraudulently procured; and

g.  Wilfully violating or being recklessly indifferent to their legal obligations to conduct "due diligence" with respect to the accounts at issue.

110. The precise role played by each Defendant is known only to Defendants at this time. Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of Defendants.

111. Plaintiffs have been injured in their business or property by reason of Defendants' violation of 18 U.S.C. §1962(c). As a direct and proximate result of these violations, Plaintiffs have been injured in that, inter alia, they had to waste time and resources in responding to Defendants's dunning calls, threats, lawsuit in New York, retaining lawyers and incurring legal expenses therefor. In addition,

Plaintiffs' credit rating has also been adversely affected, and they have suffered damages as a consequence as detailed above.

112. By reason of this violation of 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from Defendants three times their damages plus pre- and post- judgment interest, costs and attorneys' fees.

## COUNT II

(Violation of 18 U.S.C. § 1962(d))

113. The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

114. In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants at this time conspired to violate the provisions of 18 U.S.C. §1962(c) in that, beginning no later than January 1998 and continuing through today, they knowingly agreed and conspired to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above. The volume and frequency of the transactions, and the continuance of the scheme at issue for over 12 years, could not have occurred without the consent and knowing connivance of Defendants and other Conspirators.

115. As part of and in furtherance of their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each Defendant agreed to and

did commit at least two predicate acts of racketeering. Further, each Defendant's actions are attributable to the other Defendants.

116. None of the Defendants have withdrawn, or otherwise dissociated themselves from the conspiracy at issue or the other Conspirators. Defendants have also continued filing of perjurious affidavits under oath, abundantly showing the continuance of this conspiracy till today.

117. Plaintiffs have been injured in business or property by reason of Defendant's violations of 18 U.S.C. S 1962(d).

118. As a direct and proximate result of each Defendant's violations, Plaintiffs have been injured as aforesaid.

119. By reason of Defendants's violation of 18 U.S.C. §1964(d), Plaintiffs are entitled to three times their damages plus interest, costs and attorneys' fees.

## COUNT III

### (N.Y. General Business Law Article 22-A)

120. Plaintiffs incorporate the contents of the paragraphs hereinabove.

121. None of the Plaintiffs had any commercial or other relationship with Defendants or any of them. None of the Plaintiffs signed any lease with Defendants or any of them. None of the Plaintiffs sought any of Defendants' alleged products or services for any purpose whatsoever. Plaintiffs were ordinary citizens and as such, "consumers" for purposes of consumer protection statutes.

122. Further, Defendants nonchalantly misused the court system of the State of New York and the City of New York, and routinely made false and baseless statements

## Jury Demand

125.   Plaintiffs demand a trial by jury.

WHEREFORE, Plaintiffs demand judgment against Defendants on each

Count aforesaid:

a.   awarding compensatory, punitive, and/or treble damages to Plaintiffs in

such amount, not less than $10 million, as may be determined after

discovery and trial;

b.   awarding Plaintiffs the costs of this action, including reasonable attorneys'

fees and expenses, experts' fees and other disbursements; and

c.   for such further and other reliefs as may be just and proper.

Dated:    New York, New York          **Chittur & Associates, P.C.**
          January 3, 2012

_Krishnan Chittur_

By:  Krishnan Chittur, Esq. (KC9258)
286 Madison Avenue Suite 1100
New York, NY 10017
Tel: (212) 370-0447

Attorneys for Plaintiffs