**United States District Court**
**Southern District Of New York**

Arthur Angermeir, Nitesh Bhagwanani, Ken Elder,     }
Becky D. Glynn, Rajat Goyal, Kristina Greene, Louis     }
Marrou, Marilyn Murrell, and Dr. Shiva Nancy     }
Shabnam,     }
    }
                  Plaintiffs     }
    }
       v.     }
    }
Jay Cohen, Sara Krieger, Jennifer Centeno, Louis     }
Cucinotta, Ricardo Brown, Robert Taylor, Joseph I.     }
Sussman, Joseph I. Sussman, P.C., Lease Finance     }
Group, LLC, MBF Leasing LLC, and Northern Leasing     }
Systems, Inc.,     }
    }
                  Defendants     }
    }

No. 12 cv 0055

**FIRST AMENDED**
**COMPLAINT**

**JURY TRIAL DEMANDED**

## Nature of the Action

1.     This action arises out of Defendants' racketeering scheme to intimidate out-of-

state individuals into paying unwarranted sums of money by commencing

fraudulent lawsuits in New York City Civil Court for relatively small sums of

money, typically under $10,000. Defendants were aware well before bringing

such actions that the documents underlying Defendants' claims against Plaintiffs

were forged and/or that Defendants never had a claim. Nevertheless, Defendants

persisted in these small claims proceedings - and even obtained fraudulent

default judgments - in order to harass, intimidate, and thereby extort money from

Plaintiffs through threats of expensive long-distance litigation, of damage to

credit rating, and/or entry of default judgments. Despite the fact that as early as

2005, a City Civil Court judge (Cooper, J.C.C.) refused jurisdiction on Defendants' boilerplate lawsuits premised on boilerplate forum selection clause because such exercise of jurisdiction effectively deprived litigants from far-off places (such as Plaintiffs) of their day in court, Defendants have continued to commence such proceedings and enter default judgments in that Court. Worse, they have continued to do so without even apprizing that Court of the adverse ruling of 2005 and/or similar subsequent decisions.

2.  On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, and New York's Anti-Deceptive Trade Practices Act, N.Y.G.B.L., §349, and seek compensatory, treble and/or punitive damages, together with attorneys' fees and expenses incurred in this litigation.

## Jurisdiction

3.  Jurisdiction is proper under the federal racketeering statute, 18 U.S.C. §1964(c), and the principles of supplementary jurisdiction, 28 U.S.C. §1367. Defendants conducted a racketeering scheme in interstate commerce, through the use of interstate communication facilities.

## Parties

4.  Mr. Arthur Angermeir is a resident of Newport Beach, California.

5.  Mr. Nitesh Bhagwanani is a resident of San Mateo, California.

6.  Mr. Ken Elder is a resident of Odessa, Texas.

7.  Ms. Becky D. Glynn is a resident of San Antonio, Texas.

8.  Mr. Rajat Goyal is a resident of Anderson County, South Carolina.

9. Ms. Kristina Greene is a resident of Oilton, Oklahoma.

10. Mr. Louis Marrou is a resident of Miami, Florida.

11. Ms. Marilyn Murrell is a resident of Sarasota, Florida.

12. Dr. Shiva Nancy Shabnam is a resident of Canoga Park, California.

13. Defendant Jay Cohen is one of the masterminds of the racketeering enterprise which is the subject of this action ("Enterprise"). At all relevant times, he was and continues to be the principal, an officer, and controlling person of the corporate Defendants, including, without limitation, President and Chief Executive Officer of Defendant Northern Leasing Systems, Inc. At all relevant times, he received and continues to receive income directly and/or indirectly from the racketeering Enterprise.

14. Defendant Sara Krieger is one of the masterminds of the Enterprise which is the subject of this action. At all relevant times, she was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Vice President for Operations of Northern Leasing and an officer of some of the shell entities through which the Enterprise is conducted. For a substantial period of time, she verified all complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise. At all relevant times, she received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

15. Defendant Jennifer Centeno is one of the active, wilful participants in the Enterprise which is the subject of this action. At all relevant times, she was, and

continues to be, a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Legal Administrative Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted. At all relevant times, she was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise. At all relevant times, she received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

16.    Defendant Louis Cucinotta is one of the active, wilful participants in the Enterprise which is the subject of this action. At all relevant times, he was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, a Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted. At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise. At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

17.    Defendant Ricardo Brown is one of the active, wilful participants in the Enterprise which is the subject of this action. At all relevant times, he was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, a Director of Legal Collections for the

Defendants, and an officer of some of the shell entities through which the Enterprise is conducted. At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise. At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

18. Defendant Robert Taylor is one of the active, wilful participants in the Enterprise which is the subject of this action. He is also a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, a Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted. At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise. At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

19. Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York. At all relevant times, he commenced and conducted, and continues to commence and conduct, all of the litigation in the New York City Civil Court on behalf of the Enterprise. At all relevant times, his offices were, and continue to be, part of the Defendants' offices, for the use of which offices he does not pay any rent. In addition, he received, and continues to receive, a portion of the amounts collected by the Enterprise. He has, and continues to have, "all encompassing"

access to the Enterprise's lease databases at all times. He used, and continues to use, Defendants' computer system, CCS, as his own litigation management tool. He is fully integrated with Defendants' operations, and a wilful, active participant in the Enterprise. Whenever Defendant Sussman is made a party or subpoenaed as a witness in a lawsuit involving the Enterprise or its business practices, the Enterprise provides him with legal counsel and pay all attorneys' fees and expenses in his defense. Defendant Sussman has routinely disregarded the decision of Judge Cooper of the New York City Civil Court of 2005, *infra*. Indeed, in subsequent proceedings that he commenced in the New York City Civil Court, in which proceedings he asserted jurisdiction over individuals from far-off places based solely on Defendants' boilerplate forum selection clause, he affirmatively concealed Judge Cooper's decision, and even obtained default judgments.

20. Joseph I. Sussman, P.C., is a professional corporation under New York law with its principal offices at 132 West 31st Street, New York, New York 10001, the same offices as the other Defendants. It is Defendant Joseph Sussman's law firm and as such, all pleadings and court filings in the New York City Civil Court are under its name and signature. Defendants Joseph Sussman and Joseph I. Sussman, P.C., are cumulatively referred to herein as the "Sussman Defendants".

21. Defendant MBF Leasing LLC ("MBF") is a New York corporation, a wholly owned subsidiary and a "pass through" entity for Defendant Northern Leasing. All leases procured in its name are routinely and promptly transferred to Defendant Northern Leasing for "servicing."

22. Defendant Lease Finance Group, LLC, is a Delaware company and another "pass through" entity for Northern Leasing. All leases procured in its name are routinely and promptly transferred to Defendant Northern Leasing for "servicing."

23. Defendant Northern Leasing Systems, Inc., is a New York corporation with its principal place of business at 132 West 31st Street, New York, New York. At all relevant times, it has been and continues to be controlled and dominated by the Individual Defendants herein. It was and remains the main corporate front for the Enterprise. Unlike the other corporate Defendants, it has employees, bank accounts, offices, office equipment, and other assets. It controls and services MBF Leasing, Lease Finance Group, and many other shell entities that operate in the same business.

24. Defendants Cohen, Krieger, Centeno, Cucinotta, Brown, Taylor, and Sussman ("Individual Defendants") direct, control, run, and/or wilfully participate in the racketeering Enterprise as more fully described below. Defendants are ostensibly engaged in the business of leasing small business equipment, mostly credit card processing machines. The Individual Defendants worked in concert to cause the racketeering Enterprise at issue to engage in the misconduct described in this complaint. In particular, the Individual Defendants each directed Northern Leasing, Lease Finance Group, MBF Leasing, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the Enterprise to consummate the unlawful transactions

described herein, and to attempt to enforce non-existent liabilities against Plaintiffs through a misuse of New York's judicial system. Each of the Individual Defendants has personally profited personally from those activities.

### Factual Allegations

25.  This case involves the systematic and repeated manner in which Defendants' Enterprise attempted to intimidate, and did intimidate, individuals located around the country in essentially a "shakedown" effort, in common parlance, to bully them into paying the Enterprise monies to which the Enterprise was never entitled. Based on forged documents, <u>which Defendants knew were forged</u>, the Enterprise sought to intimidate Plaintiffs with dunning letters and phone calls, telling them that it would be more expensive for them to dispute the Enterprise's claims in New York City Civil Court than it would be to pay tribute to the Enterprise.

26.  Obviously, once the Enterprise commenced these legal proceedings, Plaintiffs faced significant hurdles to having their day in court, including additional expenses and inconveniences of long-distance litigation, and multiple trips to New York. The relatively small amounts at issue would have, as Defendants and other participants in the Enterprise were well aware, prevented these Plaintiffs from obtaining counsel or from otherwise developing their defense. Further, Plaintiffs' potential witnesses were all in their respective local areas, quite far from the New York City Civil Court. Defendants' entire scheme was designed to ensure that Plaintiffs had no real opportunity to raise defenses to the Enterprise's

bogus lawsuits, so that the entry of a default judgment was all but certain. In fact, an overwhelming majority of the lawsuits brought by the Sussman Defendants on behalf of the Enterprise resulted, not surprisingly, in default judgments in the New York City Civil Court.

27. As this Court is well aware, once a judgment is entered in the New York City Civil Court, it would be almost impossible for the judgment-debtor to challenge the Enterprise in subsequent judgment enforcement actions without incurring costs far in excess of the judgment itself. Had the Enterprise filed the suits in Plaintiffs' respective home locations to enforce its alleged claims, Plaintiffs would have been able to present evidence of what really transpired, and establish the bogus nature of the Enterprise's claims in a local court, either through an attorney or by themselves.

28. Further, the very entry of judgment in New York City Civil Court is automatically reported as an adverse entry in Plaintiffs' respective personal consumer credit reports. This has significant impact on credit availability to Plaintiffs, including without limitation, denial of credit opportunities, increase in interest rates, and diverse other consequences.

29. As shown below through the facts of each Plaintiff, the repeated nature of the manner in which Defendants acted and their wrongful behavior set the pattern and practice of a racketeering scheme unlawful under both federal and state law.

<u>Mr. Arthur Angermeir</u>

30. On or about October 7, 2008, Defendants' representative called Mr. Angermeir's business and offered to lease a credit card processing machine, which he sent to Mr. Angermeir's business. The machine was returned, unused, to Defendant MBF Leasing. Defendant MBF Leasing accepted the returned machine without any objections or reservations.

31. Meanwhile, Defendant MBF Leasing helped itself, through electronic deductions from Mr. Angermeir's business bank account, for alleged "lease payments."

32. Upon coming to know of this self-help, Mr. Angermeir contacted Defendant MBF Leasing and demanded a refund of the amounts wrongfully collected. Defendant MBF Leasing's representatives refused to do so, and informed Mr. Angermeir that he had signed two leases with Defendant MBF Leasing, and had to pay Defendant MBF Leasing over $7,600 thereunder.

33. Mr. Angermeir requested copies of the two leases he allegedly signed with Defendant MBF Leasing. Defendant MBF Leasing's representatives sent him the alleged copies.

34. Upon receipt of those copies, it was clear that Mr. Angermeir's signatures and initials were forged on both of these alleged leases. Mr. Angermeir had never even seen those leases before. Further, the information concerning Mr. Angermeir and the allegedly leased machine was significantly different in the two leases.

35. Mr. Angermeir promptly informed Defendant MBF Leasing that the leases were forged, and that he had neither signed nor initialed either of those leases or any of the pages thereon. Defendant MBF Leasing's representatives promised to conduct an "investigation."

36. Defendants never bothered conducting any "investigation."

37. Instead, Defendants, under the name of Defendant MBF Leasing, filed a lawsuit in the New York City Civil Court, through the Sussman Defendants. That complaint was verified by Defendant Cucinotta and notarized by Defendant Centeno.

38. Defendants, under the name of Defendant MBF Leasing, obtained a default judgment for $4,246.98 against Mr. Angermeir on April 21, 2010.

39. Mr. Angermeir was unaware of the lawsuit as well as the default judgment thereon. He eventually discovered the default judgment while checking his credit report. Thereupon, Mr. Angermeir had to retain attorneys in New York, and incur attorneys' fees and litigation expenses to set aside that default judgment. After motion practice, eventually, Defendants stipulated to vacate the default judgment and dismiss the complaint against Mr. Angermeir.[1]

40. Meanwhile, Defendants had made derogatory entries in Mr. Angermeir's <u>personal</u> consumer credit report. As a result, he suffered the usual consequences of such adverse reports, quite apart from having to retain attorneys and incurring legal

---

[1] The stipulation is "without prejudice" so that Defendants could commence this bogus lawsuit once again.

expenses in New York.[2] In addition, Mr. Angermeir had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

Mr. Nitesh Bhagwanani

41. On or about October 31, 2008, Defendants' representative approached Mr. Bhagwanani's business to sell credit card processing and check cashing services. The representative told Mr. Bhagwanani categorically that the machine for credit card processing would be provided for 90 days on a trial basis, and that Mr. Bhagwanani could cancel the arrangement at any time without penalties. Based on these representations, Mr. Bhagwanani signed a one-page document, an alleged lease, amongst other documents.

42. Consistent with these representations to Mr. Bhagwanani, the term and the schedule of payments was left blank in that one-page lease, to be filled in after Mr. Bhagwanani's trial period, and after Mr. Bhagwanani agreed to that transaction.

43. Nevertheless, the very next month, Mr. Bhagwanani noticed that Defendant Northern Leasing had debited his account. Mr. Bhagwanani immediately contacted Defendant's representative. Defendants' representative told Mr. Bhagwanani that the charges were made by mistake and promised to look into it.

---

[2] It has been well known for at least a decade that such damages include, for example, increased interest rates on existing debts, loss of promotional opportunities, curtailment and even outright refusal of credit. P. McGeehan, *The Plastic Trap: Soaring Interest Compounds Credit Card Pain for Millions*, N.Y. Times, Nov. 21, 2004, at A1.

The charges were never reversed, and the money was never refunded to Mr. Bhagwanani's business. After several telephone calls from Mr. Bhagwanani, Defendants' representative stopped answering his calls and disappeared without a trace.

44. In order to stop the unauthorized deductions, Mr. Bhagwanani closed his business bank account.

45. Mr. Bhagwani informed Defendant Northern Leasing that the leases were forged.[3] Defendants promised to conduct an "investigation."

46. Defendants never bothered conducting any "investigation." Nevertheless, Defendants insisted that the signatures on the lease as well as the guarantees were genuine, not forgeries.

47. On or about September 11, 2009, Defendant Northern Leasing commenced its usual lawsuit in New York City Civil Court through the Sussman Defendants. The complaint was verified by Defendant Cucinotta, and notarized by Defendant Centeno. On March 15, 2010, Defendant Northern Leasing obtained a default judgment for $6,739.87 against Mr. Bhagwanani.

48. Mr. Bhagwanani was unaware of the lawsuit and the default judgment until his personal bank account was frozen. Thereupon, Mr. Bhagwanani had to retain attorneys in New York, and incur attorneys' fees and litigation expenses.

---

[3]Forgery is "committed by procuring, by some artifice, trick, or device, the signature of the grantor to a deed which he had no intention of signing." *NYJUR2d, DEEDS* § 212, *Forged and Altered Instruments. Accord, Gerenstein v. Williams*, 282 A.D.2d 786, (3rd Dept. 2001). "A deed based on forgery or obtained by false pretenses is void *ab initio*," *First Nat. Bank of Nevada v. Williams*, 74 A.D.3d 740, 742 (2nd Dep't 2010).

49. Mr. Bhagwanani, through his attorneys, moved the New York City Civil Court to set aside the default judgment. In opposition, Defendant Brown submitted an affidavit asserting, under penalties of perjury, that Mr. Bhagwanani had, in a phone conversation with Defendants' representative, "affirmatively verified" all material terms of the alleged lease. Defendant Brown submitted what he claimed to be an audio-recording thereof. In the accompanying papers, the Sussman Defendants heaped abuse on Mr. Bhagwanani for perjury.

50. However, the audio-recording was actually a conversation between Defendants' representative in New York and their representative in California who, according to the recording, purported to impersonate Mr. Bhagwanani. In other words, Defendants had confirmed the alleged lease terms with their own representative, and sought to saddle Mr. Bhagwanani with those terms.

51. On June 20, 2011, the New York City Civil Court heard Mr. Bhagwanani's motion, vacated the judgment entered against Mr. Bhagwanani, and dismissed the lawsuit.

52. Meanwhile, Defendants had made derogatory entries in Mr. Bhagwanani's consumer credit report. As a result, he suffered the usual consequences of such adverse reports, quite apart from having to retain attorneys and incurring legal expenses in New York. In addition, Mr. Bhagwanani had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## Mr. Ken Elder

53. At relevant times, Mr. Elder was a part-owner of a liquor store in Bayton, Texas.

54. In January 2009, Defendants' agent approached Mr. Elder's business to sell a check verification machine. Mr. Elder agreed, and paid $5,475.06 towards the purchase price of that machine, which was duly delivered and installed.

55. In June 2011, Mr. Elder and his co-owners sold the liquor store, for which purpose they got their business bank statements audited. During that audit, Mr. Elder discovered for the first time that Defendant MBF Leasing had been electronically deducting money from their business account every month.

56. Thereupon, Mr. Elder immediately contacted Defendant MBF Leasing and demanded a refund. He informed them that he had not even heard of MBF Leasing. Defendants' representative asserted that he had signed a non-cancelable lease with Defendant MBF Leasing, and had personally guaranteed the payments thereunder. Mr. Elder requested a copy of the alleged lease, which the representative sent to him.

57. Upon review of the lease, it was clear that Mr. Elder's signatures were forged. Mr. Elder pointed out the various discrepancies to Defendants' representatives, and demanded a refund of all the money that they had taken out of his business bank account. Defendants' representatives refused to do so.

58. Instead, Defendants, under the name of Defendant Northern Leasing, commenced their usual lawsuit against him in the New York City Civil Court for $3,838.08. The lawsuit was filed by the Sussman Defendants, while the

Complaint was verified by Defendant Taylor and notarized by Defendant Centeno. Defendants obtained a default judgment against Mr. Elder. Mr. Elder was unaware of the lawsuit until Defendants froze his mother's bank account.

59. Thereupon, Mr. Elder had to retain attorneys in New York, and incur attorneys' fees and litigation expenses.

60. Meanwhile, Defendants had made derogatory entries in Mr. Elder's <u>personal</u> consumer credit report. As a result, he suffered the usual consequences of such adverse reports, quite apart from having to retain attorneys and incurring legal expenses in New York. In addition, Mr. Elder had to waste considerable time and effort, and was subjected to annoyance, embarrassment, emotional distress, and mental anguish.

<u>Ms. Becky D. Glynn</u>

61. On or about February 17, 2009, Ms. Glynn received an invoice from Defendants, under the name of Defendant MBF Leasing, concerning overdue payments for an alleged lease of a credit card processing machine. Ms. Glynn had never had any dealings, and indeed, had not even heard about Defendant MBF Leasing.

62. Thereupon, Ms. Glynn contacted Defendant MBF Leasing through the toll free number on the invoice. During the telephone conversation, Defendant MBF Leasing's representative asserted that Ms. Glynn had signed a lease with Defendant MBF Leasing. Ms. Glynn requested a copy of the alleged lease.

63. On February 24, 2009, Defendant MBF Leasing faxed a copy of the alleged lease to Ms. Glynn. According to the lease, allegedly signed in 2006, Ms. Glynn was an owner of a Laundromat in Washington, D.C.

64. The alleged lease was a fraudulent document with forged signatures. Ms. Glynn contacted Defendant MBF Leasing immediately and advised its representative that she had been a resident of Texas since 1993, and neither owned any business in Washington, D.C., nor signed any equipment leases.

65. Defendants' representatives thereupon demanded that Ms. Glynn send them an affidavit of forgery in their standard form, whereupon they would "investigate" the situation.

66. On March 3, 2009, Ms. Glynn filed an ID theft complaint with the San Antonio Police Department, completed the affidavit of forgery requested by Defendants' representatives, and mailed it along with a copy of her driver's license to Defendants.

67. Subsequently, Defendants' representatives requested additional documents from Ms. Glynn. They demanded that Ms. Glynn send a copy of identification documents to verify her signature and identity. Ms. Glynn promptly sent a copy of her driver's license and other identification documents.

68. For about a year, Ms. Glynn repeatedly contacted Defendants attempting to resolve the fraud and ID theft issue and sending them documents, relying on their promises of a "reasonable investigation."

69. However, Defendants never bothered to conduct any investigation. Ms. Glynn never received any meaningful response – except demands for more documents – from Defendants.

70. In November 2009, Ms. Glynn began to receive dunning letters from Defendants demanding payments under the forged lease.

71. On April 21, 2010, Ms. Glynn received a copy of a Summons and Verified Complaint filed by Defendant MBF Leasing in the N.Y. City Civil Court demanding $4,620 from her personally. The lawsuit was commenced by the Sussman Defendants, and the Complaint was verified by Defendant Cucinnotta.

72. Promptly, on April 22, 2010, Ms. Glynn contacted Defendants regarding the lawsuit. Defendants' representative informed her that he would expedite her paperwork to accounting in order to determine whether enough evidence was presented to support Ms. Glynn's claim of fraud and ID theft. Defendants' representative also stated that Ms. Glynn should be prepared to either settle, retain a lawyer, or appear herself in New York to answer and defend the lawsuit filed in New York City Civil Court.

73. Ms. Glynn never heard back from Defendants in response to her complaints about fraud and forgery.

74. Ms. Glynn had to retain a lawyer and incur legal expenses in New York to avoid the default judgment. That lawsuit has now been stayed upon consent of counsel.

75. Meanwhile, Defendants had made derogatory entries in Ms. Glynn's _personal_ consumer credit report. As a result, she suffered the usual consequences of such

adverse reports, quite apart from having to retain attorneys and incurring legal expenses in New York. In addition, Ms. Glynn had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## Mr. Rajat Goyal

76. In 2005, Mr. Goyal owned two convenience stores in Anderson County, South Carolina. In July-August 2006, Defendants' agent approached Mr. Goyal's business to sell credit card processing services. At that time, Mr. Goyal already had a credit card processing machine in each of his stores, which machines had been supplied by his then-processing agent.

77. Shortly thereafter, Defendant Northern Leasing commenced automatic deductions from Mr. Goyal's business accounts.

78. Mr. Goyal discovered these deductions in March 2007 while preparing his taxes. Thereupon, Mr. Goyal immediately contacted Defendant Northern Leasing to inquire about the charges. Defendants' representative asserted that Mr. Goyal had signed a non-cancellable lease for the credit card machines. Mr. Goyal requested a copy of the alleged lease. Defendants sent him a copy of the alleged lease.

79. Upon review of the lease, it was clear that Mr. Goyal's signatures were forged. It appeared that Defendants' agent, while at the store, had copied the serial numbers of Mr. Goyal's own machines, and manufactured a lease by forging Mr.

Goyal's signatures and misusing other information to enable Defendants commence their clandestine automatic deductions.

80. Mr. Goyal informed Defendant Northern Leasing's representative that the leases were forged, and tried to explain the situation. Defendants' representatives were very rude, and did not have the slightest interest in what Mr. Goyal had to say. Finally, they asked him to send an affidavit of forgery in their standard form, and promised to conduct an "investigation."

81. Mr. Goyal did so, but Defendant Northern Leasing's representatives disclaimed receipt. He once again sent the duly notarized affidavit of forgery - this time, by registered mail. Nevertheless, Defendants continued denying receipt.

82. Shortly thereafter, Defendants, under the name of Defendant Northern Leasing, brought a lawsuit in the New York City Civil Court for $5,321.70. The lawsuit was filed by the Sussman Defendants, with the complaint being verified by Defendant Robert Taylor and notarized by Defendant Centeno.

83. Thereupon, Mr. Goyal had to retain attorneys in New York, and incur attorneys' fees and litigation expenses.

84. Mr. Goyal moved to dismiss the lawsuit, supported by his own affidavit with relevant documents.

85. In response, Defendant Brown, filed an affidavit under penalties of perjury, asserting that Mr. Goyal had, in fact, entered into the lease. Further, Defendant Brown stated in that affidavit:

> On August 4, 2006, Clifford Jean Bart of [Defendant Northern Leasing's] Verifications Department placed a call to (846) 261-7190,

> [Mr. Goyal's] place of business. [Mr. Goyal] confirmed his identity
> to Mr. Bart by providing his social security number and date of
> birth . .

86.     That assertion was also false. In fact, Mr. Goyal was not even in the country on

August 4, 2006: he had left U.S. on August 2, 2006, got engaged in India on

August 6, 2006, and married in India on August 12, 2006. Mr. Goyal filed a reply

affidavit with entries from his passport, and his wedding invitation.

87.     On May 3, 2011, Mr. Goyal's motion to dismiss came up for hearing in the New

York City Civil Court. Defendants thereupon, finally, withdrew their complaint.

88.     Meanwhile, Defendants had made derogatory entries in Mr. Goyal's <u>personal</u>

consumer credit report. As a result, he suffered the usual consequences of such

adverse reports, quite apart from having to retain attorneys and incurring legal

expenses in New York. In addition, Mr. Goyal had to waste considerable time and

effort, and was subjected to considerable annoyance, embarrassment, emotional

distress, and mental anguish.

<u>Ms. Kristina Greene</u>

89.     In 2005, Ms. Greene opened a restaurant in Oilton, Oklahoma. Defendants'

agent went to her restaurant, and offered a credit card processing arrangement.

He represented that the arrangement could be terminated at will, without any

penalties or further obligations. On that understanding, Ms. Greene agreed to the

arrangement, and accepted a credit card processing machine.

90. In May 2006, Ms. Greene closed her restaurant. No longer needing the credit card machine, she returned it, and closed her business bank account, and believed that to be the end of the credit card processing arrangement.

91. But shortly thereafter, Ms. Greene started receiving dunning phone calls, ostensibly from Defendant Northern Leasing. Defendants' representative asserted that Ms. Greene had signed a non-cancellable lease with Defendant Northern Leasing, and that she had personally guaranteed payments thereunder. Hence, Defendants insisted, Ms. Greene had to continue paying them for the entire period of the lease whether or not she needed, desired, or used the machine.

92. Ms. Greene requested a copy of the alleged lease.

93. Defendants eventually sent Ms. Greene a copy of the alleged lease.

94. The alleged lease was a fraudulent document with forged signatures. Ms. Greene contacted Defendants immediately and advised its representative that she had never seen that lease before, and her signatures were forgeries. She immediately filed a police report on February 20, 2007, and informed Defendants of the same.

95. Nevertheless, Defendants, under the name of Defendant Northern Leasing, proceeded to file a lawsuit against her in the New York City Civil Court for $1,739.65. That complaint was verified by Defendant Sara Krieger under penalties of perjury, and was filed by Defendant Joseph Sussman and his law firm Joseph I. Sussman, P.C.

96. Thereupon, Ms. Greene called Defendant Northern Leasing. Defendants demanded that Ms. Greene send them an affidavit of forgery in Defendants' standard form, whereupon they would "investigate" the situation and revert to her.

97. Ms. Greene relied on these representations, and completed the affidavit of forgery requested by Defendants. She then sent the affidavit, duly notarized, to Defendant Northern Leasing.

98. Defendants never bothered sending her any written response, and never bothered conducting any reasonable investigation in good faith.

99. Instead, Defendants proceeded to enter a default judgment against Ms. Greene for $1,743.04 in the New York City Civil Court.

100. About 4 ½ years later, in February 2012, Defendants froze $3,400 in a bank account belonging to Ms. Greene's mother.

101. Ms. Greene had to retain a lawyer and incur legal expenses in New York to vacate the default judgment.

102. Meanwhile, Defendants had made derogatory entries in Ms. Greene's personal consumer credit report. As a result, she suffered the usual consequences of such adverse reports, quite apart from having to retain attorneys and incurring legal expenses in New York. In addition, Ms. Greene had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## Mr. Louis Marrou

103. Mr. Marrou never had any dealings with, and indeed, had never heard about any of the Defendants.

104. In September of 2010, Mr. Marrou started receiving phone calls from Defendants, ostensibly under the name of Defendant Northern Leasing, demanding payments for some equipment. Defendants claimed that Mr. Marrou had signed a lease and personal guarantee on behalf of S. Jordan Event Planners, a Decatur, GA, based company.

105. Mr. Marrou had never lived in Georgia, and had not even heard about the alleged company "S. Jordan Event Planners." Assuming this was a genuine mistake on Defendants' part, Mr. Marrou attempted to explain to Defendants' representative that he had neither seen nor signed any lease with Northern Leasing, and had never lived in Georgia. Northern Leasing's representative then agreed to, and did send, Mr. Marrou a copy of the alleged lease.

106. Upon examining the alleged lease, it was clear that Mr. Marrou's signature was forged. Indeed, the alleged lease reflected "Luis Marron," not Mr. Marrou, as a personal guarantor. Mr. Marrou informed Defendants of these facts by telephone and by mail on several occasions.

107. Nevertheless, Defendants continued to demand the payments for the alleged lease and threatened to commence a lawsuit against Mr. Marrou in New York.

108. Eventually, on September 26, 2011, Defendant Northern Leasing commenced a lawsuit in the N.Y. City Civil Court against Mr. Marrou personally. The Sussman

Defendants commenced these proceedings, with the complaint being verified by Defendant Taylor and notarized by Defendant Centeno.

109.   Mr. Marrou had to retain a lawyer and incur litigation expenses and fees therefor.[4]

110.   Meanwhile, Defendants had made derogatory entries in Mr. Marrou's <u>personal</u> consumer credit report. As a result, he suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York. In addition, Mr. Marrou had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## Ms. Marilyn Murrell

111.   Ms. Murrell never had any dealings with, and indeed, had never heard about any of the Defendants.

112.   In late 2010, Ms. Murrell received a letter, ostensibly from Defendant Northern Leasing, claiming that she had signed a lease and personal guarantee. Thereupon, she promptly called up Defendant Northern Leasing and informed them that she did not sign any such lease.[5]

---

[4]By agreement between counsel, that lawsuit has been stayed.

[5]One Federated Payment Systems, ostensibly marketing credit card processing services, offered Ms. Murrell significant savings if she used a machine provided by Federated. Ms. Murrell agreed, whereupon Federated left the credit card processing machine with Ms. Murrell. There was never any discussion of any lease, and she signed no such lease.

113. Meanwhile, Ms. Murrell discovered that Defendant Northern Leasing had already made electronic deductions from her business bank account.

114. Ms. Murrell promptly returned the machine to Defendant Northern Leasing. Defendant Northern Leasing accepted the machine without any objections or reservations.

115. In January 2012, Ms. Murrell closed her business bank account to prevent Defendant Northern Leasing from continuing to withdraw funds from her account.

116. Immediately, Ms. Murrell started receiving dunning phone calls from Defendants to coerce payments.

117. Eventually, on January 6, 2012, the Sussman Defendants commenced a lawsuit on behalf of Defendants, under the name of Defendant Northern Leasing, in the N.Y. City Civil Court against Ms. Murrell personally.

118. Defendant Centeno verified the complaint filed in that case under penalties of perjury.

119. Ms. Murrell had to retain a lawyer and incur litigation expenses and fees therefor.[6]

120. Meanwhile, Defendants had made derogatory entries in Ms. Murrell's _personal_ consumer credit report. As a result, she suffered the usual consequences of such adverse reports, quite apart from having to retain attorneys and incurring legal expenses in New York. In addition, Ms. Murrell had to waste considerable time

---

[6]By agreement between counsel, that lawsuit has been stayed.

and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

Dr. Shiva Shabnam

121.    Dr. Shabnam had never had any dealings with, and, indeed, had never even heard about Defendants.

122.    In May 2009, the Sussman Defendants commenced an action against Dr. Shabnam on behalf of Defendants, in the name of Defendant Lease Finance Group, in the New York City Civil Court, County of New York. The complaint was verified by Defendant Cucinotta under penalties of perjury, and notarized by Defendant Centeno. The lawsuit was based upon an alleged lease that Dr. Shabnam signed with Lease Finance.

123.    Dr. Shabnam was never served with process and was not aware of the lawsuit. On November 20, 2009, Defendants obtained a default judgment in the amount of $7,365.07 against Dr. Shabnam in the New York City Civil Court.

124.    Dr. Shabnam was unaware of the lawsuit and the default judgment.

125.    Sometime in October of 2010, Dr. Shabnam came to know of the judgment from her credit report. Thereupon, Dr. Shabnam filed an identity theft report with the Los Angeles Police Department on October 29, 2010.

126.    Dr. Shabnam contacted Defendant Lease Finance Group and informed them of the forgery, whereupon Defendants demanded that she submit an affidavit of forgery on their standard form, and they would then conduct an "investigation."

127. Dr. Shabnam submitted the affidavit of forgery as requested by Defendants. But Defendants never conducted any "investigation". Instead, they flatly told her, "We have an entered judgment and just want to be paid regardless if you owe the debt or not."

128. Left with no choice, on January 24, 2011, Dr. Shabnam moved the N.Y. City Civil Court to vacate that judgment. She had to retain an attorney and incur attorneys' fees and expenses. Defendants simply defaulted on the return date of that motion, and the N.Y. City Civil Court vacated the default judgment and dismissed Defendants' complaint with prejudice.

129. Meanwhile, Defendants had made derogatory entries in Dr. Shabnam's <u>personal</u> consumer credit report. As a result, she suffered the usual consequences of such adverse reports, quite apart from from having to retain attorneys and incurring legal expenses in New York. In addition, Dr. Shabnam had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

## COUNT I

### (RICO, 18 U.S.C. §1962(c))

130. The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

131. The association of Defendants and others whose identities are known only to Defendants at this time (cumulatively, the "Conspirators"), constituted an Enterprise within the meaning of 18 U.S.C. §1961(c), which Enterprise was

engaged in, and whose activities affected, interstate and foreign commerce. This Enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

132. Each Defendant is a person within the meaning of 18 U.S.C. §1961(3) and separate from the enterprise.

133. Defendant Cohen, the President of the Defendant Northern Leasing and officer of some of the other related corporate enterprises, was in charge of all its day-to-day operations. As such, he was one of the masterminds of the Enterprise who set up, orchestrated, and supervised the entire racketeering scheme at issue. While he and the other Conspirators acted through various corporate entities, they functioned from the same business premises, with the same staff, in the same ostensible business, with the same standard form lease and the same *modus operandi*.

134. Defendant Krieger, the Vice President for Operations of the Defendant Northern Leasing, and an officer of some of the other related corporate enterprises, was and remains one of the masterminds of the Enterprise. She was responsible for several aspects of its day-to-day operations, lease originations, and sales. In addition, until recently, she routinely verified most of the fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

135. Defendant Cucinotta, is one of the wilful, active participants in the Enterprise. At all relevant times, he was a Legal Collections Manager for the corporate Defendants, and an officer of some of the other related corporate enterprises, was

responsible for collection aspects of the Enterprise. He was one of the persons who routinely verified many fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

136. Defendant Ricardo Brown is one of the wilful, active participants in the Enterprise which is the subject of this action. At all relevant times, he was a Director of Legal Collections for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted. He was one of the persons who verified many fraudulent complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.

137. Defendant Robert Taylor is a wilful, active participant in the Enterprise which is the subject of this action. At all relevant times, he was a Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted. He was one of the persons who verified many fraudulent complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.

138. Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York. Since late 2002, and continuing to date, he commences and conducts all of the litigation in the New York City Civil Court on behalf of the Enterprise.

139. The remaining Defendants are corporate entities, through which the Enterprise functioned, and through which the underlying racketeering scheme was carried out.

140. Defendants' *scienter* is established from their pattern and practices at issue and the centrality of these practices to their entire business. As the New York Court of Appeals observed while upholding fraud claims against Defendant Cohen, Krieger, and others, "As alleged, the fraud in this case was not an isolated incident, but rather a nationwide scheme that took place over a number of years." *Pludeman v. Northern Leasing Systems, Inc.*, 10 N.Y.3d 486, 493 (2008). Moreover, Defendants continued their misconduct nonchalantly.

141. Defendants' *scienter* may also be inferred from the fact that the scheme at issue has continued despite several racketeering and class actions in various courts throughout the country impugning Defendants' deceptive business practices over the past several years, which actions are still pending as of today.[7] In one such action, for example, the New York Court of Appeals, the highest court of the State of New York, held that Defendants' systematic deception warranted an inference of fraud "against the corporate officers in their individual capacity . . ." *Pludeman*, 10 N.Y.3d at 493. Defendants knew, or should have known, of that pronouncement and taken affirmative steps to stop, at the very least, filing these fraudulent lawsuits in the New York City Civil Court.

142. Further, at least since 2005, in those rare cases where the small businesspersons from far away places did raise challenges in the New York City Civil Court, judges

---

[7]For example, the Attorney General of the State of New York commenced a lawsuit in New York Supreme Court, New York County, on April 23, 2012, asserting that Defendant Northern Leasing and its affiliates had been engaged in a fraudulent scheme to collect over $10 million from lessees under long-expired leases under false representations. People of the State of New York v. SKS Associates, et al, 400908/2012 (N.Y. Sup. N.Y. Co.) (Donna Mills, J.S.C.).

refused to enforce Defendants' consent to jurisdiction and/or forum selection clauses whereunder they have been dragging small businesspersons from far off places to New York courts. As one judge held:

> It is apparent that [Defendant Northern Leasing's] suit in New York, approximately 1600 miles away from where defendant lives and works, puts defendant at a significant disadvantage in defending herself. From the numerous cases that it has presided over, this court is aware of the boiler-plate provision in [Defendant Northern Leasing's] lease agreement to justify proceeding against an out-of-state resident in New York. "To allow [Defendant Northern Leasing] to do so is to effectively deprive litigants [such as defendant] of their day in court." *Northern Leasing Systems, Inc. v. Soumastre*, Civ Ct, N.Y. Cty, January 26, 2005, Cooper, J., Index No. 13566/03

*Northern Leasing Sys., Inc. v. Walton*, CV049136/02NY, 2012 WL 2466977 (N.Y. Civ. Ct. June 25, 2012). It merits emphasis that the *Soumastre* decision was of 2005, some seven years earlier, during which time Defendants continued filing these boilerplate lawsuits.

143.   The Sussman Defendants were Defendants' attorneys in each of those cases. Thus, the Sussman Defendants knew at least since 2005 that judges in the New York City Civil Court had refused to exercise jurisdiction in New York over the lawsuits brought by the Enterprise, and that commencing such boilerplate lawsuits here were, according to New York courts, attempts to deprive Plaintiffs and others of their day in court, *i.e.*, violative of elementary Due Process.

144.   Nevertheless, the Sussman Defendants have commenced and continued to commence these lawsuits in New York City Civil Court, presumably in the hopes of default judgments, without informing that Court in such subsequent lawsuits

of these precedents refusing jurisdiction. The Sussman Defendants, as attorneys duly admitted to the Bar in New York State, have a duty of candor to the Court, and are obligated to inform the Court of decisions such as those cited above. Instead, they have continued to file their boilerplate complaints with boilerplate verifications by Defendants as before.

145. Each Defendant knew, or should have known, of all these legal proceedings, and the decisions therein. Nevertheless, they have continued their lucrative racketeering Enterprise because they continue to reap humongous profits.

146. Defendants participated, and conspired with others (including others whose identities are known only to Defendants at this time) to participate, in the affairs of the aforementioned Enterprise through a pattern of racketeering activity, as more fully set forth below, all in violation of 18 U.S.C. §§ 1962(c)).

Mail Fraud, Violations of 18 U.S.C. §1341

147. Defendants and the other members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, placed in post office(s) or authorized depository for mail matter, several letters and/or packages to be sent or delivered by the Postal Service, and/or took or received therefrom, letters and/or packages, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which

it was directed to be delivered by the addressee such letters and/or packages. Specifically,

a. On or about November 10, 2009, Defendants in New York caused the mailing, through the use of interstate mails, of a summons and complaint to Mr. Angemeir in California;

b. On or about November 17, 2009, Defendants in New York caused the mailing, through the use of interstate mails, of another copy of the summons and complaint to Mr. Angemeir in California;

c. On or about December 15, 2009, Defendants in New York caused the mailing, through the use of interstate mails, of another copy of the summons and complaint to Mr. Angemeir in California;

d. On or about January 28, 2011, Defendants in New York caused the mailing, through the use of interstate mails,  of an order to show cause by Mr. Angermeir in California to Defendants in New York.

e. On or about April 9, 2009, Defendants in New York caused the mailing, through the use of interstate mail, of a letter to Mr. Bhagwanani in California;

f. On or about December 9, 2010, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Bhagwanani in California;

g.  On or about November 17, 2011, Defendants' agent in Texas, through the use of interstate mail, mailed to New York, caused the mailing of an affidavit of service ostensibly reflecting service of process upon Mr. Elder;

h.  On or about January 10, 2012, Defendant Centeno in New York, through the use of interstate mail, mailed a copy of the summons and complaint to Texas, ostensibly to Mr. Elder;

i.  On or about February 17, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

j.  On or about February 24, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

k.  On or about May 6, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

l.  On or about November 4, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

m.  On or about November 9, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

n.  On or about November 11, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

o.  On or about September 16, 2010, the Sussman Defendants in New York, through the use of interstate mails, caused the mailing of a summons and complaint to Mr. Goyal in South Carolina;

p.    On or about October 21, 2008, the Sussman Defendants in New York, through the use of interstate mails, caused the mailing of a letter to Mr. Goyal falsely asserting that Mr. Goyal had personally guaranteed a lease, and was fully responsible for all payments thereunder;

q.    On or about May 19, 2008, Defendants in New York, through the use of interstate mails, mailed their blank standard form affidavit of forgery to Mr. Goyal in South Carolina;

r.    On or about April 22, 2008, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Goyal in South Carolina asserting that he had signed a non-cancelable lease with a personal guaranty, and demanding that he contact Defendants "immediately";

s.    On or about May 19, 2008, Defendants in New York, through the use of interstate mail, mailed their standard form affidavit of forgery to Mr. Goyal in South Carolina;

t.    On or about July 25, 2008, Defendants in New York, through the use of interstate mail, mailed a standard form letter to Mr. Goyal threatening to ruin his consumer credit rating unless he paid $783 as outstanding dues under his alleged lease;

u.    On or about July 25, 2008, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Goyal in South Carolina asserting that he had signed a non-cancelable lease with a personal guaranty, and demanding that he contact Defendants "immediately";

v. On or about July 28, 2008, Defendants in New York, through the use of interstate mail, mailed an invoice to Mr. Goyal in South Carolina demanding payment of $1,055.35;

w. On or about August 14, 2008, Mr. Goyal in South Carolina, through the use of interstate mails, mailed a letter to Defendants in New York a duly notarized affidavit of forgery;

x. On or about May 21, 2007, Ms. Greene in Oklahoma, through the use of interstate mail, mailed an affidavit of forgery to Defendants in New York;

y. On or about May 1, 2007, the Sussman Defendants in New York, through the use of interstate mail, mailed a summons and complaint to Ms. Greene in Oklahoma;

z. On or about March 24, 2011, Defendant Northern Leasing in New York, through the use of interstate mails, mailed an "Advice of Judgment" to Ms. Greene in Oklahoma;

aa. On or about February 9, 2012, JP Morgan Chase in Ohio, through the use of interstate mail, mailed a letter to Ms. Greene in Oklahoma advising her of Defendants' levy on Ms. Greene's account;

bb. On or about July 11, 2012, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Greene in Oklahoma advising her that in order to have Defendants' attorneys notify her bank to release the levy, she should pay them $2,502.05;