**United States District Court**
**Southern District Of New York**

| | |
|---|---|
| Arthur Angermeir, Nitesh Bhagwanani, Ken Elder, Becky D. Glynn, Rajat Goyal, Kristina Greene, Marilyn Murrell, and Dr. Shiva Nancy Shabnam, | 12-cv-0055 (KBF) |
| Plaintiffs | |
| v. | |
| Jay Cohen, Sara Krieger, Jennifer Centeno, Louis Cucinotta, Ricardo Brown, Robert Taylor, Joseph I. Sussman, Joseph I. Sussman, P.C., Lease Finance Group, LLC, MBF Leasing LLC, and Northern Leasing Systems, Inc., | **SECOND AMENDED COMPLAINT** |
| Defendants | JURY TRIAL DEMANDED |

## Nature of the Action

1.    This action arises out of Defendants' racketeering scheme to intimidate out-of-state individuals into paying unwarranted sums of money by commencing fraudulent lawsuits in New York City Civil Court for relatively small sums of money, typically under $10,000. Defendants were aware well before bringing such actions that the documents underlying Defendants' claims against Plaintiffs were forged and/or that Defendants never had a claim. Nevertheless, Defendants persisted in these small claims proceedings - and even obtained fraudulent default judgments - in order to harass, intimidate, and thereby extort money from Plaintiffs through threats of expensive long-distance litigation, of damage to credit rating, and/or entry of default judgments. Despite the fact that as early as 2005, a City Civil Court judge (Cooper, J.C.C.) refused jurisdiction on

Defendants' boilerplate lawsuits premised on boilerplate forum selection clause because such exercise of jurisdiction effectively deprived litigants from far-off places (such as Plaintiffs) of their day in court, Defendants have continued to commence such proceedings and enter default judgments in that Court.  Worse, they have continued to do so without even apprizing that Court of the adverse ruling of 2005 and/or similar subsequent decisions.

2.      The racketeering scheme at issue also involves Defendants' wilful violations of the credit reporting statutes.  Defendants impermissibly accessed Plaintiffs' credit report without a permissible purpose, without authority, and without giving Plaintiffs the advance notice required under New York law.  Thereafter, Defendants made an adverse entry on some Plaintiffs' credit reports, and wilfully refused to delete that entry even after being alerted to the falsity thereof.

3.      On these and related grounds, Plaintiffs assert claims under the federal racketeering statute, 18 U.S.C. §1962, the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 *et seq*, ("FCRA"), the New York Fair Credit Reporting Act, N.Y. Gen. Bus. L., §380 *et seq* ("NYFCRA"), the New York Deceptive Trade Practices Act, N.Y. Gen. Bus. L., §349, and New York's  common law, and seek compensatory, statutory, punitive and/or exemplary damages together with equitable and injunctive relief as well as attorneys' fees and expenses.

## Jurisdiction

4.    Jurisdiction is proper under the federal racketeering statute, 18 U.S.C. §1964(c), under the Fair Credit Reporting Act, 15 U.S.C. §§1681(p), and the principles of supplementary jurisdiction, 28 U.S.C. §1367.  Defendants conducted a racketeering scheme in interstate commerce, and/or violated the credit reporting statutes through the use of the facilities of interstate commerce.

## Parties

5.    Mr. Arthur Angermeir is a resident of Newport Beach, California.

6.    Mr. Nitesh Bhagwanani is a resident of San Mateo, California.

7.    Mr. Ken Elder is a resident of Odessa, Texas.

8.    Ms. Becky D. Glynn is a resident of San Antonio, Texas.

9.    Mr. Rajat Goyal is a resident of Anderson County, South Carolina.

10.   Ms. Kristina Greene is a resident of Oilton, Oklahoma.

11.   Ms. Marilyn Murrell is a resident of Sarasota, Florida.

12.   Dr. Shiva Nancy Shabnam is a resident of Canoga Park, California.

13.   Defendant Jay Cohen is one of the masterminds of the racketeering enterprise which is the subject of this action ("Enterprise").  At all relevant times, he was and continues to be the principal, an officer, and controlling person of the corporate Defendants, including, without limitation, President and Chief Executive Officer of Defendant Northern Leasing Systems, Inc.   At all relevant times, he received and continues to receive income directly and/or indirectly from the racketeering Enterprise.

14.     Defendant Sara Krieger is one of the masterminds of the Enterprise which is the

subject of this action.  At all relevant times, she was and continues to be a

principal, an officer, and controlling person of the corporate Defendants,

including, without limitation, the Vice President for Operations of Northern

Leasing and an officer of some of the shell entities through which the Enterprise

is conducted.  For a substantial period of time, she verified all complaints filed by

the Sussman Defendants in the New York City Civil Court on behalf of the

Enterprise.  At all relevant times, she received, and continues to receive, income

directly and/or indirectly from the racketeering Enterprise at issue.

15.     Defendant Jennifer Centeno is one of the active, wilful participants in the

Enterprise which is the subject of this action.  At all relevant times, she was, and

continues to be, a principal, an officer, and controlling person of the corporate

Defendants, including, without limitation, the Legal Administrative Manager for

the Defendants, and an officer of some of the shell entities through which the

Enterprise is conducted.  At all relevant times, she was one of the persons who

verified complaints filed by the Sussman Defendants in the New York City Civil

Court on behalf of the Enterprise.  At all relevant times, she received, and

continues to receive, income directly and/or indirectly from the racketeering

Enterprise at issue.

16.     Defendant Louis Cucinotta is one of the active, wilful participants in the

Enterprise which is the subject of this action.  At all relevant times, he was and

continues to be a principal, an officer, and controlling person of the corporate

Defendants, including, without limitation, the Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted.  At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

17.     Defendant Ricardo Brown is one of the active, wilful participants in the Enterprise which is the subject of this action.  At all relevant times, he was and continues to be a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Director of Legal Collections for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted.  At all relevant times, he was one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise**.**  At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

18.     Defendant Robert Taylor is one of the active, wilful participants in the Enterprise which is the subject of this action.  He is also a principal, an officer, and controlling person of the corporate Defendants, including, without limitation, the Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted.  At all relevant times, he was

one of the persons who verified complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise**.**  At all relevant times, he received, and continues to receive, income directly and/or indirectly from the racketeering Enterprise at issue.

19.     Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York.  At all relevant times, he commenced and conducted, and continues to commence and conduct, all of the litigation in the New York City Civil Court on behalf of the Enterprise.  At all relevant times, his offices were, and continue to be, part of the Defendants' offices, for the use of which offices he does not pay any rent.  In addition, he received, and continues to receive, a portion of the amounts collected by the Enterprise.  He has, and continues to have, "all encompassing" access to the Enterprise's lease databases at all times.   He used, and continues to use, Defendants' computer system, CCS, as his own litigation management tool.  He is fully integrated with and a wilful, active participant in the Enterprise.  Whenever Defendant Sussman is made a party or subpoenaed as a witness in a lawsuit involving the Enterprise or its business practices, the Enterprise provides him with legal counsel and pay all attorneys' fees and expenses in his defense.  Defendant Sussman has routinely disregarded the decision of Judge Cooper of the New York City Civil Court of 2005, *infra*.  Indeed, in subsequent proceedings that he commenced in the New York City Civil Court, in which proceedings he asserted jurisdiction over individuals from far-off places based solely on

Defendants' boilerplate forum selection clause, he affirmatively concealed Judge Cooper's decision, and even obtained default judgments.

20.     Joseph I. Sussman, P.C., is a professional corporation under New York law with its principal offices at 132 West 31st Street, New York, New York 10001, the same offices as the other Defendants.  It is Defendant Joseph Sussman's law firm and as such, all pleadings and court filings in the New York City Civil Court are under its name and signature.  Defendants Joseph Sussman and Joseph I. Sussman, P.C., are cumulatively referred to herein as the "Sussman Defendants".

21.     Defendant MBF Leasing LLC ("MBF") is a New York corporation, a wholly owned subsidiary and a "pass through" entity for Defendant Northern Leasing.  All leases procured in its name are formally transferred routinely to Defendant Northern Leasing for "servicing."

22.     Defendant Lease Finance Group, LLC, is a Delaware company and another "pass through" entity for Northern Leasing.  All leases procured in its name are also formally transferred routinely to Defendant Northern Leasing for "servicing."

23.     Defendant Northern Leasing Systems, Inc., is a New York corporation with its principal place of business at 132 West 31st Street, New York, New York.  At all relevant times, it has been and continues to be controlled and dominated by the Individual Defendants herein.  It was and remains the main corporate front for the Enterprise.  Unlike the other corporate Defendants which are shell entities, it has employees, bank accounts, offices, office equipment, and other assets.  It controls and services MBF Leasing, Lease Finance Group, and over 150 other

shell entities that operate in the same business with the same forms through the same personnel employing the same *modus operandii.*

24. Defendants Cohen, Krieger, Centeno, Cucinotta, Brown, Taylor, and Sussman ("Individual Defendants") direct, control, and run the racketeering Enterprise as more fully described below.   Defendants are ostensibly engaged in the business of leasing small business equipment, mostly credit card processing machines. The Individual Defendants worked in concert to cause the racketeering Enterprise at issue to engage in the misconduct described in this complaint. In particular, the Individual Defendants each directed Northern Leasing, Lease Finance Group, MBF Leasing, and the shell entities to maintain continuous and systematic contacts with other members of the scheme and further directed the Enterprise to consummate the unlawful transactions described herein, and to attempt to enforce non-existent liabilities against Plaintiffs through a misuse of New York's judicial system.  Each of the Individual Defendants has personally profited personally from those activities.

25. Defendants are "furnishers of information" within the meaning of the FCRA, 15 U.S.C. §1681s-2, and "users" of consumer credit reports within the meaning of NYFCRA, Gen. Bus. L., §380a-(I).  At all relevant times, each Defendant was aware of, and a wilful participant in, the violations of the credit reporting statutes at issue.

### Factual Allegations

26.   This case involves the systematic and repeated manner in which Defendants'
Enterprise attempted to intimidate, and did intimidate, individuals located
around the country in essentially a "shakedown" effort, in common parlance, to
bully them into paying the Enterprise monies to which the Enterprise was never
entitled.  Based on forged documents, which Defendants knew were forged, the
Enterprise sought to intimidate Plaintiffs with dunning letters and phone calls,
telling them that it would be more expensive for them to dispute the Enterprise's
claims in New York City Civil Court than it would be to pay tribute to the
Enterprise.

27.   Obviously, once the Enterprise commenced these legal proceedings, Plaintiffs
faced significant hurdles to having their day in court, including additional
expenses and inconveniences of long-distance litigation, and multiple trips to
New York.  The relatively small amounts at issue would have, as Defendants and
other participants in the Enterprise were well aware, prevented these Plaintiffs
from obtaining counsel or from otherwise developing their defense.  Further,
Plaintiffs' potential witnesses were all in their respective local areas, quite far
from the New York City Civil Court.  Defendants' entire scheme was designed to
ensure that Plaintiffs had no real opportunity to raise defenses to the Enterprise's
bogus lawsuits, so that the entry of a default judgment was all but certain.  In fact,
an overwhelming majority of the lawsuits brought by the Sussman Defendants on

behalf of the Enterprise resulted in default judgments in the New York City Civil Court.

28.     As this Court is well aware, once a judgment is entered in the New York City Civil Court, it would be almost impossible for the judgment-debtor to challenge the Enterprise in subsequent judgment enforcement actions without incurring costs far in excess of the judgment itself.  Had the Enterprise filed the suits in Plaintiffs' respective home locations to enforce its alleged claims, Plaintiffs would have been able to present evidence of what really transpired, and establish the bogus nature of the Enterprise's claims in a local court.

29.     Moreover, Defendants automatically, and without any notice to small businesspersons, accessed such businesspersons' personal consumer credit reports from credit reporting agencies at will.  This was violative of the credit reporting statutes.

30.     Further, the very entry of judgment in New York City Civil Court is automatically reported as an adverse entry in Plaintiffs' respective <u>personal</u> consumer credit reports.  This has significant impact on credit availability to Plaintiffs, including without limitation, denial of credit opportunities, increase in interest rates, and diverse other consequences.

31.     As shown below through the facts of each Plaintiff, the repeated nature of the manner in which Defendants acted and their wrongful behavior set the pattern and practice of a racketeering scheme unlawful under both federal and state law.

Mr. Arthur Angermeir

32.   On or about October 7, 2008, Defendants' representative called Mr. Angermeir's business and offered to lease a credit card processing equipment, which he sent to Mr. Angermeir's business.  The equipment was returned, unused, to  Defendant MBF Leasing.  Defendant MBF Leasing accepted the returned equipment without any objections or reservations.

33.   Meanwhile, Defendant MBF Leasing helped itself, through electronic deductions from Mr. Angermeir's business bank account, for alleged "lease payments."

34.   Upon coming to know of this self-help, Mr. Angermeir contacted Defendant MBF Leasing and demanded a refund of the amounts wrongfully collected.  Defendant MBF Leasing's representatives refused to do so, and informed Mr. Angermeir that he had signed two leases with Defendant MBF Leasing, and had to pay Defendant MBF Leasing over $7,600 thereunder.

35.   Mr. Angermeir requested copies of the two leases which, according to Defendant MBF Leasing's representatives, he had allegedly signed with Defendant MBF Leasing.  Defendant MBF Leasing's representatives sent him the alleged copies.

36.   Upon receipt of those copies, it was clear that Mr. Angermeir's signatures and initials were forged on both of these alleged leases.  Mr. Angermeir had never even seen those leases before.   Further, the information concerning Mr. Angermeir and the allegedly leased equipment was significantly different in the two leases.

37.  Mr. Angermeir promptly informed Defendant MBF Leasing that the leases were forged, and that he had neither signed nor initialed either of those leases or any of the pages thereon.  Defendant MBF Leasing's representatives promised to conduct an "investigation."

38.  Defendants never bothered conducting any "investigation."

39.  Instead, Defendants, under the name of Defendant MBF Leasing, filed a lawsuit in the New York City Civil Court, through the Sussman Defendants.  That complaint was verified by Defendant Cucinotta and notarized by Defendant Centeno.

40.  Defendants, under the name of Defendant MBF Leasing, obtained a default judgment for $4,246.98 against Mr. Angermeir on April 21, 2010.

41.  Mr. Angermeir was unaware of the lawsuit as well as the default judgment thereon.  He eventually discovered the default judgment while checking his credit report.  Thereupon, Mr. Angermeir had to retain attorneys in New York, and incur attorneys' fees and litigation expenses to set aside that default judgment. After motion practice, eventually, Defendants stipulated to vacate the default judgment and dismiss the complaint against Mr. Angermeir.[1]

42.  The Enterprise, under the name of Defendant MBF, also made adverse entries in Mr. Angermeir's personal consumer credit report, which caused him tremendous damage.

---

[1]The stipulation is "without prejudice" so that Defendants could commence this bogus lawsuit once again.

43.   On or about May 22, 2009, June 14, 2009, July 14, 2009, August 20, 2009, September 20, 2009, October 20, 2009, December 1, 2009, February 3, 2010, and February 5, 2010, Defendants, through Defendant MBF, accessed Mr. Angermeir's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and State law.

44.   Defendants never provided any advance or written notice to Mr. Angermeir that they intended to pull his consumer credit report.  Such notice is mandatory under New York law.

45.   Further, Defendants, under the name of Defendant MBF, made an adverse entry in Mr. Angermeir's consumer credit report, stating that he had two "Lease" accounts with "Balance" of $3,680 and $3,105 for 36 and 48 months respectively, and that these accounts were opened in October and in November of 2008. Defendants also reported that the "Accounts" were "charged-off."  These entries were false and misleading.

46.   Defendants did not have any authority to access or make any entry in Mr. Angermeir's credit report.

47.   On August 2, 2011, Mr. Angermeir disputed the said entries to Experian.  Upon information and belief, Experian duly notified Defendants, through Defendant MBF, of Mr. Angermeir's dispute with a request to conduct a reasonable investigation into that dispute and rectify the error.  Such reasonable investigation is mandatory under federal and State law.

48. Defendants wilfully failed and refused to conduct any investigation.  Although Mr. Angermeir had categorically asserted that his signatures had been forged in the alleged leases, Defendants did not even bother calling Mr. Angermeir by phone, or writing, or communicating with him in any manner in this connection.

49. Defendants knew or ought to have known that Mr. Angermeir had no account with them, and did not owe Defendants anything.

50. Defendant Brown, as Defendants' Director of Legal Collections, Defendants Cuccinota and Taylor, as Defendants' Legal Collections Managers, persisted in those lawsuits, despite Mr. Angermeir's categorical assertions, under penalties of perjury, that the lease was forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendants Brown, Cucinotta, and Taylor were actually or constructively responsible for the impermissible access as well as wrongful refusal to conduct a reasonable investigation into Mr. Angermeir's dispute about the adverse entries in his consumer credit report raised through Experian and/or wrongful refusal to remove that entry.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Brown's, Cucinotta's, and Taylor's legitimate employment responsibilities.

51. Mr. Angermeir's credit report also reflected the judgment in the amount of $3,680.00 entered by MBF.

52. Furthermore, as a result of the Enterprise's actions, Mr. Angermeir's credit was ruined.  As a result, he suffered significant economic damages and non-economic damages, including without limitation annoyance, mental anguish,

embarrassment, and emotional distress.  Mr. Angermeir had to retain attorneys and incur legal expenses in New York,[2] and waste considerable time and effort.

Mr. Nitesh Bhagwanani

53. On or about October 31, 2008, Defendants' representative approached Mr. Bhagwanani's business to sell credit card processing and check cashing services. The representative told Mr. Bhagwanani categorically that the equipment for credit card processing would be provided for 90 days on a trial basis, and that Mr. Bhagwanani could cancel the arrangement at any time without penalties.  Based on these representations, Mr. Bhagwanani signed a one-page document, an alleged lease, amongst other documents.

54. Consistent with these representations to Mr. Bhagwanani, the term and the schedule of payments was left blank in that one-page lease, to be filled in after Mr. Bhagwanani's trial period, and after Mr. Bhagwanani agreed to that transaction.

55. Nevertheless, the very next month, Mr. Bhagwanani noticed that Defendant Northern Leasing had debited his account.  Mr. Bhagwanani immediately contacted Defendant's representative.  Defendants' representative told Mr. Bhagwanani that the charges were made by mistake and promised to look into it. The charges were never reversed, and the money was never refunded to Mr.

---

[2]It has been well known for at least a decade that such damages include, for example, increased interest rates on existing debts, loss of promotional opportunities, curtailment and even outright refusal of credit.  P. McGeehan, *The Plastic Trap: Soaring Interest Compounds Credit Card Pain for Millions*, N.Y. Times, Nov. 21, 2004, at A1.

Bhagwanani's business.  After several telephone calls from Mr. Bhagwanani,
Defendants' representative stopped answering his calls and disappeared without
a trace.

56.    In order to stop the unauthorized deductions, Mr. Bhagwanani closed his
business bank account.

57.    Mr.  Bhagwani informed Defendant Northern Leasing that the leases were
forged.[3]  Defendants promised to conduct an "investigation."

58.    Defendants never bothered conducting any "investigation."  Nevertheless,
Defendants insisted that the signatures on the lease as well as the guarantees
were genuine, not forgeries.

59.    On or about September 11, 2009, Defendant Northern Leasing commenced its
usual lawsuit in New York City Civil Court through the Sussman Defendants.  The
complaint was verified by Defendant Cucinotta, and notarized by Defendant
Centeno.  On March 15, 2010, Defendant Northern Leasing obtained a default
judgment for $6,739.87 against Mr. Bhagwanani.

60.    Mr. Bhagwanani was unaware of the lawsuit and the default judgment until his
personal bank account was frozen.  Thereupon, Mr.  Bhagwanani had to retain
attorneys in New York, and incur attorneys' fees and litigation expenses.

---

[3]Forgery is "committed by procuring, by some artifice, trick, or device, the
signature of the grantor to a deed which he had no intention of signing." *NYJUR2d,
DEEDS* § 212, *Forged and Altered Instruments. Accord, Gerenstein v. Williams*, 282
A.D.2d 786, (3ʳᵈ Dept. 2001). "A deed based on forgery or obtained by false pretenses is
void *ab initio*," *First Nat. Bank of Nevada v. Williams*, 74 A.D.3d 740, 742 (2ⁿᵈ Dep't
2010).

61.  Mr. Bhagwanani, through his attorneys, moved the New York City Civil Court to set aside the default judgment.  In opposition, Defendant Brown submitted an affidavit asserting, under penalties of perjury, that Mr. Bhagwanani had, in a phone conversation with Defendants' representative, "affirmatively verified" all material terms of the alleged lease.  Defendant Brown submitted what he claimed to be an audio-recording thereof.  In the accompanying papers, the Sussman Defendants heaped abuse on Mr. Bhagwanani for alleged perjury.

62.  In fact, the audio-recording was that of a conversation between Defendants' representative in New York and their own representative in California who impersonated Mr. Bhagwanani.  In other words, Defendants had confirmed the alleged lease terms with their own representative, and sought to saddle Mr. Bhagwanani with those terms - and abuse him for perjury on top of that.

63.  On June 20, 2011, the New York City Civil Court heard Mr. Bhagwanani's motion, vacated the judgment entered against Mr. Bhagwanani, and dismissed the lawsuit.

64.  The Enterprise, under the name of Defendant Northern Leasing, also made adverse entries in Mr. Bhagwanani's personal consumer credit report, which caused him tremendous damage.

65.  On or about August 31, 2009 and December 3, 2009, Defendants, through Defendant Northern Leasing, accessed Mr. Bhagwanani's consumer credit report. Such access was impermissible, unauthorized, and violative of federal and state law.

66. Defendants never provided any advance or written notice to Mr. Bhagwanani that they intended to pull his consumer credit report. Such notice is mandatory under New York law.

67. Further, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Mr. Bhagwanani's consumer credit report, stating that he had "Installment" accounts with "Balance" of $5,934, and that this accounts were opened in November of 2008. Northern Leasing also reported that the "Account" was "charged-off." These entries were false and misleading.

68. Defendant Northern Leasing did not have any authority to access or make any entry in Mr. Bhagwanani's credit report.

69. On or about August 2, 2011, Mr. Bhagwanani disputed the said entries to Experian. Upon information and belief, Experian duly notified Defendants, through Defendant Northern Leasing, of Mr. Bhagwanani's dispute with a request to conduct a reasonable investigation into that dispute. Such reasonable investigation is mandatory under federal and State law.

70. Defendants wilfully failed and refused to conduct any investigation. Although Mr. Bhagwanani had categorically asserted that his signatures had been forged in the alleged leases, Defendants did not even bother calling Mr. Bhagwanani by phone, or writing to him, or communicating with him in any manner in this connection.

71. Defendants knew or ought to have known that Mr. Bhagwanani had no account with them, and did not owe Defendants anything.

72.  Defendant Brown, as Defendants' Director of Legal Collections, Defendants Cuccinota and Taylor, as Defendants' Legal Collections Managers, persisted in those lawsuits, despite Mr. Bhagwanani's categorical assertions, under penalties of perjury, that the lease was forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendants Brown, Cucinotta, and Taylor were actually or constructively responsible for the impermissible access as well as wrongful refusal to conduct a reasonable investigation into Mr. Bhagwanani's dispute about the adverse entries in his consumer credit report raised through Experian and/or wrongful refusal to remove that entry.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Brown's, Cucinotta's, and Taylor's legitimate employment responsibilities.

73.  Mr. Bhagwanani's credit report also reflected judgment in the amount of $5,934.00 entered by Northern Leasing.

74.  Furthermore, as a result of the Enterprise's actions, Mr. Bhagwanani's credit was ruined.  As a result, he suffered significant economic damages and significant non-economic damages, including without limitation mental anguish, embarrassment, annoyance, and emotional distress.  In addition, Mr. Bhagwanani had to retain attorneys in New York and incur attorneys' fees and expenses, and waste considerable time and effort.

<u>Mr. Ken Elder</u>

75.     At relevant times, Mr. Elder was a part-owner of a liquor store in Bayton, Texas.

76.   In January 2009, Defendants' agent approached Mr. Elder's business to sell a

check verification machine.  Mr. Elder agreed, and paid $5,475.06 towards the

purchase price of that machine, which was duly delivered and installed.

77.   In June 2011, Mr. Elder and his co-owners sold the liquor store, for which

purpose they got their business bank statements audited.  During that audit, Mr.

Elder discovered for the first time that Defendant MBF Leasing had been

electronically deducting money from their business account every month.

78.   Thereupon, Mr. Elder immediately contacted Defendant MBF Leasing and

demanded a refund.  He informed them that he had not even heard of MBF

Leasing.   Defendants' representative asserted that Mr. Elder had signed a non-

cancelable lease with Defendant MBF Leasing, and had personally guaranteed the

payments thereunder.  Mr. Elder requested a copy of the alleged lease, which the

representative sent to him.

79.   Upon review of the lease, it was clear that Mr. Elder's signatures were forged.  Mr.

Elder pointed out the various discrepancies to Defendants' representatives, and

demanded a refund of all the money that Defendants had taken out of his

business bank account.  Defendants' representatives refused to do so.

80.   Instead, Defendants, under the name of Defendant Northern Leasing,

commenced their usual lawsuit against him in the New York City Civil Court for

$3,838.08.  The lawsuit was filed by the Sussman Defendants, while the

Complaint was verified by Defendant Taylor and notarized by Defendant

Centeno.  Defendants obtained a default judgment against Mr. Elder.  Mr. Elder

was unaware of the lawsuit and the default judgment thereunder until Defendants froze Mr. Elder's mother's bank account ostensibly in enforcement of that default judgment.

81. Thereupon, Mr. Elder had to retain attorneys in New York, and incur attorneys' fees and litigation expenses.

82. Meanwhile, Defendants had made derogatory entries in Mr. Elder's <u>personal</u> consumer credit report.  Defendants, through Defendant MBF, accessed Mr. Elder's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and state law.

83. Defendants never provided any advance or written notice to Mr. Elder that they intended to pull his consumer credit report.  Such notice is mandatory under New York law.

84. Further, Defendants, under the name of Defendant MBF, made an adverse entry in Mr. Elder's consumer credit report.   MBF also reported that the "Account" was "charged-off."  Each of the said entries was false and misleading.

85. Defendant MBF did not have any authority to access or make any entry in Mr. Elder's credit report.

86. Defendants knew or ought to have known that Mr. Elder had no account with them, and did not owe Defendants anything.

87. Defendant Brown, as Defendants' Director of Legal Collections, Defendants Cuccinota and Taylor, as Defendants' Legal Collections Managers, persisted in the lawsuit, despite Mr. Elder's categorical assertions, under penalties of perjury, that

the lease was forged, and despite Defendants' lack of any evidence to the contrary. Further, Defendants Brown, Cucinotta, and Taylor were actually or constructively responsible for the impermissible access. Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Brown's, Cucinotta's, and Taylor's legitimate employment responsibilities.

88. Mr. Elder's credit report also reflected the default judgment fraudulently obtained by Defendants in the amount of $3,198, which was entered under the name of MBF Leasing.

89. Furthermore, as a result of the Enterprise's actions, Mr. Elder's credit was ruined. As a result, he suffered significant economic and non-economic damages, including without limitation waste of time and effort, mental anguish, embarrassment, annoyance, and emotional distress, for which Defendants are liable jointly and severally.

Ms. Becky D. Glynn

90. On or about February 17, 2009, Ms. Glynn received an invoice from Defendants, under the name of Defendant MBF Leasing, concerning overdue payments for an alleged lease of a credit card processing machine. Ms. Glynn had never had any dealings, and indeed, had not even heard about Defendant MBF Leasing.

91. Thereupon, Ms. Glynn contacted Defendant MBF Leasing through the toll free number on the invoice. During the telephone conversation, Defendant MBF Leasing's representative asserted that Ms. Glynn had signed a lease with Defendant MBF Leasing. Ms. Glynn requested a copy of the alleged lease.

92.   On February 24, 2009, Defendant MBF Leasing faxed a copy of the alleged lease to Ms. Glynn.  According to the lease, allegedly signed in 2006, Ms. Glynn was an owner of a Laundromat in Washington, D.C.

93.   The alleged lease was a fraudulent document with forged signatures.  Ms. Glynn contacted Defendant MBF Leasing immediately and advised its representative that she had been a resident of Texas since 1993, and neither owned any business in Washington, D.C., nor signed any equipment leases.

94.   Defendants' representatives thereupon demanded that Ms. Glynn send them an affidavit of forgery in their standard form, whereupon, they said, they would "investigate" the situation.

95.   On March 3, 2009, Ms. Glynn filed an ID theft complaint with the San Antonio Police Department, completed the affidavit of forgery requested by Defendants' representatives, and mailed it along with a copy of her driver's license to Defendants.

96.   Subsequently, Defendants' representatives requested additional documents from Ms. Glynn.  They demanded that Ms. Glynn send a copy of identification documents to verify her signature and identity.  Ms. Glynn promptly sent a copy of her driver's license and other identification documents.

97.   For about a year, Ms. Glynn repeatedly contacted Defendants attempting to resolve the fraud and ID theft issue and sending them documents, relying on their promises of a "reasonable investigation."

98.     However, Defendants never bothered to conduct any investigation.  Ms. Glynn never received any meaningful response – except demands for more documents – from Defendants.

99.     In November 2009, Ms. Glynn began to receive dunning letters from Defendants demanding payments under the forged lease.

100.    On April 21, 2010, Ms. Glynn received a copy of a Summons and Verified Complaint filed by Defendant MBF Leasing in the N.Y. City Civil Court demanding $4,620 from her personally.  The lawsuit was commenced by the Sussman Defendants, and the Complaint was verified by Defendant Cucinnotta.

101.    Promptly, on April 22, 2010, Ms. Glynn contacted Defendants regarding the lawsuit.  Defendants' representative informed her that he would expedite her paperwork to accounting in order to determine whether enough evidence was presented to support Ms. Glynn's claim of fraud and ID theft.  Defendants' representative also stated that Ms. Glynn should be prepared to either settle, retain a lawyer, or appear herself in New York to answer and defend the lawsuit filed in New York City Civil Court.

102.    Ms. Glynn never heard back from Defendants in response to her complaints about fraud and forgery.

103.    Ms. Glynn had to retain a lawyer and incur legal expenses in New York to avoid the default judgment.  That lawsuit has now been stayed upon consent of counsel.

104.   The Enterprise, under the name of Defendant MBF, also made adverse entries in Ms. Glynn's personal consumer credit report, which caused her tremendous damage.

105.   On or about October 19, 2009, October 29, 2009, November 10, 2009, and February 18, 2010, Defendants, through Defendant MBF, accessed Ms. Glynn's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and state law.

106.   Defendants never provided any advance or written notice to Ms. Glynn that they intended to pull her consumer credit report.  Such notice is mandatory under New York law.

107.   Defendant MBF did not have any authority to access or make any entry in Ms. Glynn's credit report.

108.   Furthermore, as a result of the Enterprise's actions, Ms. Glynn's credit was damaged.  As a result, she suffered significant economic damages and significant non-economic damages, including without limitation mental anguish, embarrassment, annoyance, and emotional distress, for which Defendants are liable jointly and severally.  In addition, she had to retain attorneys and incur legal expenses in New York, and waste considerable time and effort.

<u>Mr. Rajat Goyal</u>

109.   In 2005, Mr. Goyal owned two convenience stores in Anderson County, South Carolina.  In July-August 2006, Defendants' agent approached Mr. Goyal's business to sell credit card processing services.  At that time, Mr. Goyal already

had a credit card processing machine in each of his stores, which machines had been supplied by his then-processing agent.

110.  Shortly thereafter, Defendant Northern Leasing commenced automatic deductions from Mr. Goyal's business accounts.

111.  Mr. Goyal discovered these deductions in March 2007 while doing his taxes. Thereupon, Mr. Goyal immediately contacted Defendant Northern Leasing to inquire about the charges.  Defendants' representative asserted that Mr. Goyal had signed a non-cancellable lease for the credit card machines.  Mr. Goyal requested a copy of the alleged lease.  Defendants sent him a copy of the alleged lease.

112.  Upon review of the lease, it was clear that Mr. Goyal's signatures were forged.  It appeared that Defendants' agent, while at the store, had copied the serial numbers of Mr. Goyal's own machines, and manufactured a lease by forging Mr. Goyal's signatures and misusing other information to enable Defendants commence their clandestine automatic deductions.

113.  Mr.  Goyal informed Defendant Northern Leasing's representative that the leases were forged, and tried to explain the situation.  Defendants' representatives were very rude, and did not have the slightest interest in what Mr. Goyal had to say. Finally, they asked him to send an affidavit of forgery in their standard form, and promised to conduct an "investigation."

114.  Mr. Goyal did so, but Defendant Northern Leasing's representatives disclaimed receipt.  He once again sent the duly notarized affidavit of forgery - this time, by registered mail.  Nevertheless, Defendants continued denying receipt.

115.  Shortly thereafter, Defendants, under the name of Defendant Northern Leasing, brought a lawsuit in the New York City Civil Court for $5,321.70.  The lawsuit was filed by the Sussman Defendants, with the complaint being verified by Defendant Robert Taylor and notarized by Defendant Centeno.

116.  Thereupon, Mr.  Goyal had to retain attorneys in New York, and incur attorneys' fees and litigation expenses.

117.  Mr. Goyal moved to dismiss the lawsuit, supported by his own affidavit with relevant documents.

118.  In response, Defendant Brown, filed an affidavit under penalties of perjury, asserting that Mr. Goyal had, in fact, entered into the lease.  Further, Defendant Brown stated in that affidavit:

> On August 4, 2006, Clifford Jean Bart of [Defendant Northern Leasing's] Verifications Department placed a call to (846) 261-7190, [Mr. Goyal's] place of business. [Mr. Goyal] confirmed his identity to Mr. Bart by providing his social security number and date of birth . .

119.  That assertion was also false.  In fact, Mr. Goyal was not even in the country on August 4, 2006: he had left U.S. on August 2, 2006, got engaged in India on August 6, 2006, and married in India on August 12, 2006.  Mr. Goyal filed a reply affidavit with entries from his passport, and his wedding invitation.

120.   On May 3, 2011, Mr. Goyal's motion to dismiss came up for hearing in the New York City Civil Court.  Defendants thereupon, finally, withdrew their complaint.

121.   The Enterprise, under the name of Defendant Northern Leasing, also made adverse entries in Mr. Goyal's personal consumer credit report, which caused him tremendous damage.

122.   On or about August 31, 2009 and December 3, 2009, Defendants, through Defendant Northern Leasing, accessed Mr. Goyal's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and state law.

123.   Defendants never provided any advance or written notice to Mr. Goyal that they intended to pull his consumer credit report.  Such notice is mandatory under New York law.

124.   Further, Defendants, under the name of Defendant Northern Leasing, made an adverse entry in Mr. Goyal's consumer credit report, stating that he had an account with credit limit of $7,678, and "Recent Balance" of $4,435, and that this account was opened in August of 2006.   Northern Leasing also reported that the "Account" was "charged off" and that $4,615 was "written off."  These entries were false and misleading.

125.   Defendant Northern Leasing did not have any authority to access or make any entry in Mr. Goyal's credit report.

126.   In April 2011, Mr. Goyal disputed the said entries to Experian.  Upon information and belief, Experian duly notified Defendants, through Defendant Northern Leasing, of Mr. Goyal's dispute with a request to conduct a reasonable

investigation into that dispute.  Such reasonable investigation is mandatory under federal and State law.

127.   Defendants wilfully failed and refused to conduct any investigation.  Although Mr. Goyal had categorically asserted that his signatures had been forged in the alleged leases, Defendants did not even bother calling Mr. Goyal by phone, or writing to him, or communicating with him in any manner in this connection.

128.   Defendants knew or ought to have known that Mr. Goyal had no account with them, and did not owe Defendants anything.

129.   Defendant Brown, as Defendants' Director of Legal Collections, Defendants Cuccinota and Taylor, as Defendants' Legal Collections Managers, persisted in those lawsuits, despite Mr. Goyal's categorical assertions, under penalties of perjury, that the lease was forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendants Brown, Cucinotta, and Taylor were actually or constructively responsible for the impermissible access as well as wrongful refusal to conduct a reasonable investigation into Mr. Goyal's dispute about the adverse entries in his consumer credit report raised through Experian and/or wrongful refusal to remove that entry.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Brown's, Cucinotta's, and Taylor's legitimate employment responsibilities.

130.   Furthermore, as a result of the Enterprise's actions, Mr. Goyal's credit was ruined.  As a result, he suffered significant economic damages and significant non-economic damages, including without limitation mental anguish,

embarrassment, annoyance, and emotional distress.  In addition, he had to retain

attorneys and incur legal expenses in New York, and waste considerable time and

effort.

Ms. Kristina Greene

131.   In 2005, Ms. Greene opened a restaurant in Oilton, Oklahoma.  Defendants'

agent went to her restaurant, and offered a credit card processing arrangement.

He represented that the arrangement could be terminated at will, without any

penalties or further obligations.  On that understanding, Ms. Greene agreed to the

arrangement, and accepted a credit card processing machine.

132.   In May 2006, Ms. Greene closed her restaurant.  No longer needing the credit

card machine, she returned it, and closed her business bank account, and

believed that to be the end of the credit card processing arrangement.

133.   But shortly thereafter, Ms. Greene started receiving dunning phone calls,

ostensibly from Defendant Northern Leasing.  Defendants' representative

asserted that Ms. Greene had signed a non-cancellable lease with Defendant

Northern Leasing, and that she had personally guaranteed payments thereunder.

Hence, Defendants insisted, Ms. Greene had to continue paying them for the

entire period of the lease whether or not she needed, desired, or used the

machine.

134.   Ms. Greene requested a copy of the alleged lease.

135.   Defendants eventually sent Ms. Greene a copy of the alleged lease.

136. The alleged lease was a fraudulent document with forged signatures.  Ms. Greene contacted Defendants immediately and advised its representative that she had never seen that lease before, and her signatures were forgeries.  She immediately filed a police report on February 20, 2007, and informed Defendants of the same.

137. Nevertheless, Defendants, under the name of Defendant Northern Leasing, proceeded to file a lawsuit against her in the New York City Civil Court for $1,739.65.  That complaint was verified by Defendant Sara Krieger under penalties of perjury, and was filed by Defendant Joseph Sussman and his law firm Joseph I. Sussman, P.C.

138. Thereupon, Ms. Greene called Defendant Northern Leasing.  Defendants demanded that Ms. Greene send them an affidavit of forgery in Defendants' standard form, whereupon they would "investigate" the situation and revert to her.

139. Ms. Greene relied on these representations, and completed the affidavit of forgery requested by Defendants.   She then sent the affidavit, duly notarized, to Defendant Northern Leasing.

140. Defendants never bothered sending her any written response, and never bothered conducting any reasonable investigation in good faith.

141. Instead, Defendants proceeded to enter a default judgment against Ms. Greene for $1,743.04 in the New York City Civil Court.

142. About 4 ½ years later, in February 2012, Defendants froze $3,400 in a bank account belonging to Ms. Greene's mother.

143.   Ms. Greene had to retain a lawyer and incur legal expenses in New York to vacate the default judgment.

144.   Meanwhile, Defendants had made derogatory entries in Ms. Greene's <u>personal</u> consumer credit report.  As a result, she suffered the usual consequences of such adverse reports, quite apart from having to retain attorneys and incurring legal expenses in New York.  In addition, Ms. Greene had to waste considerable time and effort, and was subjected to considerable annoyance, embarrassment, emotional distress, and mental anguish.

<u>Ms. Marilyn Murrell</u>

145.   Ms. Murrell never had any dealings with, and indeed, had never heard about any of the Defendants.

146.   In late 2010, Ms. Murrell received a letter, ostensibly from Defendant Northern Leasing, claiming that she had signed a lease and personal guarantee. Thereupon, she promptly called up Defendant Northern Leasing and informed them that she did not sign any such lease.[4]

147.   Meanwhile, Ms. Murrell discovered that Defendant Northern Leasing had already made electronic deductions from her business bank account.

---

[4]One Federated Payment Systems, ostensibly marketing credit card processing services, offered Ms. Murrell significant savings if she used a machine provided by Federated.  Ms. Murrell agreed, whereupon Federated left the credit card processing machine with Ms. Murrell.  There was never any discussion of any lease, and she signed no such lease.

148.   Ms. Murrell promptly returned the machine to Defendant Northern Leasing. Defendant Northern Leasing accepted the machine without any objections or reservations.

149.   In January 2012, Ms. Murrell closed her business bank account to prevent Defendant Northern Leasing from continuing to withdraw funds from her account.

150.   Immediately, Ms. Murrell started receiving dunning phone calls from Defendants to coerce payments.

151.   Eventually, on January 6, 2012, the Sussman Defendants commenced a lawsuit on behalf of Defendants, under the name of Defendant Northern Leasing, in the N.Y. City Civil Court against Ms. Murrell personally.

152.   Defendant Centeno verified the complaint filed in that case under penalties of perjury.

153.   Ms. Murrell had to retain a lawyer and incur litigation expenses and fees therefor.[5]

154.   The Enterprise, under the name of Defendant NLS, also made adverse entries in Ms. Murrell's personal consumer credit report, which caused her tremendous damage.

155.   Defendants, through Defendant NLS, accessed Ms. Murrell's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and state law.

---

[5]By agreement between counsel, that lawsuit has been stayed.

156.   Defendants never provided any advance or written notice to Ms. Murrell that they intended to pull her consumer credit report.  Such notice is mandatory under New York law.

157.   Further, Defendants, under the name of Defendant NLS, made an adverse entry in Ms. Murrell's consumer credit report, stating that he had "Installment Loan" account with "Balance" of $2,760, and that this account was opened in November of 2010.   NLS also reported that the "Account" was "charged-off."  Each of the said entries were false and misleading.

158.   Defendant NLS did not have any authority to access or make any entry in Ms. Murrell's credit report.

159.   Defendants knew or ought to have known that Ms. Murrell had no account with them, and did not owe Defendants anything.

160.   Defendant Brown, as Defendants' Director of Legal Collections, Defendants Cuccinota and Taylor, as Defendants' Legal Collections Managers, persisted in the lawsuit, despite Ms. Murrell's categorical assertions, under penalties of perjury, that the lease was forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendants Brown, Cucinotta, and Taylor were actually or constructively responsible for the impermissible access.  Commission of fraud and wilfully violating the law as detailed in this Complaint was beyond the scope of Defendant Brown's, Cucinotta's, and Taylor's legitimate employment responsibilities.

161.    Furthermore, as a result of the Enterprise's actions, Ms. Murrell's credit was ruined.  As a result, she suffered significant economic damages and significant non-economic damages, including without limitation mental anguish, embarrassment, annoyance, and emotional distress.  In addition, she had to retain attorneys and incur legal expenses in New York, and waste considerable time and effort.

Dr. Shiva Shabnam

162.    Dr. Shabnam had never had any dealings with, and, indeed, had never even heard about Defendants.

163.    In May 2009, the Sussman Defendants commenced an action against Dr. Shabnam on behalf of Defendants, in the name of Defendant Lease Finance Group, in the New York City Civil Court, County of New York.  The complaint was verified by Defendant Cucinotta under penalties of perjury, and notarized by Defendant Centeno.  The lawsuit was based upon an alleged lease that Dr. Shabnam signed with Lease Finance.

164.    Dr. Shabnam was never served with process and was not aware of the lawsuit.  On November 20, 2009, Defendants obtained a default judgment in the amount of $7,365.07 against Dr. Shabnam in the New York City Civil Court.

165.    Dr. Shabnam was unaware of the lawsuit and the default judgment.

166.    Sometime in October of 2010, Dr. Shabnam came to know of the judgment from her credit report.  Thereupon, Dr. Shabnam  filed an identity theft report with the Los Angeles Police Department on October 29, 2010.

167.   Dr. Shabnam contacted Defendant Lease Finance Group and informed them of the forgery, whereupon Defendants demanded that she submit an affidavit of forgery on their standard form, and they would then conduct an "investigation."

168.   Dr. Shabnam submitted the affidavit of forgery as requested by Defendants.  But Defendants never conducted any "investigation".  Instead, they flatly told her, "We have an entered judgment and just want to be paid regardless if you owe the debt or not."

169.   Left with no choice, on January 24, 2011, Dr. Shabnam moved the N.Y. City Civil Court to vacate that judgment.  She had to retain an attorney and incur attorneys' fees and expenses.  Defendants simply defaulted on the return date of that motion, and the N.Y. City Civil Court vacated the default judgment and dismissed Defendants' complaint with prejudice.

170.   The Enterprise, under the name of Defendant LFG, also made adverse entries in Ms. Shabnam's personal consumer credit report, which caused her tremendous damage.

171.   Defendants, through Defendant LFG, accessed Ms. Shabnam's consumer credit report.  Such access was impermissible, unauthorized, and violative of federal and state law.

172.   Defendants never provided any advance or written notice to Ms. Shabnam that they intended to pull her consumer credit report.  Such notice is mandatory under New York law.

173. Further, Defendants, under the name of Defendant LFG, made an adverse entry in Ms. Shabnam's consumer credit report, stating that she had a "Lease" account with "Balance" of $6,348 for 48 months, and that this account was opened in April of 2008.   LFG also reported that the "Account" was "charged-off."  Each of the said entries were false and misleading.

174. Defendant LFG did not have any authority to access or make any entry in Ms. Shabnam's credit report.

175. Defendants wilfully failed and refused to conduct any investigation.  Although Ms. Shabnam had categorically asserted that her signature had been forged in the alleged lease, Defendants did not even bother calling Ms. Shabnam by phone, or writing to her, or communicating with her in any manner in this connection.

176. Defendants knew or ought to have known that Ms. Shabnam had no account with them, and did not owe Defendants anything.

177. Defendant Brown, as Defendants' Director of Legal Collections, Defendants Cuccinota and Taylor, as Defendants' Legal Collections Managers, persisted in those lawsuits, despite Ms. Shabnam's categorical assertions, under penalties of perjury, that the lease was forged, and despite Defendants' lack of any evidence to the contrary.  Further, Defendants Brown, Cucinotta, and Taylor were actually or constructively responsible for the impermissible access as well as wrongful refusal to conduct a reasonable investigation into Ms. Shabnam's dispute about the adverse entries in his consumer credit report raised through Experian and/or wrongful refusal to remove that entry.  Commission of fraud and wilfully

violating the law as detailed in this Complaint was beyond the scope of Defendant Brown's, Cucinotta's, and Taylor's legitimate employment responsibilities.

178.   Ms. Shabnam's credit report also reflected the default judgment in the amount of $6,348.00 entered by LFG.

179.   Furthermore, as a result of the Enterprise's actions, Ms. Shabnam's credit was ruined.  As a result, she suffered significant economic damages and significant non-economic damages, including without limitation mental anguish, embarrassment, annoyance, and emotional distress, for which Defendants are liable jointly and severally.

## COUNT I

### (RICO, 18 U.S.C. §1962(c))

180.   The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

181.   The association of Defendants and others whose identities are known only to Defendants at this time (cumulatively, the "Conspirators"), constituted an Enterprise within the meaning of 18 U.S.C. §1961(c), which Enterprise was engaged in, and whose activities affected, interstate and foreign commerce.  This Enterprise was continuous in that it lasted for more than two years, had an ascertainable structure, and was distinct from the predicate offenses alleged here.

182.   Each Defendant is a person within the meaning of 18 U.S.C. §1961(3) and separate from the enterprise.

183.   Defendant Cohen, the President of the Defendant Northern Leasing and officer of some of the other related corporate enterprises, was in charge of all its day-to-day operations.  As such, he was one of the masterminds of the Enterprise who set up, orchestrated, and supervised the entire racketeering scheme at issue.  While he and the other Conspirators acted through various corporate entities, they functioned from the same business premises, with the same staff, in the same ostensible business, with the same standard form lease and the same *modus operandi.*

184.   Defendant Krieger, the Vice President for Operations of the Defendant Northern Leasing, and an officer of some of the other related corporate enterprises, was and remains one of the masterminds of the Enterprise.  She was responsible for several aspects of its day-to-day operations, lease originations, and sales.  In addition, until recently, she routinely verified most of the fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

185.   Defendant Cucinotta, is one of the wilful, active participants in the Enterprise. He is the Legal Collections Manager for the corporate Defendants, and an officer of some of the other related corporate enterprises, was responsible for collection aspects of the Enterprise.  He was one of the persons who routinely verified many fraudulent complaints filed in the New York City Civil Court under penalties of perjury.

186.   Defendant Ricardo Brown is one of the wilful, active participants in the Enterprise which is the subject of this action.  He is the Director of Legal

Collections for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted.  He was one of the persons who verified many fraudulent complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise**.**

187.    Defendant Robert Taylor is a wilful, active participant in the Enterprise which is the subject of this action.  He is the Legal Collections Manager for the Defendants, and an officer of some of the shell entities through which the Enterprise is conducted.  He was one of the persons who verified many fraudulent complaints filed by the Sussman Defendants in the New York City Civil Court on behalf of the Enterprise**.**

188.    Defendant Joseph I. Sussman is an attorney duly admitted to the Bar in New York.  Since late 2002, and continuing to date, he commences and conducts all of the litigation in the New York City Civil Court on behalf of the Enterprise.

189.    The remaining Defendants are corporate entities, through which the Enterprise functioned, and through which the underlying racketeering scheme was carried out.

190.    Defendants' *scienter* is established from their pattern and practices at issue and the centrality of these practices to their entire business.  As the New York Court of Appeals observed while upholding fraud claims against Defendant Cohen and others, "As alleged, the fraud in this case was not an isolated incident, but rather a nationwide scheme that took place over a number of years."  *Pludeman v.*

*Northern Leasing Systems, Inc.*, 10 N.Y.3d 486, 493 (2008).  Moreover, Defendants continued their misconduct nonchalantly.

191.   Defendants' *scienter* may also be inferred from the fact that the scheme at issue has continued despite several racketeering and class actions in various courts throughout the country impugning Defendants' deceptive business practices over the past several years, which actions are still pending as of today.[6]  In one such action, for example, the New York Court of Appeals, the highest court of the State of New York, held that Defendants' systematic deception warranted an inference of fraud "against the corporate officers in their individual capacity . . ." *Pludeman*, 10 N.Y.3d at 493.  Defendants knew, or should have known, of that pronouncement and taken affirmative steps to stop filing these fraudulent lawsuits in the New York City Civil Court.

192.   Further, at least since 2005, in those rare cases where the small businesspersons from far away places did raise challenges in the New York City Civil Court, judges refused to enforce Defendants' consent to jurisdiction and/or forum selection clauses whereunder they have been dragging small businesspersons from far off places to New York courts.  As one judge held:

> It is apparent that [Defendant Northern Leasing's] suit in New York, approximately 1600 miles away from where defendant lives and works, puts defendant at a significant disadvantage in

---

[6]For example, the Attorney General of the State of New York commenced a lawsuit in New York Supreme Court, New York County, on April 23, 2012, asserting that Defendant Northern Leasing and its affiliates had been engaged in a fraudulent scheme to collect over $10 million from lessees under long-expired leases under false representations.  People of the State of New York v. SKS Associates, et al, 400908/2012 (N.Y. Sup. N.Y. Co.) (Donna Mills, J.S.C.).

defending herself.  From the numerous cases that it has presided over, this court is aware of the boiler-plate provision in [Defendant Northern Leasing's] lease agreement to justify proceeding against an out-of-state resident in New York. "To allow [Defendant Northern Leasing] to do so is to effectively deprive litigants [such as defendant] of their day in court." *Northern Leasing Systems, Inc. v. Soumastre*, Civ Ct, N.Y. Cty, January 26, 2005, Cooper, J., Index No. 13566/03

*Northern Leasing Sys., Inc. v. Walton*, CV049136/02NY, 2012 WL 2466977 (N.Y. Civ. Ct. June 25, 2012).  It merits emphasis that the *Soumastre* decision was of 2005, about nine *years* ago, during which time Defendants continued filing these boilerplate lawsuits.

193.   The Sussman Defendants were Defendants' attorneys in each of those cases.  Thus, the Sussman Defendants knew at least since 2005 that judges in the New York City Civil Court had refused to exercise jurisdiction in New York over the lawsuits brought by the Enterprise, and that commencing such boilerplate lawsuits here were, according to New York courts, attempts to deprive Plaintiffs and others of their day in court, *i.e.*, violative of elementary Due Process.

194.   Nevertheless, the Sussman Defendants have commenced and continued to commence these lawsuits in New York City Civil Court, presumably in the hopes of default judgments, without informing that Court in such subsequent lawsuits of these precedents refusing jurisdiction.  The Sussman Defendants, as attorneys duly admitted to the Bar in New York State, have a duty of candor to the Court, and are obligated to inform the Court of decisions such as those cited above.  Instead, they have continued to file their boilerplate complaints with boilerplate verifications by Defendants as before.

195.   Each Defendant knew, or should have known, of all these legal proceedings, and the decisions therein.  Nevertheless, they have continued their lucrative racketeering Enterprise.

196.   Defendants participated, and conspired with others (including others whose identities are known only to Defendants at this time) to participate, in the affairs of the aforementioned Enterprise through a pattern of racketeering activity, as more fully set forth below, all in violation of 18 U.S.C. §§ 1962(c)).

Mail Fraud, Violations of 18 U.S.C. §1341

197.   Defendants and the other members of the enterprise, having devised or intending to devise the scheme or artifice to defraud, and/or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, for the purpose of executing such scheme or artifice or attempting so to do, placed in post office(s) or authorized depository for mail matter, several letters and/or packages to be sent or delivered by the Postal Service, and/or took or received therefrom, letters and/or packages, or knowingly caused to be delivered by mail or such carrier according to the direction thereon, or at the place at which it was directed to be delivered by the addressee such letters and/or packages. Specifically,

a.   On or about November 10, 2009, Defendants in New York caused the mailing, through the use of interstate mails, of a summons and complaint to Mr. Angemeir in California;

b.      On or about November 17, 2009, Defendants in New York caused the mailing, through the use of interstate mails, of another copy of the summons and complaint to Mr. Angemeir in California;

c.      On or about December 15, 2009, Defendants in New York caused the mailing, through the use of interstate mails, of another copy of the summons and complaint to Mr. Angemeir in California;

d.      On or about January 28, 2011, Defendants in New York caused the mailing, through the use of interstate mails,  of an order to show cause by Mr. Angermeir in California to Defendants in New York.

e.      On or about April 9, 2009, Defendants in New York caused the mailing, through the use of interstate mail, of a letter to Mr. Bhagwanani in California;

f.      On or about December 9, 2010, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Bhagwanani in California;

g.      On or about November 17, 2011, Defendants' agent in Texas, through the use of interstate mail, mailed to New York, caused the mailing of an affidavit of service ostensibly reflecting service of process upon Mr. Elder;

h.      On or about January 10, 2012, Defendant Centeno in New York, through the use of interstate mail, mailed a copy of the summons and complaint to Texas, ostensibly to Mr. Elder;

i.  On or about February 17, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

j.  On or about February 24, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

k.  On or about May 6, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

l.  On or about November 4, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

m.  On or about November 9, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

n.  On or about November 11, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Ms. Glynn in Texas;

o.  On or about September 16, 2010, the Sussman Defendants in New York, through the use of interstate mails, caused the mailing of a summons and complaint to Mr. Goyal in South Carolina;

p.  On or about October 21, 2008, the Sussman Defendants in New York, through the use of interstate mails, caused the mailing of a letter to Mr. Goyal falsely asserting that Mr. Goyal had personally guaranteed a lease, and was fully responsible for all payments thereunder;

q.  On or about May 19, 2008, Defendants in New York, through the use of interstate mails, mailed their blank standard form affidavit of forgery to Mr. Goyal in South Carolina;

r.     On or about April 22, 2008, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Goyal in South Carolina asserting that he had signed a non-cancelable lease with a personal guaranty, and demanding that he contact Defendants "immediately";

s.     On or about May 19, 2008, Defendants in New York, through the use of interstate mail, mailed their standard form affidavit of forgery to Mr. Goyal in South Carolina;

t.     On or about July 25, 2008, Defendants in New York, through the use of interstate mail, mailed a standard form letter to Mr. Goyal threatening to ruin his consumer credit rating unless he paid $783 as outstanding dues under his alleged lease;

u.     On or about July 25, 2008, Defendants in New York, through the use of interstate mail, mailed a letter to Mr. Goyal in South Carolina asserting that he had signed a non-cancelable lease with a personal guaranty, and demanding that he contact Defendants "immediately";

v.     On or about July 28, 2008, Defendants in New York, through the use of interstate mail, mailed an invoice to Mr. Goyal in South Carolina demanding payment of $1,055.35;

w.     On or about August 14, 2008, Mr. Goyal in South Carolina, through the use of interstate mails, mailed a letter to Defendants in New York a duly notarized affidavit of forgery;

x.      On or about May 21, 2007, Ms. Greene in Oklahoma, through the use of interstate mail, mailed an affidavit of forgery to Defendants in New York;

y.      On or about May 1, 2007, the Sussman Defendants in New York, through the use of interstate mail, mailed a summons and complaint to Ms. Greene in Oklahoma;

z.      On or about March 24, 2011, Defendant Northern Leasing in New York, through the use of interstate mails, mailed an "Advice of Judgment" to Ms. Greene in Oklahoma;

aa.     On or about February 9, 2012, JP Morgan Chase in Ohio, through the use of interstate mail, mailed a letter to Ms. Greene in Oklahoma advising her of Defendants' levy on Ms. Greene's account;

bb.     On or about July 11, 2012, Defendants in New York, through the use of interstate mail, mailed a letter to Ms. Greene in Oklahoma advising her that in order to have Defendants' attorneys notify her bank to release the levy, she should pay them $2,502.05;

cc.     On or about November 10, 2010, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Marrou in Florida;

dd.     On or about April 5, 2011, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Marrou in Florida, requiring him to appear in New York in connection with Defendants' bogus lawsuit;

ee.   On or about June 27, 2011, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Marrou in Florida;

ff.   On or about October 18, 2011, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Marrou in Florida;

gg.   On or about November 4, 2011, Defendants in New York, through the use of interstate mail, caused the mailing of a letter to Mr. Marrou in Florida, requiring him to appear in New York in connection with Defendants' bogus lawsuit;

hh.   On or about January 24, 2012, Defendants in New York, through the use of interstate mail, caused the mailing of a summons and complaint, ostensibly to Ms. Murrell in Florida;

ii.   On or about February 15, 2012, Defendants in New York, through the use of interstate mail, caused the mailing of a summons and complaint, ostensibly to Ms. Murrell in Florida;

jj.   On or about June 15, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of the summons and complaint ostensibly to Dr. Shabnam in California;

kk.   On or about July 24, 2009, Defendants in New York, through the use of interstate mail, caused the mailing of another copy of the summons and complaint ostensibly to Dr. Shabnam in California;

ll.  On or about April 1, 2010, Defendants in New York, through the use of interstate mail, caused the mailing of an "Advice of Judgment" to Dr. Shabnam in California;

mm.  On or about November 29, 2010, Dr. Shabnam in California mailed a letter to the New York City Civil Court in New York;

nn.  On or about November 29, 2010, Dr. Shabnam in California mailed a letter to Defendants in New York; and

oo.  On or about February 22, 2011, Dr. Shabnam in California mailed the signed order to show cause with supporting papers to Defendants in New York.

198.  Each participant knew, expected, reasonably foresaw, and intended that the facilities of interstate mail would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

199.  The Conspirators, wilfully and with intent to mislead, concealed the material facts from the New York City Civil Court and from Plaintiffs as referred to above.

200.  The material misrepresentations were made by Conspirators to the New York City Civil Court concerning Plaintiffs, and to Plaintiffs, Mr. Angermeir in California, Mr. Bhagwanani in California, Mr. Elder in Texas, Ms. Glynn in Texas, Mr. Goyal in South Carolina, Ms. Greene in Oklahoma, Mr. Marrou in Florida, Ms. Murrell in Florida, and Dr. Shabnam in California..

201.  The New York City Civil Court, and Plaintiffs, relied upon Defendants' misrepresentations, and such reliance was reasonable.

202.    Defendants' perjurious misconduct was a fraud on the court and on Plaintiffs.

Wire Fraud, Violations of 18 U.S.C. §1343

203.    Defendants and the other Members of the enterprise, having devised or intending

to devise the scheme or artifice to defraud, and/or for obtaining money or

property by means of false or fraudulent pretenses, representations, or promises,

for the purpose of executing such scheme or artifice or attempting so to do, made

phone calls with the use of interstate wires, and/or transmitted by means of

interstate wire directives to various Automated Clearing Houses to deduct monies

from accounts of lessees that Defendants knew they were not entitled to, and/or

electronically accessed and pulled the consumer credit report of each Plaintiff

from credit reporting agencies. For example,

a.      On or about November 13, 2008, Defendants in New York, through the use

of interstate wires, made a telephone call to Mr. Bhagwanani;

b.      On or about November 21, 2008, Defendants in New York, through the use

of interstate wires, made a telephone call to Mr. Bhagwanani;

c.      On or about January 1, 2009, Defendants in New York, through the use of

interstate wires, made a telephone call to Mr. Bhagwanani;

d.      On or about March 1, 2005, Defendants in New York, through the use of

interstate wire communication and the interstate banking system,

electronically collected $59.69 from the business bank account of Ms.

Greene;

e.     On or about April 1, 2005, Defendants in New York, through the use of
       interstate wire communication and the interstate banking system,
       electronically collected $59.69 from the business bank account of Ms.
       Greene;

f.     On or about May 2, 2005, Defendants in New York, through the use of
       interstate wire communication and the interstate banking system,
       electronically collected $59.69 from the business bank account of Ms.
       Greene;

g.     On or about June 1, 2005, Defendants in New York, through the use of
       interstate wire communication and the interstate banking system,
       electronically collected $59.69 from the business bank account of Ms.
       Greene;

h.     On or about July 1, 2005, Defendants in New York, through the use of
       interstate wire communication and the interstate banking system,
       electronically collected $59.69 from the business bank account of Ms.
       Greene;

i.     On or about August 1, 2005, Defendants in New York, through the use of
       interstate wire communication and the interstate banking system,
       electronically collected $59.69 from the business bank account of Ms.
       Greene;

j.     On or about September 1, 2005, Defendants in New York, through the use
       of interstate wire communication and the interstate banking system,

electronically collected $59.69 from the business bank account of Ms. Greene;

k.       On or about October 3, 2005, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

l.       On or about November 1, 2005, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

m.      On or about December 1, 2005, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

n.       On or about January 3, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

o.       On or about February 1, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

p.   On or about March 1, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

q.   On or about April 3, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

r.   On or about May 1, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

s.   On or about June 1, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

t.   On or about July 3, 2006, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $59.69 from the business bank account of Ms. Greene;

u.   On or about September 7, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit

report of Mr. Marrou from Experian, a credit reporting agency, outside New York State;[7]

v.      On or about October 14, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Marrou from Experian, a credit reporting agency, outside New York State;

w.     On or about March 21, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Marrou from Experian, a credit reporting agency, outside New York State;

x.      On or about November 1, 2010, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $29.97 from the business bank account of Ms. Murrell;

y.      On or about December 1, 2010, Defendants in New York, through the use of interstate wire communication and the interstate banking system, electronically collected $27.40 from the business bank account of Ms. Murrell;

z.      On or about January 2, 2011, Defendants in New York, through the use of interstate wire communication and the interstate banking system,

---

[7]Defendants' systems are set up in such a way that each alleged lessee's, *i.e.*, Plaintiff's, consumer credit report was electronically accessed and pulled automatically at the time of lease origination.  Such automated pulls do not require any human intervention.

electronically collected $69.14 from the business bank account of Ms. Murrell;

aa.    On or about May 22, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

bb.    On or about June 14, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

cc.    On or about July 14, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

dd.    On or about August 20, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

ee.    On or about September 20, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

ff.     On or about October 20, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

gg.     On or about December 1, 2009, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

hh.     On or about February 3, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

ii.     On or about February 5, 2010, Defendants in New York, through the use of interstate wires, electronically accessed and pulled the consumer credit report of Mr. Angermeir from Experian, a credit reporting agency, outside New York State;

jj.     On or about October 2, 2008, Defendants, through the use of interstate wires, faxed a copy of the alleged Form Lease to Mr. Angermeir in California; and

kk.     On or about November 20, 2008, Defendants, through the use of interstate wires, faxed a copy of the alleged Form Lease to Mr. Angermeir in California.

204.   Defendants, in the same manner through the use of interstate wires, made dunning telephone calls to abuse, intimidate, and threaten Plaintiffs on numerous other occasions.  The details of each of these phone calls is readily available from Defendants' records and recordings.

205.   Defendants, in the same manner through the use of interstate wires, electronically accessed the consumer credit reports of each Plaintiff on numerous other occasions.  The details of each of these electronic accesses are readily available from Defendants' records and recordings.

206.   Defendants, in the same manner through the use of interstate wires, electronically deducted money from the bank accounts of businesses controlled by some of the Plaintiffs identified above on numerous other occasions.  The details of each of these electronic deductions is readily available from Defendants' records and recordings.

207.    Each participant knew, expected, reasonably foresaw, and intended that the facilities of the interstate wires affecting interstate commerce would be used in furtherance of the racketeering scheme, and that such use was an essential part of the scheme.

208.   The Conspirators wilfully and with intent to mislead concealed material facts, and made affirmative misrepresentations of material facts to Plaintiffs.

209.   Plaintiffs and the court relied upon Defendants' misrepresentations, and such reliance was reasonable.

Extortion Under The Hobbs Act, 18 U.S.C. §1951

210.   Defendants had and implemented a practice and pattern of starting bogus legal proceedings based on false representations, and solely for the purpose of injuring Plaintiffs and recovering unwarranted sums through extortion.

211.   For this purpose, Defendants affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

    a.   Mr. Angermeir "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF Leasing;

    b.   Mr. Angermeir "entered into an Equipment Finance Lease" with Defendant MBF Leasing and "personally guaranteed" payments under the lease;

    c.   Mr. Angermeir "consent[ed]" to litigation in New York;

    d.   There was "presently due and owing" from Mr. Angermeir to Defendant MBF Leasing the sum of $3,680.00 with interest thereon from February 1, 2009; and

    e.   There "is due and owing" from Mr. Angermeir to Defendant MBF Leasing attorneys' fees in the sum of $736.00.

212.   Defendants similarly affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

    a.   Mr. Bhagwanani "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

b.  Mr. Bhagwanani "entered into an Equipment Finance Lease" with Defendant Northern Leasing and "personally guaranteed" payments under the lease;

c.  Mr. Bhagwanani "consent[ed]" to litigation in New York;

d.  There was "presently due and owing" from Mr. Bhagwanani to Defendant Northern Leasing the sum of $5,934.00 with interest thereon from January 1, 2009; and

e.  There "is due and owing" from Mr. Bhagwanani to Defendant Northern Leasing' attorneys' fees in the sum of $1,860.80.

213.  Defendants similarly affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.  Mr. Elder "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF Leasing;

b.  Mr. Elder "entered into an Equipment Finance Lease" with Defendant MBF Leasing and "personally guaranteed" payments under the lease;

c.  Mr. Elder "consent[ed]" to litigation in New York;

d.  There was "presently due and owing" from Mr. Elder to Defendant MBF Leasing the sum of $3,198.40 with interest thereon from November 1, 2010; and

e.  There "is due and owing" from Mr. Elder to Defendant MBF Leasing attorneys' fees in the sum of $639.68.

214.   Defendants similarly affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

    a.   Ms. Glynn "unconditionally guaranteed all of the Lessee's obligations to" Defendant MBF Leasing;

    b.   Ms. Glynn "entered into an Equipment Finance Lease" with Defendant MBF Leasing and "personally guaranteed" payments under the lease;

    c.   Ms. Glynn "consent[ed]" to litigation in New York;

    d.   There was "presently due and owing" from Ms. Glynn to Defendant MBF Leasing the sum of $3,850.00 with interest thereon from August 1, 2009; and

    e.   There "is due and owing" from Ms. Glynn to Defendant MBF Leasing attorneys' fees in the sum of $770.00;

215.   Defendants similarly affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

    a.   Mr. Goyal "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

    b.   Mr. Goyal "entered into an Equipment Finance Lease" with Defendant Northern Leasing and "personally guaranteed" payments under the lease;

    c.   Mr. Goyal "consent[ed]" to litigation in New York;

    d.   There was "presently due and owing" from Mr. Goyal to Defendant Northern Leasing the sum of $4,434.75 with interest thereon from March 1, 2008; and

e.     There "is due and owing" from Mr. Goyal to Defendant Northern Leasing attorneys' fees in the sum of $886.95;

216.   Defendants similarly affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.     Ms. Greene "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

b.     Ms. Greene "entered into an Equipment Finance Lease" with Defendant Northern Leasing and "personally guaranteed" payments under the lease;

c.     Ms. Greene "consent[ed]" to litigation in New York;

d.     There was "presently due and owing" from Ms. Greene to Defendant Northern Leasing the sum of $1,449.71, with interest thereon from August 1, 2006; and

e.     There "is due and owing" from Ms. Greene to Defendant Northern Leasing attorneys' fees in the sum of $289.94.

217.   Defendants similarly affirmatively misrepresented in filings with the New York City Civil Court in New York, under penalties of perjury, that

a.     Mr. Marrou "unconditionally guaranteed all of the Lessee's obligations to" Defendant Northern Leasing;

b.     Mr. Marrou "entered into an Equipment Finance Lease" with Northern Leasing and "personally guaranteed" payments under the lease;

c.     Mr. Marrou "consent[ed]" to litigation in New York;

      d.     There was "presently due and owing" from Mr. Marrou to Northern

Leasing the sum of $7,003.00 with interest thereon from October 1, 2010;

and

      e.     There "is due and owing" from Mr. Marrou to Northern Leasing' attorneys'

fees in the sum of $1,400.60.

218.   Defendants similarly affirmatively misrepresented in filings with the New York

City Civil Court in New York, under penalties of perjury, that

      a.     Ms. Murrell "unconditionally guaranteed all of the Lessee's obligations to"

Defendant Northern Leasing;

      b.     Ms. Murrell "entered into an Equipment Finance Lease" with Defendant

Northern Leasing and "personally guaranteed" payments under the lease;

      c.     Ms. Murrell "consent[ed]" to litigation in New York;

      d.     There was "presently due and owing" from Ms. Murrell to Defendant

Northern Leasing the sum of $2,759.54, with interest thereon from

February 1, 2011;  and

      e.     There "is due and owing" from Ms. Murrell to Defendant Northern

Leasing' attorneys' fees in the sum of $689.89.

219.   Defendants similarly affirmatively misrepresented in filings with the New York

City Civil Court in New York, under penalties of perjury, that

      a.     Dr. Shabnam "unconditionally guaranteed all of the Lessee's obligations

to" Defendant Lease Finance Group;

     b.     Dr. Shabnam  "entered into an Equipment Finance Lease" with Defendant Lease Finance Group and "personally guaranteed" payments under the lease;

     c.     Dr. Shabnam  "consent[ed]" to litigation in New York;

     d.     There was "presently due and owing" from Dr. Shabnam  to Defendant Lease Finance Group the sum of $6,348.00 with interest thereon from June 16, 2008; and

     e.     There "is due and owing" from Dr. Shabnam  to Defendant Lease Finance Group attorneys' fees in the sum of $1,269.60.

220.    These representations were part of Defendants' standard form, boilerplate complaints filed in the New York City Civil Court.  These representations were verified by different Individual Defendants as detailed earlier, abundantly establishing concerted action and conspiracy.

221.    Defendants knew, and should have known, that the above representations were false when made.  Defendants' knowing fraud upon, and/or their intentional misrepresentations to, the New York City Civil Court deprived the litigation of its legitimacy.

222.    Nevertheless, Defendants commenced actions in The New York City Civil Court with the aforesaid false statements.  Based upon such actions, they attempted to extort undeserved sums of money from Plaintiffs.

223.   Thereby, Defendants used wrongful means for a wrongful objective, with an intent to obtain that which in justice and equity Defendants were not entitled to, and knew that they were not entitled to, receive.

224.   Defendants affected interstate commerce by extortion and/or attempted or conspired so to do.

225.   Defendants attempted to extort property from each Plaintiff, with each Plaintiff's consent, induced by wrongful use of actual or threatened fear of economic loss and/or injury.  Such loss or injury included, without limitation, legal expenses in long-distance litigation, damage to credit rating, and/or entry of default judgments, and freezing of bank accounts.

Extortion Under New York Law

226.   Plaintiffs incorporate the aforesaid allegations herein by reference.

227.   Defendants intended to deprive Plaintiffs of property or to appropriate the same to themselves.  They wrongfully took or obtained, or attempted to take or obtain, such property from each Plaintiff.

228.   Defendants wrongfully attempted to take such property by compelling or inducing Plaintiffs and other persons to deliver such property to Defendants. They did so by attempting to induce a fear that, if the property is not so delivered, Defendants would cause damage to Plaintiffs' property, or engage in other conduct constituting a crime, or testify or provide false information with respect to Defendants' legal claim.

229.   Thereby, Defendants committed the offense of extortion under New York's

Extortion Act, N.Y. Penal Law, §155.05.

230.   Defendants' extortions are chargeable under New York law and punishable by

imprisonment for more than one year.  As such, they constitute predicate

racketeering acts under 18 U.S.C. §1961.

Pattern of Racketeering Activity

231.   The aforesaid acts had the same or similar purposes, results, participants,

victims, and/or methods of commission, and were otherwise interrelated by

distinguishing characteristics and were not isolated events.  The pattern of

racketeering activity engaged in by Defendants consisted of a scheme executed by

the aforementioned Conspirators from January 1998, and continuing to date, to

extort and collect unwarranted sums through litigation based on perjurious

averments or threats thereof.  That pattern included multiple predicate acts of

extortion, mail fraud, and wire fraud.

232.   The racketeering acts identified hereinabove were related to one another and

formed a pattern of racketeering activity in that they: (a) were in furtherance of a

common goal, including the goal of profiting illegally by improperly commencing

or threatening fraudulent litigation, by improperly threatening to ruin consumer

credit scores, and by improperly making adverse entries in consumer credit

reports; (b) used similar methods and standard form letters to intimidate; (c) had

similar participants; and (d) had similar victims.

233. The acts of racketeering activity extended over a substantial period of time from January 1998, and continue to this day.  They were sufficiently continuous to form a pattern of racketeering activity.

234. Defendants participated in the scheme through themselves, and, in the case of the corporate Defendants, their representatives, salesmen, employees and officers, and others whose identities are known only to Defendants at this time. Defendants benefitted enormously by the profits they made from the scheme, and the various amounts collected unlawfully.  The Conspirators knew, enabled, and actively participated in the racketeering scheme.

235. Defendants engaged in a pattern of racketeering activity consisting of extortion, mail fraud and wire fraud.  The predicate acts occurred over a period of well over 6 years.  Defendants received income from these patterns in the form of unwarranted payments.  Defendants disbursed these funds amongst themselves in a manner known only to them.

236. Each Defendant's participation was critical to the racketeering scheme.  Each Defendant enabled, conducted, maintained, aided, and abetted the racketeering scheme by:

  a.  Drafting and preparing letters, "Important Notices," Verified Complaints, false affidavits, and other documents;

  b.  Supervising, conducting, and monitoring the conduct of the fraudulent scheme;

c.   Concealing the scheme or, alternatively, consciously avoiding discovery of the scheme;

d.   encouraging third parties to participate in the racketeering scheme;

e.   wilfully violating, or being recklessly indifferent to, mandatory requirements of federal law and procedure concerning racketeering, and the misuse of the judicial system;

f.   Wilfully violating or being recklessly indifferent to their legal obligations to verify the validity of the alleged lease agreements;

g.   Wilfully violating or being recklessly indifferent to their legal obligations to conduct a reasonable investigation into allegations of forgery by Plaintiffs and other victims; and

h.   Wilfully violating or being recklessly indifferent to their legal obligations to conduct "due diligence" with respect to the accounts at issue.

237.   The precise role played by each Defendant is known only to Defendants at this time.  Such information, and evidence concerning their participation, is exclusively within the possession and knowledge of Defendants.

238.   Plaintiffs have been injured in their business or property by reason of Defendants' violation of 18 U.S.C. §1962(c).  As a direct and proximate result of these violations, Plaintiffs have been injured in that, inter alia, their business accounts were debited wrongfully, and they had to waste time and resources in responding to Defendants's dunning calls, threats, and lawsuit in New York; in retaining lawyers and incurring legal expenses therefor.  In addition, Plaintiffs' consumer

credit rating has also been adversely affected, and they have suffered economic and non-economic damages as detailed above.

239. By reason of this violation of 18 U.S.C. §1964(c), Plaintiffs are entitled to recover from Defendants three times their damages plus pre- and post- judgment interest, costs and attorneys' fees.

## COUNT II

### (Violation of 18 U.S.C. § 1962(d))

240. The contents of the above paragraphs are incorporated herein by reference as if fully set forth herein.

241. In violation of 18 U.S.C. § 1962(d), Defendants and others whose identities are known only to Defendants at this time conspired to violate the provisions of 18 U.S.C. §1962(c) in that, beginning no later than January 1998 and continuing through today, they knowingly agreed and conspired to conduct or participate, directly or indirectly, in the affairs of an enterprise through the pattern of racketeering activity described above.  The volume and frequency of the transactions, and the continuance of the scheme at issue for over 14 years, could not have occurred without the consent and knowing connivance of Defendants and other Conspirators.

242. As part of and in furtherance of their conspiracy, each Defendant agreed to and conspired in the commission of the many predicate acts described above, with the knowledge that they were in furtherance of that pattern of racketeering activity. As part of and in furtherance of their conspiracy, each Defendant agreed to and

did commit at least two predicate acts of racketeering.  Further, each Defendant's actions are attributable to the other Defendants.

243.  None of the Defendants have withdrawn, or otherwise dissociated themselves from the conspiracy at issue or the other Conspirators.  Defendants have also continued filing of perjurious affidavits under oath, showing the continuance of this conspiracy till today.

244.  Plaintiffs have been injured in business or property by reason of Defendant's violations of 18 U.S.C. S 1962(d).

245.  As a direct and proximate result of each Defendant's violations, Plaintiffs have been injured as aforesaid.

246.  By reason of Defendants's violation of 18 U.S.C. §1964(d), Plaintiffs are entitled to three times their damages plus interest, costs and attorneys' fees.

## Count III

(Fair Credit Reporting Act, Section 1681b(f):

Willfully Obtaining Consumer  Reports Without A Permissible Purpose)

247.  Plaintiffs realleges and incorporates the preceding paragraphs.

248.  Defendants willfully violated the FCRA by obtaining each Plaintiff's consumer credit report without such Plaintiff's permission and without having a permissible purpose therefor.

249.  These illegal acts affected Plaintiffs and a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants' willfully violating the provisions of the FCRA.

250. Defendants' acts in obtaining this information in willful violation of the FCRA without a permissible purpose violate 15 U.S.C. §1681b(f).

251. As a result of Defendants' aforesaid misconduct, Plaintiffs sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses, 15 U.S.C. §1681n(a).

**Count IV**

((Fair Credit Reporting Act, Section 1681b(f):

Negligently Obtaining Consumer Reports Without A Permissible Purpose)

252. This count is asserted in the alternative to Count III above.

253. Plaintiffs reallege and incorporate the preceding paragraphs.

254. Defendants violated the FCRA by negligently obtaining each Plaintiffs's consumer credit report without such Plaintiff's permission and without having a permissible purpose therefor.

255. These illegal acts affected a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants' negligently violating the provisions of the FCRA.

256. As a result of Defendants' aforesaid misconduct, Plaintiffs sustained damages for which Defendants are liable, in addition to attorneys' fees and expenses under 15 U.S.C. §1681o.

## Count V

(Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A) -

Wilful Refusal/Failure to Investigate and/or Rectify Error In Reporting)

257.   Plaintiffs realleges and incorporates the preceding paragraphs.

258.   As detailed above, certain Plaintiffs disputed the accuracy of adverse entries made by Defendants.  Upon information and belief, Defendants were informed by the credit reporting agencies that such Plaintiffs disputed the accuracy of the information Defendants had provided to credit reporting agencies.  Defendants willfully failed  to conduct a proper investigation of such Plaintiffs' dispute that such Plaintiffs were not liable for the account appearing on her credit report, as required by 15 U.S.C. §1681s-2(b)(A).

259.   Defendants willfully failed, neglected and/or refused to review all relevant information purportedly provided by such credit reporting agencies to Defendants in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

260.   Defendants' failure/refusal to direct such consumer reporting agencies to delete inaccurate information about such Plaintiffs pertaining to their respective accounts as required by 15 U.S.C. §1681s-2(b)(C) was wilful.

261.   Defendants are liable to such Plaintiffs for the actual damages sustained by reason of their violation of the FCRA, in an amount to be determined  by the trier of fact, together with an award of punitive damages in an amount to  be

determined by the trier of fact, as well as reasonable attorney's fees and expenses pursuant to 15 U.S.C. § 1681n.

## Count VI

(Fair Credit Reporting Act, 15 U.S.C. § 1681s-2(b)(A):

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting)

262.   This count is asserted in the alternative to Count V above.

263.   Plaintiffs reallege and incorporate the preceding paragraphs.

264.   After being informed by the credit reporting agencies that certain Plaintiffs disputed the accuracy of the information that Defendants had provided to a credit reporting agency, Defendants negligently failed to conduct a proper investigation of their dispute, as required by 15 U.S.C. §1681s-2(b)(A).

265.   Defendants negligently failed to review all relevant information adequately in conducting their investigation, as required by 15 U.S.C. §1681s-2(b)(B).

266.   Defendants negligently failed to direct such consumer reporting agencies to delete inaccurate information about such Plaintiffs, as required by 15 U.S.C. § 1681s-2(b)(C).

267.   Defendants are liable to such Plaintiffs for the actual damages sustained by reason of the aforesaid misconduct, together with reasonable attorney's fees and expenses, 15 U.S.C. §1681o.

## Count VII

(New York Fair Credit Reporting Act, GBL, Section 380-b:

Willfully Obtaining Consumer Reports Without A Permissible Purpose

And/or Under False Pretenses And/or Without Providing Advance Notice)

268.   Plaintiffs realleges and incorporates the preceding paragraphs.

269.   Defendants willfully violated the NYFCRA by obtaining each Plaintiffs's consumer credit reports without permission and without having a permissible purpose therefor, and/or under false pretenses.

270.   Further, Defendants wilfully failed and neglected to inform each Plaintiff in writing, before accessing such Plaintiff's consumer report, that Defendants would request a consumer report and/or that they would inform such Plaintiff of the name and address of the consumer reporting agency that furnished the report.

271.   These illegal acts affected Plaintiffs and a large number of unwitting consumers and persisted over at least a five year period, evidencing a pattern of Defendants willfully violating the provisions of the NYFCRA.

272.   Defendants' acts in obtaining this information in willful violation of the NYFCRA without a permissible purpose violate N.Y. Gen. Bus. L., §380-b, which is actionable under Section 380-l thereof.

273.   As a result of Defendants' aforesaid misconduct, Plaintiffs sustained damages for which Defendants are liable.

## Count VIII

(New York Fair Credit Reporting Act, Section 380-b -

Negligently Obtaining Consumer  Reports Without A Permissible Purpose

And/or Without Providing Advance Notice)

274.   This count is asserted in the alternative to Count VII above.

275.   Plaintiffs reallege and incorporate the preceding paragraphs.

276.   Defendants violated the NYFCRA by negligently obtaining each Plaintiffs'
consumer credit reports without permission and without having a  permissible
purpose therefor.

277.   Further, Defendants failed and neglected to inform each Plaintiff in writing,
before accessing such Plaintiff's consumer report, that Defendants would request
a consumer report and/or that they would inform such Plaintiff of the name and
address of the consumer reporting agency that furnished the report.

278.   These illegal acts affected Plaintiffs and a large number of unwitting consumers
and persisted over at least a five year period, evidencing a pattern of Defendants'
negligently violating the provisions of the NYFCRA.

279.   Defendants' actions were in violation of the NYFCRA, Gen. Bus. L., §380-b, which
is actionable under Section 380-m.

280.   As a result of Defendants' aforesaid misconduct, Plaintiffs has sustained damages
for which Defendants are liable.

## Count IX

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-l -

Wilful Reporting of False Information and/or Refusal/Failure to

Investigate and/or Rectify Error In Reporting)

281.    Plaintiffs realleges and incorporates the preceding paragraphs.

282.    Defendants knowingly and wilfully introduced or caused to be introduced false

information concerning certain Plaintiffs into the files of consumer reporting

agency or agencies in violation of Section 380-o, G.B.L.  Even after being

informed by the credit reporting agencies that such Plaintiffs disputed the

accuracy of the information provided to credit reporting agencies, Defendants

willfully refused to retract such false information, or even investigate such

Plaintiffs's assertions that the information Defendants had provided to the credit

reporting agency was false.

283.    Defendants are liable to such Plaintiffs for the actual damages sustained by

reason of Defendants' violation of the FCRA, together with an award of

punitive damages in an amount to  be determined by the jury, as well as

reasonable attorney's fees and expenses, pursuant to New York Fair Credit

Reporting Act, Gen. Bus. L., §380-l.

## Count X

(New York Fair Credit Reporting Act, Gen. Bus. L., §380-m -

Negligent Refusal/Failure to Investigate and/or Rectify Error In Reporting)

284.    This count is asserted in the alternative to Count VII above.

285. Plaintiffs reallege and incorporate the preceding paragraphs.

286. Defendants introduced or caused to be introduced false information concerning certain Plaintiffs into the files of consumer reporting agency or agencies in violation of Section 380-o, G.B.L.  Even after being informed by the credit reporting agencies that such Plaintiffs disputed the accuracy of the information provided to credit reporting agencies, Defendants failed and neglected to retract such false information, or even investigate such Plaintiffs's assertions that the information Defendants had provided to the credit reporting agency was false.

287. Defendants are liable to such Plaintiffs for the actual damages sustained by reason of the aforesaid misconduct, together with her reasonable attorney's fees, N.Y. Gen. Bus. L., §380-m.

## COUNT XI

### (N.Y. General Business Law Article 22-A)

288. Plaintiffs incorporate the contents of the paragraphs hereinabove.

289. Plaintiffs were ordinary citizens and as such, "consumers" for purposes of consumer protection statutes.

290. Defendants, in their attempts to bully and intimidate Plaintiffs into paying tribute to Defendants, pulled Plaintiffs' consumer credit reports, and wilfully violated consumer credit reporting statutes as described above.

291. Defendants' unauthorized pulling of Plaintiffs' consumer credit reports was in accordance with their systematic practice and procedure.  As clear

from deposition testimony in other cases, Defendants had and implemented a routine practice of pulling consumer credit reports of consumers, without authority and without giving the statutorily mandated notice.  Defendants thus pulled consumer credit reports thousands of times every month in wilful violation of the credit reporting statutes.

292.   Indeed, Defendants' computer systems were set up so that such pulling was done automatically, without any regard to the constraints of federal and/or state credit reporting statutes.  Defendants authorized, empowered, and enabled many of their employees to pull consumer credit reports, but never bothered giving any training or instructions to such employees on the constraints imposed by these statutes or the permissible purposes for which such consumer credit reports could be pulled.  Even Defendant Krieger, who headed and supervised Defendants' originations department and as such, set and implemented policies and procedures therefor, admitted in sworn testimony that she knew nothing about the requirements of credit reporting statutes, and that she did nothing to apprize herself of such  requirements.  Indeed, Defendants did not even *have* a reference manual concerning pulling consumer credit reports.  Consumer credit reports, which have been long considered important enough to be the specific subject of federal as well as New York legislation, were free game for Defendants.

293.  Defendants have always been well aware that such pulling of consumer reports inflicts injury on the consumer by lowering the individual's credit score.  By pulling Plaintiffs' consumer credit reports, Defendants inflicted injury on each Plaintiff.

294.  Further, Defendants nonchalantly misused the court system of the State of New York and the City of New York, and routinely made false and baseless statements with reckless abandon, and even after knowing the falsity of such statements.  Even after the New York City Civil Court rejected jurisdiction because it would deprive Defendants' victims of their day in Court, Defendants nonchalantly continued commencing and prosecuting such lawsuits, and obtaining default judgments, so that such judgments would be reported in Plaintiffs' consumer credit reports.  Litigants depend on the integrity of the conduct of participants in civil proceedings through disputing the validity of their opponents' claims to impose or resist civil liability.  For Defendants and their Conspirators to concoct testimony or make false statements under oath even after they know it is wholly fabricated and baseless is an unacceptable fraud on the court.  Based on such false testimony, Defendants procured default judgments against consumers, including some Plaintiffs herein.

295.  As Defendants certainly knew, such default judgments were promptly reported in the judgment-debtor's consumer credit report.

296.   As Defendants knew and intended, the affected consumer (such as Plaintiff
Dr. Shabnam) would come to know about the default judgment only when
attempting a financial transaction, such as leasing a car.  Such financial
transaction would occasion a credit report pull and would alert the
consumer (as it did Dr. Shabnam) to Defendants' outstanding default
judgment.  When the victimized consumer (such as Dr. Shabnam)
contacted Defendants, Defendants flatly refused to vacate the fraudulently
procured judgment.  Instead, Defendants attempted to intimidate the
consumer into paying tribute for removal of this adverse entry.

297.   Defendants' pulling of consumer credit reports, and trashing of consumer
credit reports were deceptive and/or unfair practices which affected, and
continues to affect, the public at large.

298.   Defendants committed these deceptive acts or practices in the conduct of
business in New York.  Their conduct was unlawful and of a recurring
nature, and strongly affected the public interest.  By their conduct
aforesaid, Defendants violated Article 22-A (Section 349) of New York's
General Business Law.

299.   Plaintiffs sustained damages due to Defendants' violation.  Accordingly,
under Section 349(h) of New York's General Business Law, Plaintiffs are
entitled to recover statutory, compensatory, and treble damages and
reasonable attorneys' fees and expenses.  In addition, Plaintiffs are also

entitled to an injunction against Defendants preventing them from continuing the aforesaid deceptive practices.

## Count XII

### (Fraud)

300. Plaintiffs incorporate the contents of the paragraphs hereinabove.

301. Defendants conducted a fraudulent scheme to extract tribute from Plaintiffs.  Defendants wilfully and knowingly made, or caused to be made, affirmative misrepresentations of material facts in furtherance of this scheme.  They also wilfully and knowingly concealed material facts from Plaintiffs.  Defendants knew the falsity of the misrepresentations at the time these misrepresentations were made.  Defendants also knew the material nature of the facts that they willfully concealed from Plaintiffs, and that Defendants ought to have disclosed these facts at that time to Plaintiffs.  Defendants had superior knowledge not available to Plaintiffs; as such, they had the duty to disclose the facts.  Plaintiffs and the court relied upon Defendants's representations, and were unaware of the falsity or misleading nature of the representations.  Plaintiffs' reliance was reasonable under the circumstances.  As a result of such reliance, Plaintiffs sustained damages.

302. By engaging in the conduct described above, Defendants committed a fraud upon Plaintiffs.

303.   Moreover, Defendants' wanton conduct was systematic, in reckless disregard of their statutory and other duties, tantamount to criminal indifference to civil obligations, and unconscionable.

304.   Defendants are therefore liable to pay Plaintiffs compensatory and punitive damages in such amount as may be proven at trial, together with attorneys' fees and expenses and such other amounts as may be appropriate.

### Jury Demand

305.   Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs demand judgment against Defendants on each Count aforesaid:

a.   awarding compensatory, punitive, and/or treble damages to Plaintiffs in such amount as may be determined after discovery and trial;

b.   awarding Plaintiffs the costs of this action, including reasonable attorneys' fees and expenses, experts' fees and other disbursements; and

    c.    for such further and other reliefs as may be just and proper.

Dated:      New York, New York     **Chittur & Associates, P.C.**
             October 21, 2014

                                 Sd/

                   _____
                   By:  Krishnan Chittur, Esq.
                   500 Executive Blvd. Suite 305
                   Ossining, New York 10562
                   Tel: (914) 944-4400

                   Attorneys for Plaintiffs