UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

ARTHUR ANGERMEIR et al.,                              :
                                                       :
                                  Plaintiffs,          :
                                                       :         12-cv-55 (KBF)
                     -v-                               :
                                                       :         OPINION & ORDER
JAY COHEN et al.,                                      :
                                                       :
                                  Defendants.          :

------------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: June 17, 2015
```

KATHERINE B. FORREST, District Judge:

        Before the Court is a motion for sanctions as to plaintiffs Nitesh Bhagwanani ("Bhagwanani"), Ken Elder ("Elder"), Becky D. Glynn ("Glynn"), Rajat Goyal ("Goyal"), Kristina Greene ("Greene"), Marilyn Murrell ("Murrell"), and Shiva Nancy Shabnam ("Shabnam" and collectively, "plaintiffs").[1]  (ECF No. 149.) Defendants seek dismissal of the claims against them based on plaintiffs' repeated failure to produce court-ordered discovery.

        For the reasons set forth below, defendants' motion is GRANTED and the Second Amended Complaint is DISMISSED with prejudice as to all plaintiffs except plaintiff Elder, whose claims are DISMISSED without prejudice.[2]  Plaintiffs have made serious allegations against defendants—and with serious allegations come serious obligations, including the obligation to produce the discovery necessary to prove or disprove such claims.  This Court has given plaintiffs several opportunities

---

[1] Plaintiff Angermeir is the subject of a separate motion which the Court has addressed separately.

[2] Defendants' request for a judgment on their counterclaims is DENIED.  The Court will issue a separate Order directing the parties to confer as to how to proceed with the counterclaims.

to meet their discovery obligations—and has warned them that failure to do so would lead to serious consequences, including dismissal of their claims.  Plaintiffs chose to disregard the Court's orders and must now face the consequences of this choice.

I.    LEGAL STANDARD

"The discovery provisions of the Federal Rules of Civil Procedure are 'designed to achieve disclosure of all the evidence relevant to the merits of a controversy.'" Daval Steel Products, a Div. of Francosteel Corp. v. M/V Fakredine, 951 F.2d 1357, 1365 (2d Cir. 1991) (quoting Thomas E. Hoar, Inc. v. Sara Lee Corp., 882 F.2d 682, 687 (2d Cir. 1989)).  "It is intended that this disclosure of evidence proceed at the initiative of the parties, free from the time-consuming and costly process of court intervention." Id. (citations omitted).  "When a party seeks to frustrate this design by disobeying discovery orders, thereby preventing disclosure of facts essential to an adjudication on the merits, severe sanctions are appropriate." Id. (citations omitted).

Rule 37(b) provides that a court may impose sanctions, including dismissal, against a party who "fails to obey an order to provide or permit discovery."  Fed. R. Civ. P. 37(b)(2).  In reviewing a district court's imposition of sanctions pursuant to Rule 37(b), the Second Circuit considers four non-exhaustive factors, including "(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance, and (4) whether the non-compliant party had been warned of the consequences of

noncompliance." <u>S. New England Tel. Co. v. Global NAPs Inc.</u> ("<u>SNET</u>"), 624 F.3d 123, 144 (2d Cir. 2010) (quoting <u>Agiwal v. Mid Island Mortgage Corp.</u>, 555 F.3d 298, 302 (2d Cir. 2009)) (internal quotation marks omitted).  The four <u>SNET</u> factors "need not each be resolved against the party challenging the district court's sanctions" for those sanctions to be within the district court's discretion.  <u>Id.</u> (citation omitted).

Although dismissal with prejudice is a "drastic remedy," it is justified if "the failure to comply with discovery orders was due to 'willfulness, bad faith, or any fault' of the party sanctioned."  <u>Id.</u> (citations omitted).  The noncompliant party's "persistent refusal to comply with a discovery order presents sufficient evidence of willfulness, bad faith or fault."  <u>Masi v. Steely</u>, 242 F.R.D. 278, 285 (S.D.N.Y. 2007) (citation and internal quotation marks omitted); <u>see also</u> <u>Baba v. Japan Travel Bureau Int'l</u>, 111 F.3d 2, 6 (2d Cir. 1997) (finding "dismissal under Rule 37(b) was perfectly appropriate" where the record "amply demonstrate[d] [the plaintiff's] repeated defiance of the district court's orders").[3]

## II.   DISCUSSION

Since this action was transferred to the undersigned in March 2015, the Court has repeatedly ordered plaintiffs to produce a specific set of highly relevant documents.  All of these documents had been requested through Document

---

[3] There is no need to reach the question of sanctions or dismissal under Rule 41.  <u>See, e.g.</u>, <u>Salahuddin v. Harris</u>, 782 F.2d 1127, 1134 (2d Cir. 1986) ("Rule 37 . . . addresses itself with particularity to the consequences of a failure to make discovery. . . . There is no need to resort to Rule 41(b), which appears in that part of the Rules concerned with <u>trials</u> and which lacks such specific references to discovery." (quoting <u>Societe Internationale Pour Participations Industrielles Et Commerciales, S. A. v. Rogers</u>, 357 U.S. 197, 207 (1958))).

Requests that were served on plaintiffs almost a year ago, in August 2014—and a Magistrate Judge had issued at least one order compelling plaintiffs to respond to the Document Requests by December 2014.  Plaintiffs chose to disregard all of these orders—and to continue to do so even after the Court specifically warned them that non-compliance would result in the dismissal of their claims.  Plaintiffs' repeated failure to produce court-ordered discovery and shifting, facially deficient excuses— from "we are sorry" to "these documents are irrelevant" to "we are small-time plaintiffs" to "we do not have the documents"—indicates to this Court that plaintiffs' non-compliance was willful and in bad faith, not merely negligent.  See Mahon v. Texaco Inc., 122 F. App'x 537, 539 (2d Cir. 2005) (plaintiff's "persistent refusal to comply with increasingly stern and direct court orders demonstrates not only bad faith but willfulness").

Plaintiffs' discovery tactics must be evaluated against the serious allegations in the Second Amended Complaint.  Plaintiffs allege that defendants—who are in the business of leasing business equipment—engaged in a racketeering scheme to extort money from out-of-state individuals by commencing fraudulent litigation in New York City Civil Court.  (See Second Amended Complaint ("Compl.") ¶ 1, 24, ECF No. 128.)  Defendants' alleged scheme generally involved: forging out-of-state individuals' signatures on leases for business equipment (mostly credit card processing machines), demanding payment or making deductions from the victims' bank accounts for alleged lease payments, filing fraudulent lawsuits in New York City Civil Court to enforce the forged leases (and often obtaining default

4

judgments), and making adverse entries on the victims' credit reports, thereby damaging their credit.

While the Second Amended Complaint has a separate set of allegations for each plaintiff, there are many commonalities.  All plaintiffs allege that defendants accessed their credit reports without authority and made adverse entries on such reports.  (Id. ¶¶ 65-68 (Bhagwanani), 82-85 (Elder), 104-07 (Glynn), 121-25 (Goyal), 144 (Greene), 154-58 (Murrell), 170-74 (Shabnam).)  All plaintiffs allege that their credit was damaged as a result of defendants' actions.  (Id. ¶¶ 74 (Bhagwanani), 89 (Elder), 108 (Glynn), 130 (Goyal), 144 (Greene[4]) 161 (Murrell), 179 (Shabnam).)  Four of the seven plaintiffs (Bhagwanani, Elder, Goyal, and Murrell) allege that defendants made unauthorized deductions from their bank accounts for alleged equipment lease payments.  (Id. ¶¶ 55-56 (Bhagwanani), 77 (Elder), 110 (Goyal), 147, 149 (Murrell).)  Plaintiffs assert claims under various federal statutes— including the federal racketeering ("civil RICO") statute, 18 U.S.C. § 1962, and the Fair Credit Reporting Act, 15 U.S.C. §§ 1681 et seq. ("FCRA")—as well as under state law.  (Id. ¶ 3.)

Throughout this now-3.5 year old litigation, plaintiffs have taken the position that they can prosecute a civil RICO action in federal court and yet withhold discovery necessary to test their serious allegations.  The history of plaintiffs'

---

[4] Greene's allegation as to her damages is styled differently but is similar in substance.  Greene alleges that defendants made derogatory entries on her "personal consumer credit report" and that "she suffered the usual consequences of such adverse reports."  (Compl. ¶ 144 (emphasis in original).)

5

failures to meet their discovery obligations is extensive and troubling.[5]  Plaintiffs filed this action on January 4, 2012.  Two-and-a-half years later[6], on July 3, 2014, the parties entered into a Case Management Plan.  (ECF No. 35.)[7]  Under this Case Management Plan, initial disclosures were to be completed by July 30, 2014, and fact discovery was set to close on December 20, 2014.

On August 12, 2014, defendants served Document Requests on plaintiffs. (ECF No. 150-1.)  Defendants requested various documents necessary to confirm or disprove plaintiffs' claims, including cancelled checks, tax returns, bank account statements, merchant processing agreements, and documents concerning plaintiffs' borrowing history and credit applications.  The deadline to produce these documents was September 15, 2014.

On August 28, 2014, defendants notified the Court that plaintiffs had not completed their Rule 26 initial disclosures, even though the deadline to do so had passed nearly a month before.  (ECF No. 38.)  Specifically, defendants pointed out that plaintiffs (1) failed to quantify each category of their alleged damages, and (2) failed to disclose the subject-matter of the information possessed by plaintiffs' identified witnesses.  In their letter in response, plaintiffs set forth their view that defendants' "attempt to raise discovery issues" was "premature" in light of plaintiffs'

---

[5] Throughout this litigation, plaintiffs have also brought a number of discovery disputes to the Court's attention.  The Court does not recount these disputes here.  The Court will consider these disputes if and when any remaining plaintiffs renew their motion for sanctions against defendants.

[6] In those 2.5 years, plaintiffs filed an Amended Complaint and the Court (Judge Karas) resolved a motion to dismiss.

[7] While the Court never "so ordered" this Case Management Plan, the parties have adopted it and assumed that its deadlines are binding.

request for leave to amend the Complaint for the second time. (ECF No. 41.) On October 7, 2014, defendants informed the Court that plaintiffs still had not completed their initial disclosures and had not served sworn and complete responses to defendants' interrogatories. (ECF No. 45.) Defendants also informed the Court that plaintiffs had not produced a single document in response to the August 12, 2014 Document Requests. (ECF No. 45.)

On October 9, 2014, the Court (Judge Karas) referred the <u>Angermeir</u> and <u>Ritchie</u> actions to Magistrate Judge Smith for general pre-trial purposes. (ECF No. 48.) Magistrate Judge Smith held multiple conferences with the parties. The first such conference was on November 24, 2014. At that conference, defendants informed the Court that while the plaintiff in the <u>Ritchie</u> action had produced 93 pages in response to the August 12, 2014 Document Requests, the <u>Angermeir</u> plaintiffs had not produced <u>any</u> responsive documents. Plaintiffs' counsel, Mr. Chittur, responded that "there's just a little backlog" and "we will certainly produce it." (11/24/14 Tr. 8:16-17.) The Court ordered a complete production within 30 days—which would have been prior to the end of December 2014. (<u>Id.</u> 8:21.)[8]

On March 6, 2015, defendants filed motions to compel plaintiffs to produce documents responsive to the August 12, 2014 Document Requests. (ECF No. 85 (<u>Angermeir</u>); ECF No. 76 (<u>Ritchie</u>).) Defendants represented that plaintiffs still had not produced many documents which are relevant to their RICO, FCRA, and

---

[8] The Court also ordered plaintiffs to complete their initial disclosures and to provide sworn interrogatory responses within 30 days.

common law claims and which were specifically requested in the Document

Requests.[9]  (ECF No. 85.)  Defendants also represented that they had twice

requested to meet-and-confer about plaintiffs' document production but that

plaintiffs refused both times.  In response, plaintiffs asserted that "much of"

defendants' "blunderbuss document request" "has nothing to do with any issue

herein"—and summarily set forth various objections to the document requests.

(ECF No. 87.)  Plaintiffs also filed their own discovery objections on March 6, 2015,

to which defendants responded the following week.  (ECF Nos. 84, 86.)

On March 6, 2015, the <u>Angermeir</u> and <u>Ritchie</u> actions were reassigned to the

undersigned.  To give the parties an opportunity to resolve their discovery disputes

without the undersigned's intervention, the Court allowed the cases to proceed

before Magistrate Judge Smith for three weeks.  On March 25, 2015, the Court

vacated the Orders of Reference to a Magistrate Judge and—in light of the still-

pending motions to compel—directed the parties to immediately notify the Court of

any unresolved discovery disputes.  (ECF No. 90.)  On March 26, 2015, not having

received a substantive response from the parties,  the Court ordered the parties to

notify the Court of any unresolved discovery disputes by the next day.  (ECF No.

93.)  On March 27, 2015, defendants restated the contentions in their motions to

compel and represented that plaintiffs had not produced any additional documents

---

[9] Defendants represented that plaintiffs had only produced those documents that were already in their counsel's files from the underlying Civil Court lawsuits.

8

responsive to the August 12, 2014 Document Requests.  (ECF No. 95.)  Plaintiffs did
not timely respond to the March 26, 2015 Order.

Upon reviewing the pleadings, the docket, and the Document Requests, the
Court cut down the Document Requests to the most important documents.  By
Order dated March 31, 2015, the Court directed plaintiffs to produce the following
documents by April 7, 2015:

    a.    Handwriting exemplars;

    b.    Cancelled checks;

    c.    Driver's licenses;

    d.    Tax returns;

    e.    Documents related to plaintiffs' damage claims, including documents
concerning their borrowing history and credit applications that are
relevant to the claims of damage to their credit; and

    f.    Documents that are necessary for defendants to either confirm or
disprove plaintiffs' claims, including:

        i.    Employment and termination documents;

        ii.    Certificate of incorporation, corporate minutes, and other
agreements of plaintiffs' businesses;

        iii.    Bank account statements; and

        iv.    Merchant processing agreements and statements.

(3/31/15 Order at 2-3, ECF No. 98.)

These documents—all of which were requested in the August 12, 2014 Document Requests—are highly relevant.  Defendants cannot confirm or disprove allegations that unauthorized deductions were made from several plaintiffs' bank accounts without reviewing plaintiffs' bank account statements.  Similarly, defendants cannot test the allegation—common to all plaintiffs—that defendants' actions damaged plaintiffs' credit unless plaintiffs produce documents reflecting their credit approvals, credit denials, and borrowing history.  Tax returns, employment documents, and merchant processing agreements and statements are also essential:  Tax returns and employment documents would establish whether and when plaintiffs owned or worked for the companies named as lessees in the allegedly forged leases.[10]  Merchant processing agreements and statements may reveal whether plaintiffs or their companies actually used defendants' business equipment—and, if so, when and for how long.[11]

Although the Court had cut down the Document Requests to the most essential documents, plaintiffs did not timely produce <u>any</u> of these documents by the deadline specified in the March 31, 2015 Order.  (<u>See</u> Declaration of Robert

---

[10] Plaintiffs once again make the argument that their tax returns were requested <u>solely</u> because they are relevant to the issue of forgery.  While defendants may have linked tax returns to forgery in one of their submissions, the Document Requests are not so narrowly worded.  (<u>See</u> Defendants' First Document Requests to Plaintiffs ("Document Requests") ¶ 21 (requesting "[a] copy of each Plaintiff's United States income tax return for the years 2005 to date"), ECF No. 150-1.)  In any event, plaintiffs raised this argument at the April 16, 2015 conference—and the Court made clear that handwriting verification is not the sole, or even the most important, purpose of the tax returns.  (<u>See</u> 4/16/2015 Tr. 17:1-20, 38:7-40:21, ECF No. 132.)

[11] Plaintiffs argue that "[u]se of a credit card machine has nothing to do with whether leases were forged."  The Court disagrees.  While use of a credit card machine is not determinative of the issue of forgery, it is certainly relevant evidence.

Lillienstein dated May 22, 2015 ("Second Lillienstein Decl.") ¶ 4, ECF No. 250.)

After this deadline elapsed, defendants filed motions for sanctions against plaintiffs

for failure to comply with the March 31, 2015 Order.  (ECF Nos. 106, 110.)

Although sanctions would have been appropriate, the Court did not impose

sanctions at that time.  Instead, on April 16, 2015, the Court held an in-person

hour-long status conference with the parties.  At that conference, the Court made it

crystal clear that it was giving plaintiffs one last chance to produce all of the

documents listed in the March 31, 2015 Order—and that failure to make a complete

production without an adequate justification would result in the dismissal of

plaintiffs' claims.  (See 4/16/15 Tr. 14:1-23, 15:10-12, 32:14-72.)  By Order dated

April 17, 2015, the Court gave plaintiffs 30 days to make this production, again

reminding them that this was their "last opportunity to meet their discovery

obligations."  (4/17/15 Order at 2, ECF No. 124.)

Despite these repeated warnings, plaintiffs have not produced all—or even

substantially all—of the documents listed in the March 31, 2015 Order, leading

defendants to file the instant motion for sanctions.[12]  (See Second Lillienstein Decl.

¶ 8 (chart).)  None of the plaintiffs have produced personal bank statements for any

period of time—and only two (Elder and Murrell) produced (a very limited number

of) business bank statements.[13]  (Id. ¶¶ 8, 10.)  None have produced any

---

[12] Plaintiffs argue that the motion is procedurally improper because defendants failed to "meet and confer."  However, the Court was clear what needs to be produced and by when; a further "meet and confer" was unnecessary.

[13] Plaintiffs assert that personal bank statements were never requested, and were not encompassed within the Court's orders.  This is not so.  Defendants made specific requests for personal "and/or" business bank statements of each plaintiff (see Document Requests ¶¶ 61, 79, 96, 116, 133, 150, 166,

employment/termination documents, or documents reflecting plaintiffs' borrowing history and credit applications.  (Id. ¶¶ 13, 17.)  None have produced any merchant processing agreements—and only two (Bhagwanani and Greene) produced (a few months of) merchant processing statements.  (Id. ¶ 16.)  Five plaintiffs have not produced any tax returns—and the two who did (Goyal and Shabnam) did so for one year only, even though defendants had requested tax returns for the years 2005 to date.  (Id. ¶¶ 11-12.)  Three of the plaintiffs (Glynn, Shabnam, Murrell) have not produced any cancelled checks; the remaining four plaintiffs have produced only a few cancelled checks each, even though defendants had requested 15.  (Id. ¶ 14.)  Six plaintiffs have not produced any corporate documents—and the one who did (Murrell) produced no corporate minutes or agreements for her corporation.  (Id. ¶ 15.)

In an attempt to justify their non-production of court-ordered discovery, plaintiffs submitted one-page declarations.[14]  The thrust of these declarations—and of plaintiffs' opposition to the instant motion—is, "We cannot produce what we do not have."  In that regard, each of the declarations (except for that on behalf of Elder[15]) begins with the same boilerplate statement:

---

183)—and the Court's orders listed documents by reference to the Document Requests.  (See 3/31/15 Order at 2 n.1.)

[14] The similarity of language across these declarations suggests that the declarations (except, perhaps, that submitted on behalf of plaintiff Elder) were written by plaintiffs' counsel.  At the April 16, 2015 conference, however, the Court had agreed with defense counsel that any declarations should be written by plaintiffs themselves.  (See 4/16/15 Tr. 31:2-7.)

[15] Elder did not submit a declaration, but his wife did.  According to her declaration, Elder was in a serious car accident and has been hospitalized since April 24, 2015.  (Second Lillienstein Decl. Ex. C.)

> I have reviewed the Court Order, dated March 31, 2015, April 17, 2015, and the list of documents required to be produced thereunder. Thereupon, I carefully checked all my records, and have produced all such responsive documents which are in my possession, custody, and/or control.

(See Second Lillienstein Decl. Exs. B, D, E, F, G, I.)  However, this conclusory statement cannot relieve plaintiffs of their discovery obligations.  At the April 16, 2015 conference, the Court told plaintiffs that any deficiencies in their production must be accompanied by declarations setting forth what documents are missing and why.  (See Tr. 30:16-31:4, 41:7-13.)  The Court did not, however, state or suggest that plaintiffs could satisfy their obligations with a boilerplate conclusory statement that they have produced everything they have.  Here—and as set forth below—each plaintiff has failed—without justification—to produce a host of court-ordered documents that are in his or her control.

At least two plaintiffs also assert that bank records are unavailable because their bank accounts were closed several years ago.  In that regard, the Court notes that plaintiffs brought this action in January 2012 and that litigation holds should have attached at that time.  There is therefore no excuse for missing records at least since the time this litigation was reasonably likely or as of the filing of the original complaint.  A failure to implement such holds does not excuse or justify plaintiffs' non-production of relevant documents.  In addition, it is unclear to the Court how counsel could have—consistent with Rule 11—investigated the claims based on allegations relating to bank accounts and credit issues with no records.

**Bhagwanani.**  Aside from handwriting exemplars, illegible photos of three cancelled checks, a driver's license, and a few months of merchant processing statements (July 2008 to March 2009), plaintiff Bhagwanani has not produced any of the documents listed in the March 31, 2015 Order.  Bhagwanani's declaration states that no employment or termination documents exist, that his business bank account at Bank of America was closed several years ago, that he has no bank statements in his possession, and that Bank of America advised him that no records exist.[16]  (See Second Lillienstein Decl. Ex. B.)   In light of Bhagwanani's allegations that defendants withdrew money from his business bank account (Compl. ¶55)—and that he closed that account to stop the unauthorized transactions (id. ¶ 56)—it is surprising that he did not retain any bank account statements in order to prove such allegations.  Bhagwanani also does not specify when his business bank account at Bank of America was closed—and whether appropriate litigation holds were in place at that time.

In any event, Bhagwanani's declaration does not address the missing tax returns[17], the missing bank statements for his personal bank account, the missing corporate records, and the missing documents concerning his borrowing history and credit applications.  Without these documents—all of which are within Bhagwanani's control—defendants cannot confirm or disprove Bhagwanani's

---

[16] The document from Bank of America that Bhagwanani attached to his declaration states that there are no accounts "under the name of NITESH BHAGWANANI."  The Court notes that it is possible that Bhagwanani's business account was under the name of his company or one of his partners.

[17] Bhagwanani produced only one page of one federal tax return.  (See Second Lillienstein Decl. ¶ 8.)

14

allegations that his personal bank account was frozen (Compl. ¶ 60), that defendants' adverse entries in his personal consumer credit report "caused him tremendous damage" (id. ¶ 64), and that his "credit was ruined" (id. ¶ 74). Bhagwanani's declaration also does not explain his failure to produce any merchant processing agreements and his decision to limit his production of merchant processing statements to the period from July 2008 to March 2009 (even though the Document Requests requested all such statements from January 2008 to date). Bhagwanani's repeated defiance of the Court's orders to produce this discovery warrants dismissal of his claims with prejudice.

    **Elder.**  Apart from handwriting exemplars, one cancelled check from June 2009, a driver's license, and one business bank statement from January 2010, plaintiff Elder has not produced any documents listed in the March 31, 2015 Order. In particular, Elder has not produced any tax returns, statements for his personal bank account(s), employment or corporate records, documents concerning his borrowing history and credit applications, and merchant processing agreements and statements.  These documents are all within Elder's control and are critical to verifying his allegations that, for instance, he sold his business in June 2011 (Compl. ¶ 77) and his "credit was ruined" (id. ¶ 89).  Moreover, while Elder alleges that he discovered in June 2011 that defendants had been making electronic deductions from his business account, he only produced one business bank account statement for January 2010.  Needless to say, this is insufficient.

The Court understands that plaintiff Elder sustained a serious head injury in an automobile accident on April 24, 2015.  (See Second Lillienstein Decl. Ex. C.) While the Court has no reason to believe that Elder would have produced more documents had this unfortunate accident not occurred, the Court will give this plaintiff **10 days** to make a proffer (accompanied by medical records) as to how, if at all, this accident impacted his ability to produce discovery—and whether he intends to supplement his production within a reasonable time.

**Glynn.**  Plaintiff Glynn has not produced any of the documents listed in the March 31, 2015 Order except for handwriting exemplars and a driver's license. Glynn's declaration states that she is a retired school teacher and has not been employed since 1998, so "neither employment records nor such documents as, corporate records, bank statements, and/or merchant statements exist."  (See Second Lillienstein Decl. Ex. D.)  The declaration also states that Glynn's husband has objected to production of their joint tax returns.  (Id.)

These statements do not justify Glynn's failure to produce court-ordered discovery.  Central to Glynn's case is the allegation that she has never been associated with the merchant (a laundromat) named as lessee in the alleged lease. (See Compl. ¶¶ 92-93.)  Tax returns are highly relevant in this regard: they would reveal whether or not Glynn was in fact associated with the particular laundromat—and, if so, during what periods of time.  On May 20, 2015, the Court denied Glynn's application to withhold her tax returns and ordered their production.  (ECF No. 144.)  Glynn chose to disobey the Court's order.  Glynn also

16

has not explained her failure to produce canceled checks, bank statements for her personal bank account, and documents concerning her borrowing history and credit applications.  The latter are particularly important in light of Glynn's allegations that defendant's adverse entries in her personal credit report "caused her tremendous damage" (Compl. ¶ 104) and that her "credit was damaged" (id. ¶ 108). Glynn's repeated disregard of the Court's discovery orders warrants dismissal of her claims with prejudice.

**Goyal.**  Aside from handwriting exemplars, three cancelled checks from 2008, a driver's license, and 2005 tax returns, plaintiff Goyal has not produced any of the documents listed in the March 31, 2015 Order.  Goyal's declaration explains that he was "working for [his] corporation at that time" and that no employment or termination documents exist.  (See Second Lillienstein Decl. Ex. E.)  The declaration also states that Goyal's business had a bank account with Bank of Anderson in South Carolina, but the account was closed several years ago and he has no documents in his possession except for the checks that he produced.  Finally, the declaration states that Goyal has no merchant processing agreements or statements in his possession and cannot "recall the name of the company which was processing the payments at that time."

These explanations are inadequate.  Goyal alleges that defendants commenced automatic deductions from his business accounts (plural) in 2006 (Compl. ¶ 110); to test this allegation, defendants need Goyal's business bank account statements.  If these statements were not in Goyal's "possession," he should

have asked his bank for them or signed up for an online account through which they would be accessible.  To the extent Goyal alleges that his bank no longer has any records of his closed account, he does not specify when his account was closed—and whether appropriate litigation holds were in place at that time.  Goyal also alleges that when defendants' agent approached him to sell credit card processing services, he already had a credit card processing machine in each of his stores (Compl. ¶ 109); to test this allegation, defendants need Goyal's merchant processing agreements and statements.  Goyal cannot justify his failure to produce these documents simply by saying that he cannot recall the name of the company that processed the payments—without, at the very least, detailing the steps he took to acquire this information.

In any event, the declaration does not even attempt to justify Goyal's failure to produce other important documents, including tax returns and documents concerning Goyal's borrowing history and credit applications.  While Goyal alleges that the unauthorized deductions from his bank accounts began in the summer or fall of 2006 (Compl. ¶¶ 109-10)—and that he "discovered these deductions in March 2007 while doing his taxes" (id. ¶ 111)—he inexplicably limited his production of tax returns to the year 2005.  And while Goyal alleges that defendants' adverse entries on his personal credit report "caused him tremendous damage" (Compl. ¶ 121) and that his "credit was ruined" (id. ¶ 130), he chose to disregard the Court's multiple orders to produce documents concerning his borrowing history and credit

applications.  Goyal's claims, too, shall be dismissed with prejudice for his willful disregard of the Court's discovery orders.

**Greene.**  Plaintiff Greene has not produced any of the documents listed in the March 31, 2015 Order except for handwriting exemplars, two cancelled checks, a driver's license, and six months of merchant processing statements (from December 2005 to June 2006).  Greene's declaration states that, "with respect to employment and termination documents, I was working for my company at that time and no such documents exist or ever existed."  (See Second Lillienstein Decl. Ex. F.)  The declaration further states that Greene used to have a business account at SpiritBank, but SpiritBank was later sold to RCB Bank and neither bank has any records of her account.[18]  Even if these assertions are true, the declaration does not explain Greene's failure to produce other court-ordered documents, including tax returns, corporate records for her company, and documents concerning her borrowing history and credit applications.  Defendants are entitled to see these documents to test Greene's allegations that she closed her business in May 2006 (Compl. ¶ 132) and that her credit suffered as a result of defendants' adverse entries on her personal credit report (id. ¶ 144).  The Court ordered Greene to produce these documents on multiple occasions; her willful disregard of these orders warrants dismissal of her claims with prejudice.

---

[18] The declaration attaches a letter from RCB Bank stating that Greene's business was closed in May 2006 and that records are kept for five years only.

**Murrell.**  Like her co-plaintiffs, plaintiff Murrell has not complied with the Court's multiple discovery orders.  Murrell's production is limited to handwriting exemplars, a driver's license, articles of incorporation for her business, and three bank statements for her business account.  She claims in her declaration that she has placed an order for cancelled checks and that no employment documents exist. (See Second Lillienstein Decl. Ex. G.)  However, Murrell has offered no justification for her failure to produce other court-ordered discovery, including merchant processing agreements and statements[19], tax returns, or documents concerning her borrowing history and credit applications.  Murrell also has not explained why she produced only three months of bank statements even though the Document Requests encompassed the period January 2010 to date.  Without this discovery, defendants cannot confirm or disprove Murrell's allegations that she returned the credit card processing machine to defendants "promptly" after she discovered defendants' unauthorized deductions from her bank account (Compl. ¶ 148); that she closed her business bank account in January 2012 to prevent further withdrawals (id. ¶ 149); that alleged adverse entries on her personal credit report "caused her tremendous damage" (id. ¶ 154); and that her "credit was ruined" (id. ¶ 161).  Murrell's willful disregard of the Court's discovery orders warrants dismissal of her claims with prejudice.

_____

[19] Murrell acknowledges that her business used a credit card processing machine (Compl. ¶ 146 n.4), but asserts in her declaration that she does not have any separate merchant processing agreement or statements because "[a]ll our credit card transactions were directly reported in our bank statements, which have been produced."  However, Murrell produced only three months of business bank statements (November 2010 to January 2011)—and none of these statements appear to reflect any credit card transactions as credits.  (See Second Lillienstein Decl. Ex. H.)

**Shabnam.**  Plaintiff Shabnam has not produced any of the documents listed in the March 31, 2015 Order except for handwriting exemplars, a driver's license, and 2008 tax returns.  Shabnam's declaration states that Shabnam has been employed as a physician and did not have any business—and that, therefore, "no corporate records, bank statements, cancelled checks and/or merchant statements exist."  (Second Lillienstein Decl. Ex. I.)  Central to Shabnam's case is the allegation that she has never been associated with the merchant named as lessee in the alleged lease.  (See Compl. ¶ 162 ("Dr. Shabnam had never had any dealings with, and, indeed, had never even heard about Defendants.").)  Tax returns, statements from personal bank accounts, and employment records are highly relevant in this regard: they would establish Shabnam's sources of income during the relevant period and reveal whether or not Shabnam was ever associated with the subject merchant.  Yet, despite multiple court orders to do so, Shabnam has not produced any employment records or bank account statements, and has produced only one tax return (for 2008).  Shabnam also has not produced any documents concerning her borrowing history and credit applications, which are necessary to confirm or disprove her allegations that alleged adverse entries on her personal credit report "caused her tremendous damage" (Compl. ¶ 170) and that her "credit was ruined" (id. ¶ 179).  Shabnam's claims, too, are dismissed with prejudice.

III.   CONCLUSION

Plaintiffs have repeatedly defied the Court's orders to produce discovery.  The documents that plaintiffs have refused to produce were first requested in August

21

2014—almost a year ago.  Since then, plaintiffs have been ordered to complete their production on multiple occasions—and warned that their claims would be dismissed unless such production was made.  Until very recently, plaintiffs' general position had been not that they sought but could not obtain the documents—but that these documents are irrelevant and the Court should not compel their production.  (See, e.g., 3/13/15 Letter, ECF No. 87.)  When the Court did issue orders compelling their production, plaintiffs chose not to comply with those orders.  Plaintiffs' non-production of relevant documents—and facially inadequate excuses offered for such non-production—were similar across plaintiffs.  It also appears that at least several plaintiffs may not have implemented appropriate litigation holds at the inception of this action (at the very least plaintiffs have not represented that such holds had been implemented).  In light of all of these circumstances and upon carefully considering the SNET factors, the Court finds that plaintiffs' non-production of court-ordered discovery was willful and in bad faith—and that their non-compliance was lengthy in duration and highly prejudicial to defendants.  The Court also finds that, in light of plaintiffs' history of defying court orders and neglecting their discovery obligations, a sanction short of dismissal would be ineffective.  The drastic remedy of dismissal with prejudice is appropriate.

The Court is mindful that plaintiffs are individuals who may not have significant resources.  However, plaintiffs chose to bring this action in federal court and to assert very serious, resource-consuming claims against defendants.  As such,

22

plaintiffs had an obligation to produce significant discovery, including documents that may undercut their claims or support certain defenses.

For the foregoing reasons, defendants' motion is GRANTED and the Second Amended Complaint is DISMISSED with prejudice as to all plaintiffs except plaintiff Elder, whose claims are DISMISSED without prejudice.  Within **10 days** from the date of this Opinion & Order, Elder shall make a proffer (accompanied by medical records) as to how, if at all, his car accident impacted his ability to produce discovery—and whether he intends to supplement his production within a reasonable time.

The Clerk of Court is directed to terminate the motion at ECF No. 149.  The Clerk of Court is directed to terminate this action as to all plaintiffs except plaintiff Angermeir.

SO ORDERED.

Dated:        New York, New York
              June 17, 2015

_____
       KATHERINE B. FORREST
       United States District Judge